No. 23-60641

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

MAURINE MOLAK;
MATTHEW MOLAK,

*Petitioners*,

v.

FEDERAL COMMUNICATIONS COMMISSION;
UNITED STATES OF AMERICA,

*Respondents*.

_____

Petition for Review of an Order
of the Federal Communications Commission,
FCC 23-84

BRIEF FOR AMICUS CURIAE PROFESSOR ADAM CANDEUB IN SUPPORT
OF PETITIONERS

James M. Burnham
King Street Legal, P.L.L.C.
800 Connecticut Ave, N.W., Suite 300
Washington, D.C. 20006
(602) 501-5469
james@kingstlegal.com

*Counsel for Amicus Curiae*

**SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS**

**No. 23-60641,** *Molak v. FCC*

Under Federal Rule of Appellate Procedure 26.1 and Fifth Circuit Rules 28.2.1 and 29.2, the undersigned counsel of record certifies that in addition to the persons and entities listed in the parties' principal briefs, the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made so that the judges of this Court may evaluate possible disqualification or recusal:

**1.** Adam Candeub (*Amicus Curiae*)

**2.** James M. Burnham (Counsel for *Amicus Curiae*)

April 5, 2024

*/s/ James Burnham*

*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ ii

INTEREST OF *AMICUS CURIAE* ................................................................. 1

INTRODUCTION .............................................................................................. 1

ARGUMENT ....................................................................................................... 3

I.     SECTION 254'S TEXT AND HISTORY SHOWS THAT THE SCHOOLS AND LIBRARIES PROGRAM IS TARGETED AND FOCUSED ON PROVIDING INTERNET CONNECTIONS TO CLASSROOMS. ............................... 3

II.    THE FCC'S PRIOR EXPANSION OF SECTION 254'S SUBSIDY TO SUPPORT BROADBAND PROVIDERS AND INTERNAL CONNECTIONS DOES NOT JUSTIFY EXPANDING THE SUBSIDY TO WI-FI ON BUSES. ..................... 9

III.   IF FOUND AMBIGUOUS, THE DECLARATORY RULING FAILS CHEVRON. .......... 12

CONCLUSION .................................................................................................. 15

# TABLE OF AUTHORITIES

**Supreme Court Cases**

*Chevron v. NRDC*, 467 U.S. 837 (1984) ............................................................. 2, 10, 11, 14

*Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.,* 545 U.S. 967 (2005).................. 5

**United States Courts of Appeals Cases**

*Ill. Bell Tel. Co. v. Worldcom Techs., Inc.*, 179 F.3d 566 (7th Cir. 1999) ................................ 5

*Tex. Off. of Pub. Util. Couns. v. FCC*, 183 F.3d 393 (5th Cir. 1999) .......................... *passim*

**Statutes**

47 U.S.C. § 214(e) ......................................................................................................... 8

47 U.S.C. § 153(50) ....................................................................................................... 5

47 U.S.C. § 153(53) ....................................................................................................... 5

47 U.S.C. § 254 ..................................................................................................... *passim*

Pub. L. No. 104-104, 110 Stat. 56 (1996) ....................................................................... 6

**Administrative Materials**

*Addressing the Homework Gap through the E-Rate Program*, FCC 23-91, WC Docket No. 21-31, at 2, 24–25 (Nov. 8, 2023) ..................................................................................... 12

*E-Rate Program for Schools and Libraries*, FCC 23-84, Declaratory Ruling WC Docket No. 13-184 (Oct. 25, 2023) ...................................................................................... *passim*

*Fed.-State Joint Bd. on Universal Serv.*, 12 FCC R. 8776 (1997) ......................................... 8, 9

*Fed.-State Joint Bd. on Universal Serv.*, 13 FCC R. 11,501, 1998 WL 166178 (1998) ......... 5

*Performance Measurements & Reporting Requirements for Operations Support Sys., Interconnection, & Operator Servs. & Directory Assistance*, 13 FCC R. 12817 (1998) ................................. 5

*Preserving the Open Internet Broadband Indus., Pracs.*, 25 FCC R. 17905 (2010).................... 6

*Schs. & Librs. Universal Serv. Support Mechanism*, WC Docket No. 02-6, Sixth Rep. & Ord., 25 FCC R. 18762 (2010) ......................................................................................... 4, 10

**Other Authorities**

Gerald W. Brock, *Telecommunication Policy for the Information Age* (1994)............................ 7

James B. Speta, *Deregulating Telecommunications in Internet Time*, 61 Wash. & Lee L. Rev. 1063 (2004)............................................................................................................................. 7

Jonathan Haidt, *The Anxious Generation: How the Great Rewiring of Childhood is Causing an Epidemic of Mental Illness* (2024) .......................................................................................13–14

Reed E. Hundt, *You Say You Want a Revolution: A Story of Information Age Politics* (Yale Univ. Press 2000).................................................................................................................... 8

U.S. Surgeon General's Advisory, *Social Media and Youth Mental Health* (2023)............. 13

# INTEREST OF *AMICI CURIAE*[1]

Adam Candeub is a professor of law at Michigan State University and a Senior Fellow at the Center for Renewing America. A former attorney advisor at the Federal Communications Commission and Acting Assistant Secretary of Commerce for the National Telecommunications and Information Authority, he has a deep interest in the lawful development of telecommunications regulation and policy that benefits all Americans. He has written extensively about the history and interpretation of the Telecommunications Act of 1996, which created the schools and libraries subsidy program at issue in this case, as well as the effect of social media and other online experiences on young people. The order of the Federal Communications Commission, which petitioners challenge, is an unlawful exercise of its statutory authority and may damage American students' health and diminish their educational achievement.

## INTRODUCTION

The FCC's order entitled *Modernizing the E-Rate Program for Schools and Libraries*, FCC 23-84, WC Docket No. 13-184 (Oct. 25, 2023) (Declaratory Ruling), expands Section 254's E-Rate subsidy from internet connections for school classrooms and libraries to Wi-Fi on school buses. The Declaratory Ruling ignores Section 254's text

---

[1] All parties have consented to the filing of this brief. *See* Fed. R. App. P. 29(a)(2). No counsel for any party authored this brief in whole or part, and no person or entity other than *amici*, their members, or their counsel made a monetary contribution intended to fund the preparation or submission of this brief. *See id.* 29(a)(4)(E).

and purpose. The provision's text requires phone companies, i.e., "telecommunications carriers," that receive subsidies through the universal service fund, a subsidy program that the Telecommunications Act of 1996 created, to provide lower rates to schools and libraries for "telecommunication services." These services refer to furnishing what was typically called "plain old telephone service" or "POTS." And this is hardly surprising. In 1996, most internet was through over-the-phone dial-up; internet service was bought separately, often from a different provider (*i.e.*, an internet service provider (ISP), such as AOL or Prodigy).

Despite the statutory text's clear focus on POTS, in the late 1990s, the FCC successfully expanded the Section 254 subsidy to include both broadband internet service and internal connections within a school on the back of judicial deference this Court afforded in *Texas Off. of Pub. Util. Couns. v. FCC*, 183 F.3d 393, 406 (5th Cir. 1999). This Court made perfectly clear its disagreement with the FCC's interpretation of Section 254, but it ruled that under *Chevron v. NRDC*, 467 U.S. 837 (1984), it had to affirm the FCC's dubious expansion of E-Rate.

Floating on these vapors of *Chevron* deference, the FCC now seeks even more: a further expansion of E-Rate based on a total textual demolition of Section 254. The statute refers to "enhanc[ing] access" for "classrooms" and "libraries" and contemplates "telecommunications carriers" providing discounted "services to elementary schools, secondary schools, and libraries." 47 U.S.C. § 254(h)(1)(B). But the FCC's Declaratory Ruling now interprets that language to include internet access on

*buses.* This interpretation should receive no deference because there is no ambiguity: classrooms and schools are not buses. The FCC's basis for expanding Section 254's subsidy to buses is not based on the statute's text but on interpreting its own orders.

Finally, to the degree the Court finds ambiguity in Section 254, the FCC's decision fails at *Chevron* step 2 because its interpretation is unreasonable. The purpose of Section 254 is to promote access to educational materials in classrooms and libraries—under the supervision of teachers and librarians. Unsupervised Wi-Fi bus access is more than likely to facilitate access to insalubrious material like social media, which extensive evidence shows harms children. The FCC's interpretation of Section 254 does not reflect a reasoned and deliberate policy with a sound educational purpose to help students, and therefore is not a "permissible reading" of the statute that *Chevron* step 2 requires. In this light, the FCC's ruling, despite its claims to help close the so-called "homework gap," can be viewed as simply an old-fashioned, smoke-filled backroom deal to provide more government subsidies to social media platforms by giving them a new venue to push advertising and harmful content on children.

## ARGUMENT

I. **SECTION 254'S TEXT AND HISTORY SHOWS THAT THE SCHOOLS AND LIBRARIES PROGRAM IS TARGETED AND FOCUSED ON PROVIDING INTERNET CONNECTIONS TO CLASSROOMS.**

The Declaratory Ruling makes little effort to base its conclusions on Section 254's statutory text. Instead, quoting its own orders, the FCC states that the only limit the FCC places on the subsidy is that schools and libraries must use "E-Rate-supported

services 'primarily for educational purposes.'" Declaratory Ruling ¶ 4 (quoting *Schs. & Librs. Universal Serv. Support Mechanism*, WC Docket No. 02-6, Sixth Rep. & Ord., 25 FCC R. 18762, 18774, ¶ 22 (2010)). The Commission again quotes its own definition of "educational purposes" as "activities that are integral, immediate, and proximate to the education of students." *Id.* Relying on its own precedent, the FCC concludes that "Wi-Fi . . . on school buses serves an educational purpose and, therefore, the service and equipment that enable it are eligible for E-Rate funding." Declaratory Ruling ¶ 9.

This conclusion is a "mockery of the law." Declaratory Ruling, Dissent of Commissioner Simington. As Commissioner Simington explains, "[i]f Congress had meant for E-Rate to apply to any educational purpose, broadly defined, it would have said so. Instead, it specifically limited the applicability of the program to schools and libraries." *Id.*

Section 254 is, indeed, a "specifically limited," focused subsidy, requiring "telecommunications carriers" to provide "services" at "rates less than the amounts charged for similar services to other parties." 47. U.S.C. § 254(h)(1)(B); *see also id.* § 254(h)(2)(A) (referring to "classroom" and "libraries" specifically). The statute's best reading, as the Fifth Circuit recognized in *Tex. Off. of Pub. Util. Couns.*, 183 F.3d at 440, is that Section 254 requires that schools and libraries receive discounted phone lines from telecommunications carriers, which, in 1996, provided nearly all internet access through dial-up.

The text supports that reading. The statute defines telecommunications carriers as "any provider of telecommunications services." Telecommunications services, in turn, "means the offering of telecommunications for a fee directly to the public." 47 U.S.C. § 153(53). And "telecommunications" means "the transmission, between or among points specified by the user, of information of the user's choosing . . . ." *Id.* § 153(50).

This definition of telecommunications services, though abstruse, was widely recognized to refer primarily to POTS. Contemporaneously with enactment, the FCC typically stated that "telecommunications services" include "1) residential POTS; 2) business POTS; and 3) special services." *Performance Measurements & Reporting Requirements for Operations Support Sys., Interconnection, & Operator Servs. & Directory Assistance*, 13 FCC R. 12817, 12840 (1998). As a matter of now ancient regulatory history, "[t]he special services category captures all non-POTS-type services, which require design intervention by the incumbent [local telephone companies] (*e.g.,* centrex, PBX trunks, channelized services, etc.)." *Id.* at 12840 n.70.

While POTS are "telecommunications services," old-fashioned dial-up internet access over POTS is an "information service." *Fed.–State Joint Bd. on Universal Serv.*, 13 FCC R. 11,501, 1998 WL 166178, at *29 n. 182 (1998); *see also Ill. Bell Tel. Co. v. Worldcom Techs., Inc.*, 179 F.3d 566, 574 (7th Cir. 1999), *as amended* (Aug. 19, 1999). Broadband access is also an "information service." *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet*

*Servs.*, 545 U.S. 967, 977–78 (2005) (upholding the "Commission conclu[sion] that broadband Internet service provided by cable companies is an 'information service'").

In 1996, virtually all internet access was provided through old-fashioned dial-up service through phone lines.[2] Internet access was typically purchased separately from early ISPs, such as AOL or Prodigy. Thus, Section 254's command to the FCC "to enhance, to the extent technically feasible and economically reasonable, access to advanced telecommunications and information services for all public and nonprofit elementary and secondary school classrooms," 47 U.S.C. § 254(h)(2)(A), refers to encouraging schools to have internet access in classrooms through discounted phone lines.

And the purpose and structure of Section 254—indeed, the entire Telecommunications Act of 1996,[3] of which Section 254 was a part—supports this interpretation. The Act had two goals. As this Court recognized, they were "[t]o attain the goal of local competition while preserving universal service." *Tex. Off. of Pub. Util. Couns.*, 183 F.3d at 406.

---

[2] *Preserving the Open Internet Broadband Indus. Pracs.*, 25 F.C.C. R. 17905, 17916 (2010) ("broadband providers have incentives to interfere with the operation of third-party Internet-based services that compete with the providers' revenue-generating telephony and/or pay-television services. This situation contrasts with the first decade of the public Internet, when dial-up was the primary form of consumer Internet access. Independent companies such as America Online, CompuServe, and Prodigy provided access to the Internet over telephone companies' phone lines.").

[3] Pub. L. No. 104-104, 110 Stat. 56 (1996).

These goals were in tension. On one hand, the Act sought to encourage "local competition" in local phone service, and it abolished the legal protections and restrictions of the regional Bell monopolies ("Baby Bells") that had persisted since the breakup of AT&T in 1984. This allowed new entrants to compete with the Baby Bells. James B. Speta, *Deregulating Telecommunications in Internet Time*, 61 WASH. & LEE L. REV. 1063, 1097 (2004).

At the same time, the Act sought to maintain the AT&T system that encouraged widespread telephone service, i.e., "universal service," through lower residential and rural rates for telecommunications service, a/k/a POTS. Regulators required "the carrier to charge 'above-cost' rates to low-cost, profitable urban customers to offer the 'below-cost' rates to expensive, unprofitable rural customers." *Tex. Off. of Pub. Util. Couns.*, 183 F.3d at 406. This policy produced a complex subsidy scheme, both before and after the AT&T breakup. *See* Gerald W. Brock, *Telecommunication Policy for the Information Age* 173–94 (1994).

Thus, in a competitive environment, this subsidy scheme would fail because telecommunications carriers would "cream-skim" the most profitable-to-serve customers, leaving poorer, rural customers disconnected. To resolve that tension, Section 254 authorized the FCC to create "specific, predictable and sufficient Federal and State mechanisms to preserve and advance universal service," 47 U.S.C. § 254(b)(5), that were available not only to the Baby Bells but to any new competitive local telephone service provider that could qualify as an "eligible telecommunications carrier." *id.* §

7

254(e); *see also id.* § 214(e) (describing the ETC designation process). The theory was that by making subsidies for telecommunications services (POTS) available to all companies, the Telecommunications Act would eliminate the cream-skimming incentive.

In *Fed.-State Joint Bd. on Universal Serv.*, 12 FCC R. 8776 (1997), the FCC responded to this statutory command to create a subsidy regime for the new competitive local telephony by issuing an elaborate regulatory scheme—the order was over 700 pages long. Tacked onto this scheme of subsidizing local phone service was the "schools and libraries" or "E-Rate" program, which aimed to "put the Internet in every classroom." Reed E. Hundt, *You Say You Want a Revolution: A Story of Information Age Politics* 167 (Yale Univ. Press 2000). Reed Hundt, under whose chairmanship the FCC passed the Universal Service Order, described the program's genesis in his political memoir. In lobbying for the program, which he considered the "fulfill[ment of] the President's promise that all *classrooms* would be connected to the Net," *id.* at 167, he describes "the proposed amendment to empower the FCC to fund *classroom* connections" as "a small, almost unreported story." *Id. at* 108–09 (emphases added).

Regardless of how small the program was, it was part of a universal service regulatory program under Section 254 to subsidize *phone lines* provided by "telecommunications carriers." Neither its text nor purpose supports the FCC's view that Section 254 can subsidize any internet connection with an "educational purpose."

## II. THE FCC'S PRIOR EXPANSION OF SECTION 254'S SUBSIDY TO SUPPORT BROADBAND PROVIDERS AND INTERNAL CONNECTIONS DOES NOT JUSTIFY EXPANDING THE SUBSIDY TO WI-FI ON BUSES.

The Declaratory Ruling's logic that it has the authority to subsidize virtually any internet connection that serves educational purposes might be facially appealing because it follows from the FCC's asserted authority to subsidize all internet connections and access in classrooms. But this authority, in turn, rests on extraordinary judicial deference under *Chevron*, which in no way supports the FCC's textually implausible claim that it has statutory authority for buses.

The origins of the FCC's argument can be found in a 25-year-old case, *Tex. Off. of Pub. Util. Couns. v. FCC*, where this Court deferred to the FCC's determination that Section 254 allowed it to subsidize schools' "internal connections," *Fed.-State Joint Bd. on Universal Serv.*, 12 FCC R. 8776, 8794 ¶ 29 (1997), as well as "Internet access" even if not provided by a telecommunications carrier. *Id.* at 9002 ¶ 425. *See Tex. Off. of Pub. Util. Couns.*, 183 F.3d at 440.

While affirming these interpretations, this Court recognized that the *challenger* to the FCC's actions—the telecommunications carrier GTE, who argued that Section 254 permitted subsidizing *only* telecommunications carriers for telecommunications services—offered the more "persuasive reading of the statute." As discussed above, this Court deferred to the FCC's interpretation under "Chevron step two" because the statute was "not . . . sufficiently unambiguous." *Id.* at 442–43. The Court continued that "[a]lthough we agree with [plaintiff] that the statute and its legislative history do not

support the FCC's interpretation, the language of the statute is ambiguous enough to require deference under *Chevron* step-two." *Id.* at 440.

This Court's affirmance was grudging, as it concedes "[t]he best reading of the relevant statutory language nonetheless indicates that the FCC exceeded its authority by mandating discounts for internet access and internal connections." *Id.* at 441. In upholding the FCC's decision under *Chevron* to expand the statutory text, the Court relied on the fact that the "agency's primary directive is to 'enhance access to advanced telecommunications and information services' for schools and libraries." *Id.* at 444.

The Declaratory Ruling, however, does not hew to Section 254's text *or* the agency's "primary directive." The FCC points to no statutory "gap for an agency to fill" or need to "elucidate a specific provision of the statute by regulation." *Chevron*, 467 U.S. at 843–84. Moreover, it points to no ambiguity within the statute that it resolves. Rather, it supports its conclusions with its own orders, which had been upheld in *Tex. Off. of Pub. Util. Couns.* under *Chevron*. It asserts that E-Rate allows subsidizing any "services" that are "primarily for educational purposes." Declaratory Ruling ¶ 6 (citing *Schs. & Librs. Sixth Rep. and Ord.*, 25 FCC R. 18762, 18774, ¶ 22 (2010)). The FCC explained that while it usually required services to be on school premises in the past, it made a few exceptions, such as a school bus driver's use of wireless phones or librarians in a mobile library.

Relying on the previous deference to its expanded interpretation of Section 254, the FCC states:

> Consistent with our precedent, we therefore clarify that the use of Wi-Fi, or other similar access point technologies, on school buses, as well as any E-Rate-eligible equipment needed to enable these services, meets our definition of an educational purpose and the provision of such services is eligible for E-Rate funding.

Declaratory Ruling ¶ 12. But it is fundamental administrative law that an agency does not get authority from its own precedent; it receives authority only from statutes. Therefore, "[i]f the intent of Congress is clear, that is the end of the matter; for . . . the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron,* 467 U.S. at 843.

The FCC's Declaratory Ruling does not discuss how a subsidy intended to encourage "services to elementary schools, secondary schools, and libraries for educational purposes" includes school buses. Schools are not school buses. Nor is "schools" an ambiguous term. Even under *Chevron,* the FCC's interpretation of this term receives no deference.

As Commissioner Carr states in his dissent, quoting a July 31, 2023 letter from Sen. Ted Cruz, Ranking Member, Senate Committee on Commerce, Science, and Technology, and Rep. Cathy McMorris Rodgers, Chair, House Committee on Energy and Commerce, to FCC Chair Jessica Rosenworcel, the "FCC's 'E-Rate authority is explicitly confined to classrooms.'" Commissioner Simington is even more forthright: "The Telecommunications Act could not state more clearly that E-Rate may only be used to subsidize internet connectivity for elementary schools, secondary schools, and

libraries, and a school bus is neither a school nor a library. This item eviscerates Congress's restrictions on E-Rate."[4]

## III. IF FOUND AMBIGUOUS, THE DECLARATORY RULING FAILS CHEVRON.

In his dissent, Commissioner Simington points out that "anyone who has ever ridden a school bus should be skeptical that any significant proportion of children will sit quietly and do homework on their laptops instead of socializing with their friends on the bus and browsing social media on their phones." The majority brushes this concern aside, concluding that Section 254 allows subsidies for internet access for any "educational purpose." But as shown above, Section 254 was intended to subsidize internet connections for classroom or library use, where there was some supervision to ensure an educational purpose.

It is a real question, though, whether unsupervised internet access on buses—where children will likely be on social media—provides an "educational purpose" or

---

[4] Concerns that the FCC will use E-Rate subsidies to subsidize internet infrastructure anywhere in the United States are quite real. The FCC is already planning to do so. Pointing to the Declaratory Ruling as precedent, the FCC recently issued a notice of proposed rulemaking (NPRM) to fund Wi-Fi hotspots and Internet access services anywhere that students could use them for homework. *Addressing the Homework Gap through the E-Rate Program*, FCC 23-91, WC Docket No. 21-31, at 2, 24–25 (Nov. 8, 2023), https://docs.fcc.gov/public/attachments/FCC-23-91A1.pdf. The decision to issue the NPRM was 3–2; Commissioners Carr and Simington dissented. Commissioner Simington stated: "This proposed E-Rate expansion is even more lawless and wasteful than the last. Just a few weeks ago, we were told that school buses are actually classrooms. Today, we are asked to believe that when Congress says schools, classrooms, and libraries, it actually means private homes, offices, amusement parks, and, really, anywhere and everywhere a mobile hotspot could be used." *Id.* at 53.

instead harms children. President Biden's Surgeon General Vivek Murthy seems to have said the latter via a 2023 advisory warning that social media poses "a profound risk of harm to the mental health and well-being of children and adolescents." U.S. Surgeon General's Advisory, *Social Media and Youth Mental Health* (2023), https://tinyurl.com/bdz9ts7e. The most recent research supports the Surgeon General's conclusion. In his 2024 book, *The Anxious Generation: How the Great Rewiring of Childhood is Causing an Epidemic of Mental Illness,* the eminent New York University psychologist Jonathan Haidt provides the most comprehensive survey to date of the existing evidence about the effects of internet-connected "phone-based childhood." He identifies its four "foundational harms": social deprivation, sleep deprivation, attention fragmentation, and addiction. *Id.* at 139-40.

Haidt demonstrates that smartphones have led to a decline in the time that young people spend with friends. For 15- to 24-year-olds, this decline has been from around 150 minutes per day to just over 40. Drawing on the trailblazing work of psychology professor Jean Twenge, Haidt shows that this shift is harmful. "[T]eens who spend more time using social media are more likely to suffer from depression, anxiety, and other disorders, while teens who spend more time with groups of young people . . . have better mental health." *Id.* at 121. Buses are a great time to interact with friends. Internet access may thus interfere with activities necessary for children's mental health.

As Haidt points out, "[w]hen adolescents have continuous access to a smartphone at that developmentally sensitive age, it may interfere with their maturing

ability to focus." *Id.* at 128. People report a decreased "ability to focus and reflect because [they] now craved a constant stream of stimulation." *Id.* at 127. Certainly, looking out the window and having time to reflect (or be bored!) is an important part of childhood and self-development. And there is strong evidence that a "phone-based childhood exacerbate[s] existing ADHD symptoms . . ." *Id.* at 128. The FCC's decision does not show how making ADHD worse for students has "educational purposes."

Finally, Haidt points out that social media firms "intentionally hooked teens using behaviorist techniques." *Id.* at 133. Haidt notes that "[w]hen we gave children and adolescents smartphones in the early 2010s, we gave companies the ability to apply variable-ratio reinforcement schedules all day long, training them like rats." *Id.* at 136. The FCC has no business subsidizing these reinforcement schedules, especially during bus rides.

Given the harms that children will face from unsupervised internet use in buses—let alone the lack of evidence that students, in fact, use the internet on school buses for homework—the Declaratory Order failed to show that Wi-Fi on buses is rationally related to "educational purposes" and thereby "a permissible construction of the statute" under *Chevron* step two. *Chevron*, 467 U.S. at 843.

# CONCLUSION

*Amicus* respectfully asks the Court to vacate the FCC's Declaratory Order.

April 5, 2024

Respectfully submitted,

*/s/ James Burnham*
James M. Burnham
King Street Legal, P.L.L.C.
800 Connecticut Ave, N.W., Suite 300
Washington, D.C. 20006
(602) 501-5469
james@kingstlegal.com

*Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I certify that on April 5, 2024, I served a copy of the foregoing on all counsel of record by CM/ECF.

April 5, 2024                                     Respectfully submitted,

                                                  */s/ James Burnham*
                                                  James M. Burnham

                                                  *Counsel for Amicus Curiae*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume, typeface, and type-style requirements of limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(5)-(7), and Fifth Circuit Rules 29.2, 32.1, and 32.2. Excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) and Fifth Circuit Rule 32.2, the brief contains 3514 words and was prepared using Microsoft Word and produced in Garamond 14-point font.

April 5, 2024                                    Respectfully submitted,

*/s/ James Burnham*
James M. Burnham

*Counsel for Amicus Curiae*