No. 23-60641

## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

MAURINE MOLAK, MATTHEW MOLAK,

*Petitioners*,

v.

FEDERAL COMMUNICATIONS COMMISSION;
UNITED STATES OF AMERICA,

*Respondents.*

On Petition for Review of an Order of the
Federal Communications Commission

**JOINT BRIEF OF AASA–THE SCHOOL SUPERINTENDENTS
ASSOCIATION, AMERICAN FEDERATION OF SCHOOL
ADMINISTRATORS, AMERICAN FEDERATION OF TEACHERS,
AMERICAN LIBRARY ASSOCIATION, ASSOCIATION OF SCHOOL
BUSINESS OFFICIALS INTERNATIONAL, ASSOCIATION OF
EDUCATIONAL SERVICE AGENCIES, CONSORTIUM FOR SCHOOL
NETWORKING, NATIONAL ASSOCIATION OF ELEMENTARY
SCHOOL PRINCIPALS, NATIONAL CATHOLIC EDUCATION
ASSOCIATION, NATIONAL EDUCATION ASSOCIATION, AND
NATIONAL SCHOOL BOARDS ASSOCIATION
AS *AMICI CURIAE* IN SUPPORT OF RESPONDENTS**

Jennifer Tatel
L. Charles Keller
Travis E. Litman
Wilkinson Barker Knauer, LLP
1800 M Street NW, Suite 800N
Washington, DC 20036
(202) 783-4141
jtatel@wbklaw.com
*Counsel for Amici Curiae*

June 10, 2024

## CERTIFICATE OF INTERESTED PERSONS

Case No. 23-60641

*Maurine Molak, Matthew Molak*
*v.*
*Federal Communications Commission; United States of America*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Local Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

Petitioners

1. Maurine Molak

2. Matthew Molak

Respondents

3. Federal Communications Commission

4. United States of America

Intervenors

5. Benton Institute for Broadband & Society. It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

6. Schools, Health & Libraries Broadband Coalition. It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

i

Amici

7.  AASA – The School Superintendents Association.  It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

8.  American Federation of School Administrators.  It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

9.  American Federation of Teachers.  It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

10.  American Library Association.  It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

11.  Association of School Business Officials International.  It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

12.  Association of Educational Service Agencies.  It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

13.  Professor Adam Candeub

14.  Competitive Enterprise Institute.  It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

15. Consortium for School Networking.  It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

16. National Association of Elementary School Principals.  It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

17. National Catholic Educational Association.  It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

18. National Education Association.  It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

19. National School Boards Association.  It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

20. Senator Ted Cruz

21. Senator Marsha Blackburn

22. Senator Mike Braun

23. Senator Ted Budd

24. Senator James Lankford

25. Senator Cynthia Lummis

26. Senator Pete Ricketts

27. Texas Public Policy Foundation.  It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

Counsel

28. Jones Day: Yaakov M. Roth and David K. Suska are counsel for Petitioners.

29. Federal Communications Commission: P. Michele Ellison, Jacob M. Lewis, Sarah E. Citrin, and Rachel Proctor May are counsel for Respondent Federal Communications Commission.

30. United States Department of Justice: Robert B. Nicholson and Robert Wiggers are counsel for Respondent United States of America.

31. Andrew Jay Schwartzman is counsel for Intervenor Benton Institute for Broadband & Society.

32. Harris, Wiltshire & Grannis, LLP: Jason Neal is counsel for Intervenor Schools, Health & Libraries Broadband Coalition.

33. Wilkinson Barker Knauer, LLP: Jennifer Tatel, L. Charles Keller, and Travis Litman are counsel for *amici curiae* AASA – The School Superintendents Association, American Federation of School Administrators, American Federation of Teachers, American Library Association, Association of School Business Officials International, Association of Educational Service Agencies, Consortium for School Networking, National Association of Elementary School Principals,

National Catholic Educational Association, National Education Association, and National School Boards Association.

34. King Street Legal, P.L.L.C.: James Burnham is counsel for *amicus curiae* Professor Adam Candeub.

35. David Sean McFadden is counsel for *amicus curiae* Competitive Enterprise Institute.

36. Peele Nimocks Toth: Michael Christopher Toth, David Austin Robert Nimocks, and Christopher Peele are counsel for *amici curiae* United States Senators.

37. Consovoy McCarthy, P.L.L.C.: Thomas McCarthy and Tiffany Bates are counsel for *amicus curiae* Texas Public Policy Foundation.

*/s/ Jennifer Tatel*
Jennifer Tatel

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................................ i

TABLE OF AUTHORITIES ............................................................................... vii

INTEREST OF AMICI CURIAE ...........................................................................1

SUMMARY OF ARGUMENT .............................................................................5

ARGUMENT .......................................................................................................7

I.      E-RATE IS A RECOGNIZED SUCCESS IN CONNECTING STUDENTS
        AND LIBRARY PATRONS TO 21ST CENTURY OPPORTUNITIES AND
        LEARNING. ..............................................................................................7

II.     THE *DECLARATORY RULING* EMPOWERS SCHOOLS TO USE
        SCHOOL BUS WI-FI TO HELP CLOSE THE HOMEWORK GAP, AN
        ISSUE OF BIPARTISAN NATIONAL CONCERN. ...................................11

III.    SECTION 254 SUPPORTS PROVIDING OFF-CAMPUS
        CONNECTIVITY ....................................................................................18

        A.      The *Declaratory Ruling* Rests on a Lawful Basis ...............................19

        B.      In Any Event, School Buses Satisfy the Classroom Test Under Section
                254(h)(2)(A). .............................................................................21

        C.      The *Declaratory Ruling* is Consistent with Longstanding Precedent of
                Using E-Rate Funding to Support Off-Campus Connectivity for
                Educational Purposes. ..................................................................22

IV.     CONCLUSION ........................................................................................24

# TABLE OF AUTHORITIES

CASES

*Tex. Off. of Pub. Util. Couns. v. FCC*, 183 F.3d 393 (5th Cir. 1999)......................20

STATUTES

47 U.S.C. § 254(c)(3).................................................................................6, 19

47 U.S.C. § 254(h)(1)(B) .....................................................................6, 19, 21

47 U.S.C. § 254(h)(2)(A) ..........................................................................6, 21

47 U.S.C. § 254(h)(5)................................................................................16, 21

REGULATIONS

47 C.F.R. § 54.500 ........................................................................................19

OTHER AUTHORITIES

*16.9 Million Children Remain Logged Out Because They Don't Have Internet at Home*, All4Ed (July 21, 2020)................................................................12

*2018 State of the States*, EducationSuperHighway (Oct. 2018) .................9

*2019 State of the States*, EducationSuperHighway (2019) .........................9

*Addressing the Homework Gap Through the E-Rate Program*, Notice of Proposed Rulemaking, FCC 23-91 (rel. Nov. 8, 2023).........................................12

Alaa Elassar, *Texas School District Deployed Over 100 School Buses Equipped With WiFi For Students Without Internet Access*, KSAT.com (Apr. 15, 2020)...17

Amina Fazlullah & Stephanie Ong, *The Homework Gap:  Teacher Perspectives on Closing the Digital Divide*, Common Sense Media (2019) ..................................13

Austan Goolsbee & Jonathan Guryan, *The Impact of Internet Subsidies in Public Schools*, Nat'l Bureau of Econ. Rsch. (Aug. 2002)..........................................7, 10

Beth Spence, *Long School Bus Rides: Their Effect on School Budgets, Family Life, and Student Achievement*, Rural Education Digest (2000) ..................................15

Cameron Sibert, *Port Arthur ISD To upgrade school buses with Wi-Fi to Help Students*, 12 News (June 24, 2021) .......................................................16

Claudia Newton, *Districts Realize Unintended Benefits of Installing Wi-Fi on the School Bus*, School Transportation News (May 10, 2022) ...................16

Dr. Suzanne Lacey, Driving Change With Rolling Study Halls, Google Blog (Mar. 15, 2019)................................................................................................17

*E-Rate Schools*, Center for Public Education (2020) ................................8

*E-rate Trends Report*, Funds for Learning (2023)......................................8

*Fed.-State Joint Bd. on Universal Serv.*, Report and Order, 12 FCC Rcd 8776 (1997)................................................................................................20, 21

H. Res. 939, 114th Cong., 162 Cong. Rec. (2016) ....................................12

*Inquiry Concerning the Deployment of Advanced Telecommunications Capability to All Americans in a Reasonable and Timely Fashion*, 2024 Section 706 Report, FCC 24-27 (rel. Mar. 18, 2024)................................................................9

Jane Arnold Lincove, et al., *New Orleans Students' Commute Times by Car, Public Transit, and School Bus*, Urban Inst. (Sept. 2018)................................15

John Wells & Laurie Lewis, *Internet Access in U.S. Public Schools and Classrooms: 1994-2005*, U.S. Dept. of Ed., Nat'l Center for Ed. Stats., (Nov. 2006)................................................................................................7

Keith N. Hampton et al., *Broadband and Student Performance Gaps After the COVID-19 Pandemic*, Quello Center, Mich. State Univ. (2023) .........14

Keith N. Hampton et al., *Broadband and Student Performance Gaps*, Quello Center, Mich. State Univ. (Mar. 3, 2020) ............................................14

Ken Amaro, *Lengthy Hours on School Bus a Major Concern With Parents*, First Coast News (Oct. 5, 2020) ................................................................15

Lilyn Hester, *Rolling Study Halls: Turning Bus Time Into Learning Time*, Google Blog (April 2, 2018) ...........................................................................17

Matt Harab, *Parents Voice Concerns About Hours-Long School Bus Route*, Houston Public Media (Jan. 21, 2021).................................................15

viii

Melissa Santillana et al., *Digital Inequalities: Homework Gap and Techno-Capital in Austin, Texas*, 25 First Monday 7–6 (2020) ..................................................... 13

Memorandum from Richard Wilson, Assistant Dir. for Rsch. Servs., Arkansas Bureau of Legis. Rsch. (Aug. 12, 2014) ................................................................... 15

*Modernizing the E-Rate Program for Schools and Libraries*, Declaratory Ruling, FCC 23-84, WC Docket No. 13-184 (rel. Oct. 25, 2023) ............................. passim

*Modernizing the E-Rate Program for Schools and Libraries*, Order, DA 23-171 (rel. Dec. 15, 2023) ....................................................................................................... 21

*Modernizing the E-Rate Program for Schools and Libraries*, Report and Order and Further Notice of Proposed Rulemaking, 29 FCC Rcd 8870 (2013) ................... 10

Monica Anderson & Andrew Perrin, *Nearly one-in-five teens can't always finish their homework because of the digital divide*, Pew Research Center (Oct. 26, 2018) ..................................................................................................................... 13

Nat'l Ctr. for Edu. Stat., Fast Facts, Transportation ................................................ 14

*Request for Review of the Decision of the Universal Service Administrator by Montgomery County-Norristown Public Library, Norristown, PA et al.*, Order, 18 FCC Rcd 1775 (WCB 2003) ................................................................................... 23

Richard W. Walker, *Louisiana District Illustrates Power of E-Rate in Education*, EdScoop (Oct. 13, 2017) ........................................................................................... 8

Sam Dillon, *Wi-Fi Turns Rowdy Bus Into Rolling Study Hall*, N.Y. Times (Feb. 11, 2010) ....................................................................................................................... 19

Sarah A. Cordes, et al., *Do Long Bus Rides Drive Down Academic Outcomes?*, Annenberg Brown Univ., EdWorking Paper No. 21-504 (Dec. 2021) ........... 15, 16

*Schools and Libraries Universal Service Support Mechanism*, Second Report and Order and Further Notice of Proposed Rulemaking, 18 FCC Rcd 9202 (2003) ................................................................................................................. 19, 23

*Schools and Libraries Universal Service Support Mechanism; A National Broadband Plan For Our Future*, Sixth Report and Order, 25 FCC Rcd 18762 (2010) .................................................................................................... 19, 23, 24

ix

Thomas W. Hazlett *et al.*, *The Educational Impact of Broadband Subsidies for Schools Under E-Rate*, 28 Econ. of Innovation & New Tech. 483 (2019).....10, 11

Todd Price et al., *Lack of Internet Access Has Become Critical for Southern Students*, The Tenneseean (Sept. 8, 2020)...........................................................17

# INTEREST OF AMICI CURIAE[1]

The American Association of School Administrators (AASA), founded in 1865, is the professional organization for more than 13,000 educational leaders in the United States and throughout the world.  AASA members range from chief executive officers, superintendents and senior level school administrators to cabinet members, professors, and aspiring school system leaders.  AASA members are the chief education advocates for children.  AASA members advance the goals of public education and champion children's causes in their districts and nationwide.  As school system leaders, AASA members set the pace for academic achievement. They help shape policy, oversee its implementation, and represent school districts to the public at large.

The American Federation of School Administrators is the exclusive national labor union for administrators, professionals and supervisors advocating for excellence and equity in all of our schools, workplaces, and communities.

The American Federation of Teachers is a union of professionals that champions fairness; democracy; economic opportunity; and high-quality public

---

[1] All parties consented to the filing of this brief.  *See* Fed. R. App. P. 29(a)(2). Pursuant to Fed. R. App. P. 29(a)(4)(E), undersigned counsel confirms that no counsel for any party authored this brief in whole or in part and that no person or entity other than *amici curiae* and their counsel made a monetary contribution intended to fund the preparation and submission of this brief.

education, healthcare and public services for our students, their families, and our communities.

The American Library Association (ALA) is a nonprofit educational association, incorporated under the laws of the Commonwealth of Massachusetts with a large and diverse membership of over 49,000 members. Founded on October 6, 1876 during the Centennial Exposition in Philadelphia, the mission of ALA is to provide leadership for the development, promotion and improvement of library and information services and the profession of librarianship in order to enhance learning and ensure access to information for all. ALA's advocacy and public policy staff work to secure information technology policies that support and encourage efforts of libraries to ensure access to electronic information resources as a means of upholding the public's right to a free and open information society.

The Association of Educational Service Agencies supports over 500 regional educational service agencies (ESAs) in 45 states. ESAs and their staff support school districts in their regions with services such as staffing, professional development, and various other resources. ESAs significantly contribute to educating our nation's students in pre-kindergarten through grade 12 and beyond.

The Association of School Business Officials (ASBO) International provides programs, resources, services, and a global network to school business professionals who are passionate about quality education. ASBO International promotes the

highest standards of school business management, professional growth, and the effective use of educational resources.

The Consortium for School Networking (CoSN), a non-profit professional association for K-12 EdTech leaders, stands at the forefront of education innovation. CoSN is driven by a mission to equip current and aspiring K-12 education technology leaders, their teams, and school districts with the community, knowledge, and professional development they need to cultivate engaging learning environments. CoSN's vision is rooted in a future where every learner reaches their unique potential, guided by the community.

Established in 1921, the National Association of Elementary School Principals (NAESP) leads in the advocacy and support for elementary and middle-level principals in the U.S. and internationally. NAESP supports principals as the primary catalysts for creating lasting foundations for learning through policy and professional learning, advocacy, programs, and resources for effective instructional leadership.

The National Catholic Educational Association (NCEA) is the largest private professional education association in the world. NCEA works with Catholic educators to support ongoing faith formation and the teaching mission of the Catholic Church. NCEA membership includes almost 140,000 educators serving 1.6 million students in Catholic education. Committed to Catholic school education,

NCEA focuses on leadership development for superintendents, presidents, principals, pastors, and governing bodies; professional development for teachers and administrators; and serves as the voice for Catholic school education.

The National Education Association (NEA) is the nation's largest professional association, representing almost three million members—the vast majority of whom serve as educators, counselors, and education support professionals in our nation's public schools. NEA maintains a deep commitment to expanding broadband internet access to public-school school students, which NEA believes is a core component of ensuring access to a high-quality public education.

The National School Boards Association (NSBA), founded in 1940, is a non-profit organization ensuring that each student everywhere has access to excellent and equitable public education governed by high-performing school board leaders and supported by the community. NSBA regularly represents its members' interests before federal and state courts, and it has participated as *amicus curiae* in numerous cases addressing public schools. NSBA has resolved that Congress and the FCC should close the education technology gap, commonly called "The Homework Gap," for children in rural and low-income communities who lack access to or cannot afford out-of-school technology.

## SUMMARY OF ARGUMENT

The decision of the Federal Communications Commission ("FCC" or "Commission") in *Modernizing the E-Rate Program for Schools and Libraries*, Declaratory Ruling, FCC 23-84, WC Docket No. 13-184 (rel. Oct. 25, 2023) ("*Declaratory Ruling*") (A__-__) that Wi-Fi on school buses is eligible for funding through the E-Rate program is both appropriate and lawful. Since its inception nearly three decades ago, E-Rate has a track record of success at achieving the goals Congress set for it, enabling thousands of schools and libraries all across the country to afford the cost of connecting students and library patrons to the internet and thereby gain access to online materials crucial to digital learning and 21st century opportunities.

Data show that over half of the country's K-12 schoolchildren take the bus each day. School bus Wi-Fi can transform this ride time into an educational opportunity by enabling students to complete their schoolwork and keep up in class. For students facing long rides to and from school or after-school activities, the FCC's decision will be a game-changer. Its impact will be most transformative, however, for the millions of students caught in the "Homework Gap," who lack the connectivity needed to complete their daily schoolwork. Rural and minority students, particularly, will benefit, because data show that these students

disproportionately face the longest bus rides and are most likely to lack home internet.

The FCC's decision to take this commonsense step to help tackle the Homework Gap rests on a strong legal foundation. The Commission properly exercised its authority in Sections 254(c)(3) and 254(h)(1)(B) of the Communications Act of 1934, as amended ("Act"), 47 U.S.C. § 254(c)(3), (h)(1)(B), consistent with precedent, to provide support for Wi-Fi on school buses because these services are provided to schools and serve educational purposes. These provisions of Section 254, upon which the FCC primarily relied to adopt the *Declaratory Ruling*, contain no reference to "classrooms." As a result, contrary to petitioners' assertions, the use of the word "classrooms" in another part of Section 254, 47 U.S.C. § 254(h)(2)(A), is not a limitation on the Commission's authority here. But even if the Commission's authority to adopt the *Declaratory Ruling* depended on Section 254(h)(2)(A), which it does not, Congress's decision not to define the word "classrooms," which appears in that section, makes clear that E-Rate is meant to fund connectivity beyond just the schoolhouse door and into areas where student learning occurs. The *Declaratory Ruling* is entirely aligned with this congressional intent.

As representatives of school leaders, educators, and librarians across the United States, *amici* urge this court to affirm the FCC's decision.

## ARGUMENT

**I.    E-RATE IS A RECOGNIZED SUCCESS IN CONNECTING STUDENTS AND LIBRARY PATRONS TO 21ST CENTURY OPPORTUNITIES AND LEARNING.**

For close to thirty years, E-Rate has been critical to connecting the country's schools and libraries to the internet, allowing U.S. schools to move into the 21st century.  When E-Rate was first implemented, most schools had dial up internet access, if they had internet access at all, while today virtually all schools and libraries nationwide have high-speed broadband internet connectivity.  John Wells & Laurie Lewis, *Internet Access in U.S. Public Schools and Classrooms: 1994-2005*, U.S. Dept. of Ed., Nat'l Center for Ed. Stats., at 4–5 (Nov. 2006); *id.* at 14, 18.  Similarly, prior to E-Rate, about 20 percent of libraries had public internet access while nearly 100 percent do today.  *See, e.g.,* Comments of the Education & Libraries Networks Coalition, Federal Communications Commission WC Docket No. 13-184, at 2 (filed Sept. 3, 2019).  Even critics of the program concede "the success of the E-Rate program in regards to its primary goal of getting classrooms connected to the Internet, particularly at disadvantaged schools."[2]  In 2023, the E-Rate program

---

[2] Austan Goolsbee & Jonathan Guryan, *The Impact of Internet Subsidies in Public Schools*, Nat'l Bureau of Econ. Rsch. (Aug. 2002) ("*Goolsbee*"); Opening Brief for Petitioners at 11, *Molak v. FCC*, No. 23-60641 (5th Cir. Apr. 2, 2024) ("Pet'rs. Br."). As such, the Texas Public Policy Foundation is incorrect in asserting that "no studies have linked increased connectivity with the administration of the E-Rate program." Brief for Texas Public Policy Foundation as *Amicus Curiae* In Support of Petitioners

helped provide connectivity to over 130,000 schools and libraries nationwide, and these schools and libraries readily recognize the importance of this crucial funding— in response to a survey, fully 95 percent of schools and libraries indicated that E-Rate is "vital" to their organization's Internet connectivity goals. *E-rate Trends Report*, Funds for Learning, at 9, 13 (2023). For example, a Louisiana school district leveraged E-Rate funding to ensure connectivity to support devices for each student, which the district's technology director called "essential for us moving forward in our district," particularly as the state transitions to online testing.[3] As of 2019, Louisiana and Texas were in the top five states with the highest number of low-income students attending schools that receive E-Rate support.[4]

E-Rate also has allowed schools' and libraries' internet connectivity to grow to meet the increasing demands of digital learning. In 2015, the FCC set a short-term benchmark goal of 100 megabits per second per 1,000 students and staff and, just this year, based on data showing that 99 percent of school districts nationwide successfully met that goal, the FCC revised its short-term benchmark to 1 gigabit

---

at 10, *Molak v. FCC*, No. 23-60641 (5th Cir. Apr. 9, 2024) ("Texas Public Policy Foundation Br.").

[3] Richard W. Walker, *Louisiana District Illustrates Power of E-Rate in Education*, EdScoop (Oct. 13, 2017), https://edscoop.com/louisiana-district-illustrates-power-of-e-rate-in-education/.

[4] *E-Rate Schools*, Center for Public Education, at 3 (2020), cpe-e-rate-schools-report-march-2020.pdf (nsba.org).

per second per 1,000 students and staff. *Inquiry Concerning the Deployment of Advanced Telecommunications Capability to All Americans in a Reasonable and Timely Fashion*, 2024 Section 706 Report, FCC 24-27, ¶¶ 131–32 (rel. Mar. 18, 2024). E-Rate also has helped schools and libraries to afford Wi-Fi. Since 2015, the amount of E-Rate funding spent on Wi-Fi nearly doubled from prior years.[5] In addition, E-Rate has helped drive efficiencies in the cost of services for schools and libraries. According to one report, E-Rate pricing transparency and technological improvements helped reduce the cost of K-12 internet access on a per megabit basis by 90 percent between 2013 and 2019.[6]

E-Rate is essential to ensuring that all schools and libraries—including those in low-income, rural, and remote areas—have the same access and opportunity afforded by internet connectivity to support teaching, learning, and engagement in the 21st century global economy. Even before the pandemic, technology had become an essential part of the learning experience in K-12 classrooms, with 87 percent of teachers in 2019 reporting using digital learning tools at least a few days

---

[5] *2018 State of the States*, EducationSuperHighway, at 8 (Oct. 2018), https://s3-us-west-1.amazonaws.com/esh-sots-pdfs/2018%20State%20of%20the%20States.pdf.

[6] *2019 State of the States*, EducationSuperHighway, at 8 (2019), https://www.educationsuperhighway.org/wp-content/uploads/2019-State-of-the-States-Full-Report-EducationSuperHighway.pdf.

a week and 96 percent of 3rd grade through 5th grade students reporting using digital learning tools "some or a lot of the time in class."[7]

E-Rate is and has always been a connectivity program whose measure of success is in connecting students, educators and library patrons.[8]  As a result, the studies that Petitioners and their *amici* offer questioning the impact of E-Rate spending on student learning are not relevant to this case.  Moreover, these studies are questionable at best.[9]  For example, the Goolsbee study is over twenty years old and concedes that that point in time (only four years after E-Rate began) likely was "too early to evaluate long-term investments in information technology" and that its proxy for student performance (one specific standardized test) may have been inadequate.  *Goolsbee* at 17.  Similarly, the Hazlett study purports to analyze data from North Carolina schools to show that incremental dollars of E-Rate spending in

---

[7]    EducationSuperHighway,    *Journey    to    99%*, https://www.educationsuperhighway.org/our-story/journey-to-99/ (last visited May 22, 2024).

[8] *See, e.g., Modernizing the E-Rate Program for Schools and Libraries*, Report and Order and Further Notice of Proposed Rulemaking, 29 FCC Rcd 8870, 8873 (2013) (adopting the following goals for the E-Rate program: "(1) ensuring affordable access to high-speed broadband sufficient to support digital learning in schools and robust connectivity for all libraries; (2) maximizing the cost-effectiveness of spending for E-Rate supported purchases; and (3) making the E-Rate application process and other E-rate processes fast, simple and efficient.").

[9] Pet'rs. Br. at 10; Texas Public Policy Foundation Br. at 10 (both citing Thomas W. Hazlett *et al*., *The Educational Impact of Broadband Subsidies for Schools Under E-Rate*, 28 Econ. of Innovation & New Tech. 483 (2019) ("*Hazlett*")); *Goolsbee*.

a particular school did not result in higher SAT scores. *Hazlett* at 6. The study did not consider impacts on non-SAT takers and, even if its conclusion was valid, all it would reveal is a debate about the appropriate *level* of E-Rate funding. Yet such studies are offered to support much broader conclusions, including that E-rate could be eliminated or significantly curtailed without harming student learning—points which they do not study or support. In fact, eliminating or significantly curtailing E-Rate would have a catastrophic impact on education in the United States. Schools and libraries would lose the billions of dollars in funding that is vital to their interconnectivity goals.

In sum, the E-Rate program has succeeded in connecting schools and libraries to learning opportunities by nearly any measure. Arguments to the contrary by Petitioners and their *amici* are as inaccurate as they are irrelevant. And there are good reasons to believe that the *Declaratory Ruling* will further empower schools to improve student learning.

## II. THE *DECLARATORY RULING* EMPOWERS SCHOOLS TO USE SCHOOL BUS WI-FI TO HELP CLOSE THE HOMEWORK GAP, AN ISSUE OF BIPARTISAN NATIONAL CONCERN.

The Homework Gap and long school bus rides are both factors that undermine student learning. The *Declaratory Ruling* allows schools to use E-Rate funding to address both by narrowing the Homework Gap for students who spend long periods

11

of time each day on school buses—facilities that are owned or controlled by the schools themselves.

For years, the Homework Gap—the lack of adequate internet access at home to complete homework—has been recognized by policymakers on a bipartisan basis as a national concern. *See, e.g.*, H. Res. 939, 114th Cong., 162 Cong. Rec. H7200–H7201 (2016). Students who lack access to the internet face significant obstacles to learning because they cannot access the educational resources they need to succeed or must access the internet only though inconvenient or unreliable methods. The FCC has estimated that between 8.5 to 16 million schoolchildren nationwide fall into the Homework Gap. *Addressing the Homework Gap Through the E-Rate Program*, Notice of Proposed Rulemaking, FCC 23-91, ¶ 2 (rel. Nov. 8, 2023) (A__). Studies show that the Homework Gap disproportionately affects rural students and minority students.[10] Even before the pandemic lockdowns, nearly one in five teens nationally reported that they could not complete their homework because they did not have

---

[10] *See, e.g.*, *16.9 Million Children Remain Logged Out Because They Don't Have Internet at Home*, All4Ed (July 21, 2020), https://all4ed.org/publication/homeworkgap/. In the midst of the COVID-19 pandemic, 36% of households with one or more children in rural areas and roughly a third of Black, Latino, and American Indian/Alaska Native households with one or more children did not have access to high-speed home internet. All told, according to this study, over 2,000,000 children in Texas, 318,000 children in Louisiana, and 290,000 children in Mississippi lacked high-speed home internet. *Id.*

internet access outside the classroom.[11]  A separate survey of families in Austin, Texas confirmed that a sizeable proportion of parents and guardians were concerned that lack of internet access as well as access to computers constitute barriers to homework completion.[12]

The Homework Gap undermines student learning.  As schools integrate technology into the daily education experience, students need access to the internet to complete and submit assignments, study, access educational applications, watch lecture videos, and even take tests or quizzes.  According to one study, four out of ten teachers said that many of their students do not have adequate internet access at home and, as grade levels increase, teachers are more likely to assign homework that requires students to use the internet.[13]  A study of Michigan middle and high

---

[11] *See, e.g.,* Monica Anderson & Andrew Perrin, *Nearly one-in-five teens can't always finish their homework because of the digital divide*, Pew Research Center (Oct. 26, 2018), https://www.pewresearch.org/short-reads/2018/10/26/nearly-one-in-five-teens-cant-always-finish-their-homework-because-of-the-digital-divide/.

[12] *See* Melissa Santillana et al., *Digital Inequalities: Homework Gap and Techno-Capital in Austin, Texas*, 25 First Monday 7–6 (2020), https://firstmonday.org/ojs/index.php/fm/article/view/10860/9569 (reporting that 12 percent of respondents "feel that their children or grandchildren cannot complete their homework because they do not have Internet access" and that 20 percent of respondents "feel that their children or grandchildren cannot complete their homework because they do not have access to computers.").

[13] Amina Fazlullah & Stephanie Ong, *The Homework Gap:  Teacher Perspectives on Closing the Digital Divide*, Common Sense Media, at 6, 9 (2019), https://www.commonsensemedia.org/sites/default/files/featured-content/files/homework-gap-report-2019.pdf.

schoolers found that students without home internet access "perform lower on a range of metrics, including digital skills, homework completion, and grade point average."[14]  A post-pandemic follow-up study found that students with home internet access during the pandemic experienced fewer problems learning from home and, although home broadband access increased from pre-pandemic levels, "one in three rural students still has inadequate internet access at home."[15]  Without internet access at home, students are unable to complete some crucial parts of the curriculum from their own homes, forcing them to seek out connectivity elsewhere.

Long school bus rides, too, have been found to be detrimental to student performance, particularly affecting rural students and urban minority students.  Over half of the nation's K-12 students use the bus to get to school each day.[16]  Students, particularly in rural areas, often face long school bus rides.  For example, a study commissioned by the Arkansas legislature found that the longest one-way school bus ride in the state was 167 minutes, with the average route being nearly 50

[14] Keith N. Hampton et al., *Broadband and Student Performance Gaps*, Quello Center, Mich. State Univ. (Mar. 3, 2020), https://doi.org/10.25335/BZGY-3V91.

[15] Keith N. Hampton et al., *Broadband and Student Performance Gaps After the COVID-19 Pandemic*, Quello Center, Mich. State Univ., at 6 (2023), https://quello.msu.edu/wp-content/uploads/2023/08/Broadband-and-Student-Performance-Gaps-After-the-COVID-19-Pandemic.pdf.

[16] Nat'l Ctr. for Edu. Stat., Fast Facts, Transportation, https://nces.ed.gov/fastfacts/display.asp?id=67 (last visited May 22, 2024).

minutes.[17]  Media reports reveal parents' concerns about school bus rides of up to

two hours each way.[18]  Studies show that the students spending the most time on

buses are rural students and minority students in urban areas.[19]

Not surprisingly, these hours lost on the school bus can have a negative impact

on students and academic achievement.  A study of New Orleans bus routes found

that students with the longest bus rides on average "spend about six hours on the bus

each week, nearly the equivalent of a full school day," time that is "not spent

learning, sleeping, playing, or spending time with family."[20]  Other researchers have

---

[17] Memorandum from Richard Wilson, Assistant Dir. for Rsch. Servs., Arkansas Bureau of Legis. Rsch. (Aug. 12, 2014) (reporting on K-12 Student Transportation Survey per Act 1288 of 2013).

[18] *See*, *e.g.*, Ken Amaro, *Lengthy Hours on School Bus a Major Concern With Parents*, First Coast News (Oct. 5, 2020), https://www.firstcoastnews.com/article/news/local/concerns-over-school-transportation-has-northside-parents-upset/77-1eafc7bf-2326-473d-8bd2-70037e9e501a; Matt Harab, *Parents Voice Concerns About Hours-Long School Bus Route*, Houston Public Media (Jan. 21, 2021), https://www.houstonpublicmedia.org/articles/education/2020/01/21/357958/parents-complaining-about-hisd-bus-routes/.

[19] *See, e.g.*, Beth Spence, *Long School Bus Rides: Their Effect on School Budgets, Family Life, and Student Achievement*, Rural Education Digest (2000), https://files.eric.ed.gov/fulltext/ED448955.pdf; Sarah A. Cordes, et al., *Do Long Bus Rides Drive Down Academic Outcomes?*, Annenberg Brown Univ., EdWorking Paper No. 21-504, at 2 (Dec. 2021), https://files.eric.ed.gov/fulltext/ED616857.pdf ("*Cordes*").

[20] Jane Arnold Lincove, et al., *New Orleans Students' Commute Times by Car, Public Transit, and School Bus*, Urban Inst., at 13 (Sept. 2018), https://educationresearchalliancenola.org/files/publications/new_orleans_students_commute_times_by_car_public_transit_and_school_bus.pdf.

found that commute times negatively impact attendance and increase chronic absenteeism. *Cordes* at 3.

Meanwhile, connectivity on school buses can lead to other benefits. One school district reported that disciplinary referrals fell by 75 percent year over year after onboarding school bus Wi-Fi.[21] Moreover, in the face of concerns about enabling social media, *see, e.g.*, Pet'rs. Br. at 12 (citing dissent of Commissioner Nathan Simington), filtering technology exists to allow schools to customize the student internet experience, *see Newton*, and schools using E-Rate funds are required by other legal provisions to apply internet filters to students' access. *See* 47 U.S.C. § 254(h)(5).

For students, Wi-Fi on school buses can be a game changer. For instance, the Port Arthur Independent School District in Texas sought to add Wi-Fi on its school buses after similar efforts in other districts yielded 1,000 additional hours of study time per week.[22] In Lexington, South Carolina, 83 percent of participating students

---

[21] Claudia Newton, *Districts Realize Unintended Benefits of Installing Wi-Fi on the School Bus*, School Transportation News (May 10, 2022), https://stnonline.com/news/districts-realize-unintended-benefits-of-installing-wi-fi-on-the-school-bus/ ("*Newton*"); *see also*, Sam Dillon, *Wi-Fi Turns Rowdy Bus Into Rolling Study Hall*, N.Y. Times (Feb. 11, 2010), https://www.nytimes.com/2010/02/12/education/12bus.html.

[22] Cameron Sibert, *Port Arthur ISD To upgrade school buses with Wi-Fi to Help Students*, 12 News (June 24, 2021), https://www.12newsnow.com/article/news/local/port-arthur-isd-upgrading-school-buses/502-b3ae1904-197e-415e-9c25-56f5a4010b39.

reported that time on Wi-Fi-equipped buses is critical to helping them finish their homework.[23]  Meanwhile, in a trial of equipping school buses with Wi-Fi and other educational support in rural North Carolina, "[t]he effects were immediate…. Students were engaged.  They were learning.  And after a few months, … [s]chool officials saw students do better in school."[24]  During the pandemic, some districts even parked their Wi-Fi-equipped school buses in public places to allow students to access the internet.[25]

In the *Declaratory Ruling*, the FCC empowered schools to use E-Rate funding to purchase Wi-Fi connections for school buses so that students can make productive, educational use of the time spent on school buses—property that the

---

[23] Dr. Suzanne Lacey, Driving Change With Rolling Study Halls, Google Blog (Mar. 15, 2019), https://blog.google/outreach-initiatives/education/rolling-study-halls-talladega/.

[24] Lilyn Hester, *Rolling Study Halls: Turning Bus Time Into Learning Time*, Google Blog (April 2, 2018), https://blog.google/outreach-initiatives/grow-with-google/rolling-study-halls-turning-bus-time-learning-time/.  The North Carolina project also provided an onboard educator on the Wi-Fi-equipped buses, which schools benefiting from the *Declaratory Ruling* could do more readily once E-Rate funded the Wi-Fi connectivity.

[25] *See* Todd Price et al., *Lack of Internet Access Has Become Critical for Southern Students*, The Tennessean (Sept. 8, 2020), https://www.tennessean.com/story/news/american-south/2020/09/02/during-coronavirus-internet-access-critical-students-south/5625573002/; Alaa Elassar, *Texas School District Deployed Over 100 School Buses Equipped With WiFi For Students Without Internet Access*, KSAT.com (Apr. 15, 2020), https://www.ksat.com/news/local/2020/04/15/texas-school-district-deployed-over-100-school-buses-equipped-with-wifi-for-students-without-internet-access/.

school owns or controls.  The FCC rightly concluded that "many students who do not have broadband connectivity at home could use the school bus Wi-Fi to complete homework and other assignments while traveling to and from school." *Declaratory Ruling* ¶ 6 (A__).  On this score, the FCC's record demonstrated how Wi-Fi on school buses could make time in transit more effective for students and represented a sensible programmatic change.  *Id*.[26]  (A__)  With this relatively minor extension of the scope of school property eligible for E-Rate funded connectivity, the FCC gave school administrators expanded flexibility to make more effective choices with their academic and budgetary resources and to ensure equitable internet access for all students, including those in the Homework Gap.

## III.    SECTION 254 SUPPORTS PROVIDING OFF-CAMPUS CONNECTIVITY.

From its inception, Section 254 has been recognized as a demonstration of Congress's commitment to ensuring that K-12 public and nonprofit schools and libraries can provide their students with access to the internet.  Petitioners and their *amici* attempt to argue that the *Declaratory Ruling* represents an unprecedented new understanding of the FCC's authority under section 254, but this is inaccurate.

---

[26] Notably, the FCC's record included support from state educational agencies across the country, including New Mexico, Illinois, West Virginia, and Wisconsin, all of which expressed support for improving students' access to broadband by equipping school buses with Wi-Fi.  *Declaratory Ruling* at n.18 (A__).

## A.    THE DECLARATORY RULING RESTS ON A LAWFUL BASIS.

Contrary to Petitioners' assertions (Pet'rs. Br. at 19), the *Declaratory Ruling* rests primarily on the authority granted by Sections 254(h)(1)(B) and 254(c)(3) of the Act, neither of which include the word "classroom" as a limitation on E-rate funding.  Section 254(h)(1)(B) requires all telecommunications carriers to provide to elementary schools, secondary schools, and libraries, on request, discounted services for educational purposes.  47 U.S.C. § 254(h)(1)(B); *see also Declaratory Ruling* ¶ 4 (A__).  The FCC defines educational purposes as "activities that are integral, immediate, and proximate to the education of students."  47 C.F.R. § 54.500; *see also Declaratory Ruling* ¶¶ 4–5 (A__); *Schools and Libraries Universal Service Support Mechanism; A National Broadband Plan For Our Future*, Sixth Report and Order, 25 FCC Rcd 18762, 18774 ¶ 22 (2010) ("*Schools and Libraries Sixth Report and Order*").  The *Declaratory Ruling* reasonably determined that the use of the internet on school buses satisfies the educational purpose element of Section 254(h)(1)(B) and therefore qualifies for E-rate funding. *Declaratory Ruling* ¶ 9 n.32 (A__).

Section 254(h)(1)(B) makes no reference to the classroom and thus supports expanding internet access to certain off-campus sites as long as the activity qualifies as an educational purpose under the E-rate program.  *Id.* (A__); *see also Schools and Libraries Universal Service Support Mechanism*, Second Report and Order and

Further Notice of Proposed Rulemaking, 18 FCC Rcd 9202, 9208–09 ¶ 19 (2003) ("*Schools and Libraries Second Report and Order*").  In the *Declaratory Ruling*, the FCC determined that the use of the internet on the school bus satisfies the educational purpose element in Section 254(h)(1)(B) and thus is eligible for E-Rate funding.

The *Declaratory Ruling* relies on the same sources of legal authority that the FCC relied on in adopting the E-rate program—reliance which this court has specifically affirmed.  In 1997, the FCC concluded "that sections 254(c)(3) and 254(h)(1), in the context of the broad policies set forth in section 254(h)(2), authorize [it] to permit schools and libraries to receive the telecommunications and information services provided by telecommunications carriers needed to use the Internet at discounted rates."  *Fed.-State Joint Bd. on Universal Serv.*, Report and Order, 12 FCC Rcd 8776, 9008–09 ¶ 436 (1997) ("*First USF Order*").  The FCC also concluded Section 254(c)(3) authorizes it to "'designate additional services for support' and section 254(h)(1)(B) authorizes [it] to fund any section 254(c)(3) services."  *Id.* ¶ 437 (internal citations omitted).  This court upheld this interpretation, affirming the FCC's determination that Section 254(c)(3) granted it the authority to allow schools and libraries to obtain support discounts on all commercially available telecommunications services. *Tex. Off. of Pub. Util. Couns. v. FCC*, 183 F.3d 393, 444–45 (5th Cir. 1999).  This authority authorizes the FCC

to provide discounts on telecommunications services, internet access, and internal connections provided "to" schools and libraries for educational purposes. Wi-Fi service on school buses will be provided "to elementary schools [and] secondary schools," since they will be billed for, and receive discounts on, the services, and the services will be delivered to school buses owned by, or under contract to, the school. 47 U.S.C. § 254(h)(1)(B). The services authorized by the *Declaratory Ruling* meet these criteria.[27]

### B.    IN ANY EVENT, SCHOOL BUSES SATISFY THE CLASSROOM TEST UNDER SECTION 254(H)(2)(A).

Petitioners and their *amici* read a limitation into the reference to "classrooms" in Section 254(h)(2)(A) that belies the intent of the statutory provision. The reference to "classrooms" made clear that Congress did not intend for E-Rate to fund the costs of internet access just to the edge of school property, but also to fund internal connections within the school necessary for students to access the internet

---

[27] Petitioners' and their *amici*'s concerns about harmful uses of school bus Wi-Fi are overblown as well as speculative. *See, e.g.*, Brief for U.S. Senators as *Amici Curiae* In Support of Petitioners at 7-8, *Molak v. FCC*, No. 23-60641 (5th Cir. Apr. 9, 2024). Per Section 254(h)(5) of the Act, all schools receiving E-Rate support must have an internet safety policy that uses filters and other tools to block minors' access to harmful material and prohibits illegal activity. 47 U.S.C. § 254(h)(5). In fact, the FCC subsequently made clear that "[s]chools have Children's Internet Protection Act (CIPA)-required content filtering capabilities in place for their school-based networks, and we expect schools to implement the same filtering capability for a school's network provided through school-bus Wi-Fi." *Modernizing the E-Rate Program for Schools and Libraries*, Order, DA 23-171 (rel. Dec. 15, 2023) (A__-__).

for educational purposes. *See First USF Order*, 12 FCC Rcd at 9004–05, 9018–19 ¶¶ 429, 455–56. Given that the word "classrooms" was meant to expand the scope of where E-Rate would fund internet access rather than limit it, "Congress declined to define 'classrooms'" in this context (*Declaratory Ruling* ¶ 9 n.32 (A__)), indicating congressional support for the concept that the E-Rate program covers the cost of services beyond the walls of the schoolhouse to extend to all places where students need and use the internet to learn and to complete assignments.

The *Declaratory Ruling* is consistent with this congressional intent. As the FCC recognized, the use of the Internet on school buses "independently satisfies the 'classroom' test in section 254(h)(2)(A)" because buses are a natural extension of the school. *Id.* (A__). After all, schools that provide transportation are responsible for the students on buses, and learning takes place on the school bus. Indeed, in today's hybrid learning environment, where the notion that learning takes places only in a four-walled room in the schoolhouse is a relic of the past, the *Declaratory Ruling* is a legitimate application of the FCC's authority to authorize E-Rate support to advance the learning and educational development of children.

**C.    THE *DECLARATORY RULING* IS CONSISTENT WITH LONGSTANDING PRECEDENT OF USING E-RATE FUNDING TO SUPPORT OFF-CAMPUS CONNECTIVITY FOR EDUCATIONAL PURPOSES.**

Petitioners and their *amici* also ignore longstanding precedent for the use of E-Rate funding to support schools' and libraries' educational connectivity outside

of classrooms. Over 20 years ago, the FCC held that E-Rate support could be used for internet access on bookmobiles. *Request for Review of the Decision of the Universal Service Administrator by Montgomery County-Norristown Public Library, Norristown, PA et al.*, Order, 18 FCC Rcd 1775 (WCB 2003). That same year, the FCC made clear that the following off-site activities met the educational purpose requirement under Section 254(h)(1)(B): (1) "a school bus driver's use of wireless telecommunications services while delivering children to and from school"; (2) "a library staff's person's use of wireless telecommunications services on a library's mobile library unit van"; and (3) "the use by teachers or other school staff of wireless telecommunications services while accompanying students on a field trip or sporting event." *Schools and Libraries Second Report and Order*, 18 FCC Rcd at 9208–09 ¶ 19 n.28.

In 2010, the FCC authorized E-Rate support in residential areas of schools serving unique populations, such as Tribal residents and students with medical needs, to "facilitate ongoing access to educational learning materials beyond the normal school day and increase the ability of those students to complete homework assignments, such as those that require broadband access for research projects, after school hours." *Declaratory Ruling* ¶ 10 (quoting *Schools and Libraries Sixth Report and Order*, 25 FCC Rcd at 18778–79 ¶ 31) (A__). And in 2011, as part of the EDU2011 Program, the FCC authorized "up to $10 million for funding year 2011 to

support innovative and interactive off-premises wireless device connectivity for schools and libraries." *Schools and Libraries Sixth Report and Order*, 25 FCC Rcd at 18785–86 ¶ 46. The *Declaratory Ruling* is consistent with these decisions, with the statutory language and purpose of Section 254 of the Act, and with the realities of the learning environment for American children in 2024. By contrast, Petitioners' and their *amici*'s interpretation of section 254 is unmoored from precedent and inconsistent with congressional intent.

## IV.    CONCLUSION

For these reasons, in addition to those set forth in the Brief for Respondents, this Court should deny the Petition.

Respectfully submitted,

June 10, 2024

*/s/ Jennifer Tatel*
Jennifer Tatel
L. Charles Keller
Travis E. Litman
Wilkinson Barker Knauer, LLP
1800 M Street NW, Suite 800N
Washington, DC 20036
(202) 783-4141
jtatel@wbklaw.com

*Counsel for Amici Curiae AASA – The School Superintendents Association, American Federation of School Administrators, American Federation of Teachers, American Library Association, Association of School Business Officials International, Association of Educational Service*

*Agencies, Consortium for School Networking, National Association of Elementary School Principals, National Catholic Education Association, National Education Association, and National School Boards Association*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on June 10, 2024, I filed the foregoing Joint Brief of *Amici Curiae* AASA – The School Superintendents Association, American Federation of School Administrators, American Federation of Teachers, American Library Association, Association of School Business Officials International, Association of Educational Service Agencies, Consortium for School Networking, National Association of Elementary School Principals, National Catholic Education Association, National Education Association, and National School Boards Association in Support of Respondents with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit using the electronic CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

*/s/ Jennifer Tatel*
Jennifer Tatel

# CERTIFICATE OF COMPLIANCE

1.   This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because this brief contains 5433 words, excluding the parts of the brief exempted by Fed. R. App. 32(f) and Circuit Rule 32.2.

2.   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word using 14-point Times New Roman font.

*/s/ Jennifer Tatel*
Jennifer Tatel