No. 23-60641

# In the United States Court of Appeals for the Fifth Circuit

MAURINE MOLAK;
MATTHEW MOLAK,

*Petitioners*,

v.

FEDERAL COMMUNICATIONS COMMISSION;
UNITED STATES OF AMERICA,

*Respondents*.

Petition for Review of an Order
of the Federal Communications Commission
FCC 23-84; WC Docket No. 13-184

## REPLY BRIEF FOR PETITIONERS

Jacob (Yaakov) M. Roth
yroth@jonesday.com
David K. Suska
dsuska@jonesday.com
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Telephone: (202) 879-3939

*Counsel for Petitioners*

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

No. 23-60641, *Molak et al. v. FCC et al.*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

Petitioners:

    1.    Maurine Molak

    2.    Matthew Molak

Petitioners' Counsel:

    1.    Jones Day

    2.    Jacob (Yaakov) M. Roth

    3.    David K. Suska

Respondents:

    1.    Federal Communications Commission

    2.    United States of America

Respondents' Counsel:

    1.    P. Michele Ellison

    2.    Jacob Matthew Lewis

    3.    Sarah E. Citrin

    4.    Rachel Proctor May

5. Robert B. Nicholson

6. Robert Wiggers

7. Jonathan S. Kanter

Intervenor:

1. Schools, Health & Libraries Broadband Coalition

Intervenor's Counsel:

1. Andrew Jay Schwartzman

2. HWG LLP

3. Jason Neal

4. Mohammad M. Ali

*Amici Curiae*:

1. Adam Candeub

2. Competitive Enterprise Institute

3. U.S. Senators Ted Cruz, Marsha Blackburn, Mike Braun, Ted Budd, James Lankford, Cynthia Lummis, and Pete Ricketts

4. Texas Public Policy Foundation

5. AASA – The School Superintendents Association, American Federation of School Administrators, American Federation of Teachers, American Library Association, Association of School Business Officials International, Association of Educational Service Agencies, Consortium for School Networking, National

Association of Elementary School Principals, National Catholic Education Association, National Education Association, and National School Boards Association

Counsel for *Amici Curiae*

1. King Street Legal, P.L.L.C. – Counsel for Adam Candeub

2. James M. Burnham – Counsel for Adam Candeub

3. David S. McFadden – Counsel for Competitive Enterprise Institute

4. Peele | Nimocks | Toth – Counsel for U.S. Senators

5. Christopher L. Peele – Counsel for U.S. Senators

6. Austin R. Nimocks – Counsel for U.S. Senators

7. Michael C. Toth – Counsel for U.S. Senators

8. Robert Henneke – Counsel for Texas Public Policy Foundation

9. Antonin Scalia Law School Administrative Law Clinic – Counsel for Texas Public Policy Foundation

10. Consovoy McCarthy PLLC – Counsel for Texas Public Policy Foundation

11. Thomas R. McCarthy – Counsel for Texas Public Policy Foundation

12. Tiffany H. Bates – Counsel for Texas Public Policy Foundation

13. Wilkinson Barker Knauer, LLP – Counsel for AASA et al.

14. Jennifer Tatel – Counsel for AASA et al.

15.    L. Charles Keller – Counsel for AASA et al.

16.    Travis E. Litman – Counsel for AASA et al.


                                    s/ *Jacob Moshe Roth*
                                    *Counsel for Petitioners*

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION ...................................................................................................1

ARGUMENT ........................................................................................................2

I.     PETITIONERS HAVE ARTICLE III STANDING...........................................2

II.    THERE IS NO OTHER OBSTACLE TO JUDICIAL REVIEW. ........................5

    A. Circuit Precedent Holds That "Party Status" Is Not Required To
       Challenge an Agency's Statutory Authority. .........................................5

    B. The Molaks Were Not Required To File a Futile Reconsideration
       Petition Before Seeking Judicial Review. .............................................7

III.   THE DECLARATORY RULING IS CONTRARY TO LAW. ...........................11

    A. Section 254(h)(2)(A) Does Not Authorize the Declaratory Ruling. .................13

    B. Section 254(h)(1)(B) Alone Cannot Authorize E-Rate. ......................15

    C. The FCC's Other Arguments Miss the Point. .....................................18

CONCLUSION .....................................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Adar v. Smith,*
   639 F.3d 146 (5th Cir. 2011) .............................................. 6

*Ala. Ass'n of Realtors v. HHS,*
   594 U.S. 758 (2021) ..........................................................19

*Am. Airlines, Inc. v. Herman,*
   176 F.3d 283 (5th Cir. 1999) .............................................. 7

*Am. Trucking Ass'ns, Inc. v. ICC,*
   673 F.2d 82 (5th Cir. 1982) ............................................... 6

*Bowen v. Georgetown Univ. Hosp.,*
   488 U.S. 204 (1988) ..........................................................20

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013) ........................................................... 4

*Competitive Enter. Inst. v. FCC,*
   970 F.3d 372 (D.C. Cir. 2020) ...................................... 8, 10

*Comsat Corp. v. FCC,*
   250 F.3d 931 (5th Cir. 2001) .............................................. 8

*Crawford v. Hind Cnty. Bd. of Supervisors,*
   1 F.4th 371 (5th Cir. 2021) ................................................ 4

*Czyzewski v. Jevic Holding Corp.,*
   580 U.S. 451 (2017) ........................................................... 3

*Entergy Corp. v. Riverkeeper, Inc.,*
   556 U.S. 208 (2009) ..........................................................14

*Forest Grove Sch. Dist. v. T.A.,*
  557 U.S. 230 (2009) ........................................................................17

*Harrow v. Dep't of Def.,*
  144 S. Ct. 1178 (2024) ....................................................................9

*Hill v. FCC,*
  496 F. App'x 396 (5th Cir. 2012) ................................................10

*Jackson Mun. Airport Auth. v. Harkins,*
  98 F.4th 144 (5th Cir. 2024) (en banc) ......................................3

*Kirby Corp. v. Pena,*
  109 F.3d 258 (5th Cir. 1997) ........................................................7

*Leedom v. Kyne,*
  358 U.S. 187 (1958) ........................................................................7

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) .....................................................................3, 4

*NLRB v. Noel Canning,*
  573 U.S. 513 (2014) ......................................................................19

*Off. of Commc'n of United Church of Christ v. FCC,*
  779 F.2d 702 (D.C. Cir. 1985) .....................................................8

*Ohio Telecom Ass'n v. FCC,*
  No. 24-3449 (6th Cir. docketed May 28, 2024) ......................20

*Spokeo, Inc. v. Robins,*
  578 U.S. 330 (2016) ........................................................................4

*Susan B. Anthony List v. Driehaus,*
  573 U.S. 149 (2014) ........................................................................4

*Tex. Off. of Pub. Util. Couns. v. FCC,*
  183 F.3d 393 (5th Cir. 1999) ................................................12, 16

*Texas v. NRC,*
 78 F.4th 827 (5th Cir. 2023) ................................................ 6, 10

*Time Warner Ent. Co., L.P. v. FCC,*
 144 F.3d 75 (D.C. Cir. 1998) ....................................................... 8

*TransUnion LLC v. Ramirez,*
 594 U.S. 413 (2021) .................................................................... 2

*U.S. Telecom Ass'n v. FCC,*
 855 F.3d 381 (D.C. Cir. 2017) ................................................... 20

*Van v. LLR,*
 61 F.4th 1053 (9th Cir. 2023) ...................................................... 3

*Vt. Pub. Serv. Bd. v. FCC,*
 661 F.3d 54 (D.C. Cir. 2011) ....................................................... 2

*Wales Transp., Inc. v. ICC,*
 728 F.2d 774 (5th Cir. 1984) ....................................................... 6

*WATCH v. FCC,*
 712 F.2d 677 (D.C. Cir. 1983) ............................................... 8, 10

*Worldcall Interconnect, Inc. v. FCC,*
 907 F.3d 810 (5th Cir. 2018) ................................................. 8, 10

**STATUTES**

28 U.S.C. § 2344 ............................................................................ 5

47 U.S.C. § 153 ............................................................................ 15

47 U.S.C. § 254 ...................................................................*passim*

47 U.S.C. § 405 .............................................................. 7, 9, 10, 11

Children's Internet Protection Act,
 Pub. L. No. 106-554, 114 Stat. 2763A-335 ............................... 17

American Rescue Plan Act of 2021,
    Pub. L. No. 117-2, 135 Stat. 109 ...................................................................18

**OTHER AUTHORITIES**

47 C.F.R. § 54.709 ........................................................................................2

47 C.F.R. § 54.712 ........................................................................................4

A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts
    (2012)............................................................................................................17

*In the Matter of Safeguarding and Securing the Open Internet,*
    FCC 24-52, 2024 WL 2109860 (Apr. 25, 2024) ........................................20

*In the Matter of Schools & Libraries Universal Service Support Mechanism,*
    FCC 11-125, CC Docket No. 02-6, 2011 WL 3547577
    (Aug. 11, 2011) ...........................................................................................21

Report and Order, 62 Fed. Reg. 32,862 (June 17, 1997) .............................. 12, 15, 16, 17

# INTRODUCTION

The FCC, along with intervenors and *amici* who benefit from E-Rate funding, contend that it will advance students' education if they have Internet access, not just at school, but *everywhere* they go. There is powerful and growing evidence to doubt that claim. All that matters here, however, is that Congress authorized the FCC to enhance Internet access only for "classrooms." 47 U.S.C. § 254(h)(2)(A). Not private homes, not coffee shops, and not school buses—even though students could do homework in any of those places. If remote-learning and digital-education advocates want to keep federal funds flowing post-pandemic, they will need to persuade Congress.

Unable to argue with a straight face that a school bus is a "classroom," the FCC now tries to defend its Declaratory Ruling under § 254(h)(1)(B), which pledges support for "schools" generally. But its pivot raises a different problem: Subsection (h)(1)(B) authorizes subsidies for *telecommunications carriers* providing *telecommunications services*, yet E-Rate subsidizes *non*-telecommunications carriers for *non*-telecommunications services and equipment (such as the Wi-Fi networking equipment at issue here). That is why, more than 25 years ago, the FCC and this Court recognized that § 254(h)(1)(B) alone cannot authorize the full scope of E-Rate—§ 254(h)(2)(A) provides the necessary gap-filling authority. The same is true today. This pivot therefore leads to a dead end.

That leaves the FCC wriggling desperately to avoid judicial review. Its objection to the Molaks' Article III standing, however, is halfhearted and contrary to precedent. And repeating its motion to dismiss arguments does not make them any stronger.

# ARGUMENT

## I. PETITIONERS HAVE ARTICLE III STANDING.

In their opening brief, the Molaks explained why they have Article III standing. *See* Molak Br. 15–18. *First*, the Declaratory Ruling will financially harm the Molaks by saddling them with a higher Federal Universal Service Charge on their monthly phone bill. That pocketbook injury "obvious[ly]" qualifies as injury in fact. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 432 (2021). *Second*, that injury in fact is fairly traceable to the Declaratory Ruling, because the inevitable result of expanding the services eligible for E-Rate subsidies will be to increase the program's costs—costs to be paid by telephone companies, 47 C.F.R. § 54.709(a), and then invariably recouped from their customers, *see Vt. Pub. Serv. Bd. v. FCC*, 661 F.3d 54, 57 (D.C. Cir. 2011); Furchtgott-Roth Decl., ¶¶ 8–9. *Third*, vacating the Declaratory Ruling will obviate these new costs and thereby redress the Molaks' injury. That is enough for Article III.

Although the FCC includes a few pages of argument, in the middle of its brief, purporting to challenge the Molaks' standing (FCC Br. 29–31), it does not meaningfully challenge the predicate facts or propositions of law upon which the Molaks rested. The Commission does not dispute that the Declaratory Ruling will increase costs, or that those costs will be borne by customers like the Molaks. Nor does it dispute that vacatur of the Ruling would preempt that financial harm. Yet the FCC nonetheless urges that the Molaks have failed to establish Article III standing, based on half-baked reasons that flout black-letter law.

*First*, the FCC argues that the Molaks' financial injury may "be no more than a fraction of a penny." FCC Br. 30. But there is no small-dollar exception to the rule that monetary harm is a cognizable injury. To the contrary, "[f]or standing purposes, a loss of even a small amount of money" counts. *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017). That remains true even if the money at stake is "as small as a fraction of a cent." *Van v. LLR*, 61 F.4th 1053, 1064 (9th Cir. 2023); *accord, e.g., Jackson Mun. Airport Auth. v. Harkins*, 98 F.4th 144, 149 (5th Cir. 2024) (en banc) (Ho, J., concurring, joined by Stewart, Elrod, Higginson, and Ramirez, J.J.) ("Certainly, there's no *de minimis* exception to economic injury under Article III."). So the FCC cannot eliminate the injury in fact here by nitpicking its size or rounding it down to zero.[1]

*Second*, the Commission observes that it is not clear *which month's* phone bill will reflect the added costs of the Declaratory Ruling. *See* FCC Br. 30–31 (arguing that it is uncertain exactly when "subsidies for bus Wi-Fi [will] … cause petitioners' universal service fees to round up to the next cent"). But this argument misunderstands the requirement that a cognizable injury be "actual or imminent." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). That requirement ensures that an "alleged injury is not too

---

[1] The FCC's discussion of how the costs underlying the Federal Universal Service Charge are calculated has no bearing on the standing analysis in this case. The upshot is that the cost of subsidizing school bus Wi-Fi will not be a standalone line-item on customers' bills, but will instead be recouped through a broader formula alongside other E-Rate subsidies. FCC Br. 30–31. But that does not change the end result, which the FCC does not dispute: Consumers like the Molaks will bear the cost of subsidizing Wi-Fi on school buses. That is all that matters here.

speculative," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013), and therefore it is satisfied so long as "there is a substantial risk that the harm will occur," *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). That standard is met here, as it is "fairly likely"—indeed, not even seriously disputed—that expanded E-Rate subsidies will increase the Federal Universal Service Charge line-item that the Molaks pay. *Crawford v. Hind Cnty. Bd. of Supervisors*, 1 F.4th 371, 376 (5th Cir. 2021). Imminence requires nothing more, even if uncertainty remains as to exactly which month's bills will be affected. *Cf. id.* ("It's fairly likely that Crawford will again, at some point, be called for jury duty. It is true that we cannot say with certainty when, precisely, Crawford will again be called, but 'imminence' is an 'elastic concept' that can accommodate that uncertainty." (quoting *Lujan*, 504 U.S. at 564 n.2)).

*Finally*, the FCC muses that maybe the Molaks' injury is just a generalized grievance. FCC Br. 31 (citing *Hotze v. Burwell*, 784 F.3d 984, 995 (5th Cir. 2015)). But a generalized grievance exists where an impact "is plainly undifferentiated and 'common to all members of the public.'" *Lujan*, 504 U.S. at 575. That is not true here: The Declaratory Ruling affects only those individuals who (i) purchase telephone services with (ii) an interstate telecommunications component and (iii) pay a Federal Universal Service Charge. 47 C.F.R. § 54.712(a). To be sure, that may describe a large number of people besides the Molaks. But "[t]he fact that an injury may be suffered by a large number of people does not of itself make that injury a nonjusticiable generalized grievance." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 n.7 (2016).

## II. THERE IS NO OTHER OBSTACLE TO JUDICIAL REVIEW.

Aware that the Molaks have Article III standing, yet desperate to avoid judicial review, the FCC's lead argument is a rehash of its motion to dismiss, which the Court carried with the case. The thrust is that the Molaks were not entitled to seek review, because they did not "participate in the agency proceedings," by submitting comments or filing a reconsideration petition. FCC Br. 24–28. Those arguments are meritless. As the FCC now admits, this Court recognizes an exception to the "party status" requirement for challenges to an agency's statutory authority—which is exactly what this case presents. And since the Molaks did not need to be a "party" to the agency proceedings to pursue this challenge, they did not have to file a futile reconsideration petition in order to *become* a "party." The FCC's insistence otherwise defies both precedent and common sense.

### A. Circuit Precedent Holds That "Party Status" Is Not Required To Challenge an Agency's Statutory Authority.

The FCC contends that the Hobbs Act does not confer jurisdiction over this petition, because it authorizes only a "party aggrieved" to seek judicial review, 28 U.S.C. § 2344, and the Molaks are supposedly not such "part[ies]" within the meaning of that statute because they did not "participat[e] in the agency proceeding." FCC Br. 26.

The FCC's party-participation argument flies in the teeth of binding precedent. "This circuit recognizes an *ultra vires* exception to the party-aggrieved status requirement … where a person may appeal an agency action even if not a party to the original agency

5

proceeding … where the agency action is attacked as exceeding [its] power." *Texas v. NRC*, 78 F.4th 827, 839 (5th Cir. 2023). This is not a one-off exception, but a well-established one. It was applied not just in *Texas v. NRC*, but also in prior cases. *See Wales Transp., Inc. v. ICC*, 728 F.2d 774, 776 n.1 (5th Cir. 1984); *Am. Trucking Ass'ns, Inc. v. ICC*, 673 F.2d 82, 85 n.4 (5th Cir. 1982). Indeed, as this Court recognized in *American Trucking*, the exception traces to even earlier Supreme Court decisions. *See* 673 F.2d at 85 n.4 (citing *Edward Hines Yellow Pine Tr. v. United States*, 263 U.S. 143, 147 (1923), and *Skinner & Eddy Corp. v. United States*, 249 U.S. 557, 563–64 (1919)).

The FCC acknowledges the *ultra vires* exception, but insists it does "not properly apply here." FCC Br. 27. Wrong. The *ultra vires* exception lets the Court adjudicate "those portions of [a petitioner's] challenges that argue the [agency] acted beyond its statutory authority." *Texas v. NRC*, 78 F.4th at 839 (citing *Wales Transp.*, 728 F.2d at 776 n.1). That is the nature of the challenge here—that the statute does not authorize the agency to subsidize Internet service outside "classrooms."

Sure, the FCC disagrees *on the merits*. It claims that the Molaks' interpretation of its authority "is contrary to the text of Section 254(h) and longstanding agency practice." FCC Br. 28. But treating that as a jurisdictional obstacle puts the cart before the horse. The question presented by the petition for review is whether Congress authorized the FCC to issue the Declaratory Ruling. The agency cannot assume the answer is yes for the purpose of denying the Court's power to decide the question. *See Adar v. Smith*, 639 F.3d 146, 150 (5th Cir. 2011) ("[S]tanding does not depend upon … the merits.").

The FCC also tries to raise the bar for the *ultra vires* exception, claiming it applies only if there is "a plain violation of an unambiguous and mandatory provision of the statute." FCC Br. 28. That language derives from a different doctrine, however, recognizing implied "equitable jurisdiction" to review agency action absent a statutory cause of action. All the cases that the FCC cites address that distinct inquiry. *Leedom v. Kyne*, 358 U.S. 187 (1958); *Am. Airlines, Inc. v. Herman*, 176 F.3d 283, 293 (5th Cir. 1999); *Kirby Corp. v. Pena*, 109 F.3d 258, 268–69 (5th Cir. 1997). But none of this Court's cases applying the Hobbs Act rest on that line of authority or invoke its higher standard. And for good reason: In Hobbs Act cases like this one, petitioners are not demanding implied equitable jurisdiction. They are relying on the Hobbs Act and precedent applying it. In all events, the statutory violation here *is* "plain," as the Molaks showed in their opening brief and expose further below, *see infra*, Part III.

### B. The Molaks Were Not Required To File a Futile Reconsideration Petition Before Seeking Judicial Review.

The FCC claims that "party status" was also required by 47 U.S.C. § 405(a). That provision says that "a petition for reconsideration *shall not be* a condition precedent to judicial review … except where the party seeking such review (1) was not a party to the proceedings resulting in such order, decision, report, or action, or (2) relies on questions of fact or law upon which the Commission … has been afforded no opportunity to pass." 47 U.S.C. § 405(a) (emphasis added). The FCC misunderstands the function of this administrative-exhaustion rule, which is not implicated here.

As courts have long, consistently, and correctly understood, this provision simply codifies the "doctrine of exhaustion of administrative remedies." *WATCH v. FCC*, 712 F.2d 677, 681 (D.C. Cir. 1983); *accord Off. of Commc'n of United Church of Christ v. FCC*, 779 F.2d 702, 706 (D.C. Cir. 1985). As such, it is subject to "the established exceptions to the exhaustion doctrine in general." *United Church*, 779 F.2d at 706.

One such exception is where the agency "had an 'opportunity to pass' on [the petitioner's] claims." *Competitive Enter. Inst. v. FCC*, 970 F.3d 372, 380 (D.C. Cir. 2020) (Katsas, J.) (quoting *United Church*, 779 F.2d at 706–07). As the D.C. Circuit recently explained, that can occur not only through a reconsideration petition, but also "when another party raises the issue; when a dissenting Commissioner raises the issue; or when the agency addresses it anyway." *Competitive Enter. Inst.*, 970 F.3d at 380 (citing cases). In those cases, a reconsideration petition would be futile, and is *not* a precondition to judicial review. *See Competitive Enter. Inst.*, 970 F.3d at 380–81; *Time Warner Ent. Co., L.P. v. FCC*, 144 F.3d 75, 79–81 (D.C. Cir. 1998); *United Church*, 779 F.2d at 706–07. This Court has approvingly cited *Time Warner*, agreeing with Judge Katsas that "[w]here the Commission has considered an argument, § 405 does not preclude review." *Comsat Corp. v. FCC*, 250 F.3d 931, 937 (5th Cir. 2001); *see also Worldcall Interconnect, Inc. v. FCC*, 907 F.3d 810, 820 (5th Cir. 2018) (similar).[2]

---

[2] There is also an established exception to exhaustion for "agency action that is patently in excess of the agency's authority." *WATCH*, 712 F.2d at 682. This case fits within that exception too. *See infra*, Part III.

Here, the FCC had a chance to consider the legal points that the Molaks advance. Multiple parties filed comments making the same arguments about how the Declaratory Ruling exceeds the limits of the agency's statutory authority. *See, e.g.*, Comments of Virginians for Safe Technology, WC Docket No. 13-184, at 1 (filed Oct. 18, 2023) (A197–201). Members of Congress did the same in a letter. *See* Letter from Sen. Ted Cruz, Ranking Member, Comm. on Commerce, Science, and Technology, to Hon. Jessica Rosenworcel, Chair, FCC (July 31, 2023) (A202–05). The dissenting statements of Commissioners Carr and Simington echoed those arguments. *See* Declaratory Ruling at 12–13, 15 (A12–13, 15). And the FCC ultimately addressed these concerns on the merits (or at least purported to do so). *See id.* ¶¶ 3–5, 9 & n.32 (A1–2, 6).

The FCC insists this is not enough. Bucking precedent, it contends that § 405(a) allows no exceptions, and demands a reconsideration petition not only where the party presents new issues, but also where the party "was not a party to the proceedings" in the agency. FCC Br. 25–26. This draconian interpretation is incorrect.

As an initial matter, and as the Supreme Court recently explained, "[t]he procedural requirements that Congress enacts to govern the litigation process are only occasionally as strict as they seem." *Harrow v. Dep't of Def.*, 144 S. Ct. 1178, 1182 (2024). "Most of these rules" resemble § 405(a) in that they "read as categorical commands," using the word "shall." *Id.* "But Congress legislates against the backdrop of judicial decisions creating exceptions, and typically expects those doctrines to apply." *Id.* One doctrine relevant here is that "a court may be able to excuse a [litigant]'s non-

compliance for equitable reasons," *id.*, such as when a petition for reconsideration would be futile, *see Competitive Enter. Inst.*, 970 F.3d at 380–81. It would have been futile for the Molaks to seek reconsideration, given that their arguments were already before the agency, and given that the agency had blown past them over two robust dissents.

Moreover, Section 405(a) does not actually impose a condition precedent to judicial review. *Contra* FCC Br. 25–26. Instead, it says that a petition for reconsideration "*shall not be* a condition precedent to judicial review," subject to two exceptions. 47 U.S.C. § 405(a) (emphasis added). Neither of the exceptions applies here.

The first exception, for where the agency "has been afforded no opportunity to pass" on the issue, *id.*, operates as a classic exhaustion requirement. It "ensure[s] that the agency had the opportunity to consider the issue." *Texas v. NRC*, 78 F.4th at 838; *see also Hill v. FCC*, 496 F. App'x 396, 402 (5th Cir. 2012) (similar). As already explained, that concern is not implicated here. Not only were the issues presented, but there was also nothing the agency could have done differently—short of tanking the Declaratory Ruling altogether—to cure the lack of statutory authority.[3]

---

[3] The Commission asserts that any argument that 47 U.S.C. § 254(h)(1)(B) does not authorize the Declaratory Ruling is "waived" because it was not raised before the agency. FCC Br. 37. But many people told the Commission that the Declaratory Ruling exceeds the agency's statutory authority under § 254. *Supra* at p.9. Such arguments necessarily denied the agency's authority to act under subsection (h)(1)(B) whether they specifically cited it or not. The FCC would have this Court treat 47 U.S.C. § 405(a) as requiring lengthy briefs replete with full citations. That is not the law. All that is required is that the agency have a "fair opportunity" to pass on an issue. *WATCH*, 712 F.2d at 681; *see also Worldcall*, 907 F.3d at 820 (arguments in litigation need not be in "exact congruity" with those raised before the agency).

The second exception, for scenarios where the party seeking review "was not a party to the [agency] proceedings," 47 U.S.C. § 405(a), simply recognizes that party status is ordinarily required by the Hobbs Act. *See supra*, Part II.A. So if someone who did not participate in agency proceedings wants to seek judicial review, § 405(a) explains how to *become* a "party" and thus claim Hobbs Act jurisdiction—by filing a petition for reconsideration. But as already explained, the Molaks were excused from the Hobbs Act's "party status" requirement by this Circuit's *ultra vires* exception. To say that they nonetheless had to file a reconsideration petition to secure that party status makes no sense, and would completely nullify the *ultra vires* exception.

In short, this Court should not create a Circuit split, deviate from longstanding principles of administrative exhaustion, and undermine its own Hobbs Act precedent through a novel reading of an *exception* to § 405(a)'s rule that reconsideration petitions are *not* conditions precedent. There is no bar to reaching the merits.

## III.  THE DECLARATORY RULING IS CONTRARY TO LAW.

In the Declaratory Ruling's first substantive paragraph, the FCC recounted how the "E-Rate program was authorized by Congress" to "enhance … access to advanced telecommunications and information services for all public and nonprofit elementary and secondary school *classrooms*." Declaratory Ruling ¶ 3 (emphasis added) (A1–2). As support, the Ruling cited a single statutory provision: 47 U.S.C. § 254(h)(2)(A), which indeed empowers the FCC to promulgate "rules" for exactly that purpose—to enhance access to these services for "*classrooms*."

Yet, as the Molaks explained, the Declaratory Ruling purported to extend E-Rate subsidies *beyond* classrooms, to pay for Internet on school buses. And the FCC is poised to push the envelope further, with a pending proposal to subsidize Internet "hotspots" anywhere students or teachers go—including private homes. Molak Br. 28.

Called on this obvious overreach, § 254(h)(2)(A) drops from the first statutory cite in the FCC's Ruling all the way to the last four paragraphs of the FCC's brief, which offers only a sheepish argument that "'classroom' may be interpreted more broadly" in view of "evolving" reality. FCC Br. 50. The FCC's real strategy is to pivot to a different statutory provision—§ 254(h)(1)(B)—which speaks of services for "schools" generally rather than "classrooms" specifically. *See* FCC Br. 32–48. But § 254(h)(1)(B) cannot sustain the Declaratory Ruling, because that provision authorizes reimbursement only for "telecommunications carriers" who provide telecommunications services. E-Rate generally, and the Declaratory Ruling specifically, go further. That is why the FCC invoked § 254(h)(2)(A) when it originally constructed the E-Rate regulatory framework, *see* Report and Order, 62 Fed. Reg. 32,862 (June 17, 1997), and it is why this Court specifically rested on that provision to uphold the program, *see Tex. Off. of Pub. Util. Couns. v. FCC*, 183 F.3d 393 (5th Cir. 1999) (*TOPUC I*).

Put simply, § 254(h)(1)(B) alone does not and cannot authorize the full E-Rate program. Section 254(h)(2)(A) is a critical element of its statutory foundation. And § 254(h)(2)(A) only authorizes support for "classrooms." The agency therefore has no statutory power to expand E-Rate subsidies to Wi-Fi on school buses (or elsewhere).

That would require new congressional legislation—of the sort that Congress enacted to help students during the pandemic but recently allowed to lapse. This Court should reject the FCC's attempt to usurp legislative power by renewing that broad but expired program in the guise of "reinterpreting" an extant but restrictive one.

### A. Section 254(h)(2)(A) Does Not Authorize the Declaratory Ruling.

Despite pretending otherwise (*see* FCC Br. 32 n.9), the FCC cited § 254(h)(2)(A) in the Declaratory Ruling as the statutory authorization for the E-Rate program. *See* Declaratory Ruling, ¶ 3 & n.3 (A1–2). That provision, however, allows the FCC to enhance access to telecommunications and information services for "elementary and secondary school *classrooms*." 47 U.S.C. § 254(h)(2)(A) (emphasis added). As the Molaks explained, school buses are not "classrooms." Not as a matter of dictionary definitions. Not as a matter of ordinary usage or understanding. Not as a matter of statutory terms of art or industry practice. Not as a matter of anything. *See* Molak Br. 19–21.

Evidently embarrassed by its obligation to argue otherwise, the FCC relegates its response on this point to the very last words of its brief, before once again reiterating that § 254(h)(2)(A) is merely an afterthought the Court need not consider. *See* FCC Br. 48–50. It then offers two arguments that, to be fair, fully deserve bottom billing.

*First*, the Commission observes that § 254(h)(2)(A) refers to services provided "for" classrooms, rather than "in" or "at" classrooms. FCC Br. 49. But prepositions cannot prop up this Order. Internet service on a bus is not service "for" a classroom any more than it is service "in" or "at" a classroom. It is service "for" a bus, or perhaps

13

"for" its passengers. The Commission speculates that students may, while riding the bus, abstain from playing videogames or scrolling addictive social media, and instead "complete out-of-class assignments that prepare them for the next day's lessons"—and, in that highly attenuated sense, the service could supposedly be described as "for" the classroom. *Id.* That logic, however, would allow service *anywhere* to count as "for" the classroom, since it is hypothetically (indeed, definitionally) possible for students to complete their "out-of-class assignments" in any "out-of-class" location. "This surely proves too much." *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 222 (2009).

*Second*, the FCC sermonizes that, "in today's world, teaching and learning often occur outside of brick and mortar school buildings." FCC Br. 50. But "the world is my classroom" is a bromide, not a canon of construction. When Congress authorized the FCC to enhance access to telecommunication and information services for "public and nonprofit elementary and secondary school classrooms," 47 U.S.C. § 254(h)(2)(A), it was obviously referring to brick and mortar locations with desks and teachers, not metaphorical classrooms that transcend time and space. And once again, adopting the FCC's strained interpretation would render E-Rate boundless. In a real sense, the FCC would treat the *student* as the "classroom," connected to Wi-Fi wherever he or she goes.

That may well be the FCC's objective. It is evidently the objective of its *amici*, direct or indirect beneficiaries of E-Rate subsidies, who dismiss as a "relic of the past" the "notion that learning takes place only in a four-walled room in the schoolhouse." Joint Amicus Br. 22. They are transparent in their aims: Federal dollars for Internet

service should "extend to all places where students need and use the internet to learn," *id.*—that is, *everywhere*. In one fell swoop, this classroom-and-library program would become an unbounded font of federal funds for Internet across the nation, closing the "digital divide." It is no surprise that recipients of federal largesse want to keep opening the spigot. But as a matter of statutory construction, this is untenable.

### B. Section 254(h)(1)(B) Alone Cannot Authorize E-Rate.

Unable to ground the Declaratory Ruling in § 254(h)(2)(A), the FCC tries to shift attention to § 254(h)(1)(B). FCC Br. 32–41. But this provision cannot independently make school bus Wi-Fi eligible for E-Rate support. No need to take the Molaks' word for it—both the FCC and this Court reached that conclusion decades ago.

In 1997, the FCC issued an order implementing the Telecommunications Act of 1996, including the universal-service provisions of § 254. 62 Fed. Reg. 32,862. Two related aspects of that order are relevant here. *First*, even though § 254(h)(1)(B) limits support to "telecommunications carriers," *i.e.*, "any provider of telecommunications services," 47 U.S.C. § 153(51), the FCC declared that it may give E-Rate subsidies to *non*-carriers. *See, e.g.*, 62 Fed. Reg. 32,913–14 (¶¶ 369–75). *Second*, even though Internet access and internal connections are not telecommunication services delivered by such carriers, the FCC declared that E-Rate is available for such other services and equipment too. *See, e.g.*, *id.* at 32,898–99 (¶ 260); *id.* at 32,899–900 (¶¶ 269–70, 272, 276–77); *see also* A28–30 (order identifying eligible services and equipment for Funding Year 2024, including Internet access service, Wi-Fi, and related equipment).

How did the FCC justify this? By repeatedly invoking § 254(h)(2)(A), which authorizes it to make rules to enhance access to "advanced telecommunications *and information services*" (emphasis added). *See, e.g.*, 62 Fed. Reg. 32,898–99 (¶ 260); *id.* 32,899 (¶ 261); *id.* 32,913–14 (¶¶ 370, 372). The FCC thus recognized nearly 30 years ago that E-Rate could not rest on § 254(h)(1)(B) alone; the program as implemented also requires the agency to draw on its authority under § 254(h)(2)(A).

This Court upheld much of the 1997 FCC order, including the E-Rate portions described above, in *TOPUC I*. But in doing so, the Court underscored the centrality of § 254(h)(2)(A) to the statutory issue, citing it four times over the relevant few pages of analysis. *See* 183 F.3d at 442–44; *see, e.g., id.* at 443 (recounting that "[t]he FCC invokes its rulemaking power under § 254(h)(2)(A) … to provide support payments to non-telecommunications entities that provide internet access and internal connections to schools"). And even with the benefit of pairing § 254(h)(1)(B) and § 254(h)(2)(A), the agency barely squeezed by. *TOPUC I* began by observing that "the best reading" of § 254(h)(1)(B) did not permit the FCC to subsidize non-telecommunications services. 183 F.3d at 441. But the opinion then determined that reading § 254(h)(1)(B) in tandem with § 254(h)(2)(A) made the statute "sufficiently ambiguous to invoke step-two of *Chevron*." 183 F.3d at 441; *see also id.* at 442 ("After all, subsection (h)(2)(A) … instructs the FCC to establish competitively neutral rules to 'enhance ... access to advanced telecommunications and information services ….'"). And once at step two, essentially all that was left to do was to defer to the agency. *See id.* at 443.

The FCC is wrong, then, in asserting that it is "well established" that the agency can subsidize Internet access through § 254(h)(1)(B), and that this Court "upheld that interpretation" in *TOPUC I*. FCC Br. 39–40. Quite the opposite. The agency invoked § 254(h)(2)(A) in setting up E-Rate in the 1997 order. And this Court understood that § 254(h)(2)(A) was essential just to find enough ambiguity to get into *Chevron* territory. All of the FCC's arguments about the word "schools" in § 254(h)(1)(B) therefore miss the point. *See* FCC Br. 33–36. The relevant limit in subsection (h)(1)(B) is not "schools" but rather "telecommunications carriers." The relevant limit in subsection (h)(2)(A) is "classrooms." Neither subsection can stabilize the Declaratory Ruling.

The FCC also errs in asserting that Congress "ratified" its interpretation of § 254(h)(1)(B) when it enacted the Children's Internet Protection Act (CIPA) in 2001, Pub. L. No. 106-554, 114 Stat. 2763A-335, tit. XVII, §§ 1701 *et seq.* For one thing, this "prior-construction canon" applies when Congress "re-enacts a statute without change." *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 239–40 (2009). For another, the canon requires an authoritative consensus on the meaning of the text, such as "uniform holdings of lower courts." A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 324 (2012). Neither condition is met here. CIPA did not reenact § 254(h)(1)(B); it just added a new provision to § 254. FCC Br. 40 n.11. And *TOPUC I*, deferring with some reluctance at *Chevron* step two, hardly qualifies as an authoritative consensus on the meaning of § 254(h)(1)(B).

In sum, § 254(h)(1)(B) cannot alone support the Declaratory Ruling because it cannot alone authorize subsidies to non-telecommunications providers for Internet service and connections—such as Wi-Fi service and equipment for buses. The agency thus has to rely at least in part on § 254(h)(2)(A)—which is why the Declaratory Ruling cites it. *See* Declaratory Ruling ¶ 3 & n.3, ¶ 9 & n.32 (A1–2, 6). But § 254(h)(2)(A) imposes its own limits, including by limiting E-Rate support to "classrooms." The Declaratory Ruling blows past that limit. It is therefore unlawful.

## C. The FCC's Other Arguments Miss the Point.

The other miscellaneous arguments advanced by the FCC (joined by intervenors and *amici*) do not move the needle on the legality of the Declaratory Ruling.

*First*, the FCC insists that there is no inference to be drawn from Congress's enactment—and then sunsetting—of the Emergency Connectivity Fund (ECF), which expressly permitted subsidies for services and equipment for students and staff to use "at locations … *other than the school*" during the COVID-19 emergency. American Rescue Plan Act of 2021, Pub. L. No. 117-2, 135 Stat. 109, § 7402(a)(1) (emphasis added). FCC Br. 44–48. But there would have been no point in including that language unless Congress understood that the E-Rate program did not otherwise allow subsidies for remote learning. The FCC observes that ECF also did other things—like infuse special funding, increase the reimbursement rate, and streamline procedures. But Congress could have done all that without extending E-Rate beyond the schoolhouse

gate. On the Commission's reading of the statute, ECF's "locations other than the school" innovation was superfluous.

To be clear, the point is not that the enactment of an "emergency statute" blocks the agency from exercising "preexisting authority." FCC Br. 47. Rather, the point is that Congress's specification of beyond-the-classroom reach confirms that the agency *never had* "preexisting authority." And the agency's contrary conclusion, so proximate to expiration of its broader emergency powers, is a red flag about the good-faith of its interpretation. *Cf. Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 759–65 (2021).

*Second*, resisting the premise that it reversed course, the FCC maintains that it has previously "allowed E-Rate support for specific off-campus services." FCC Br. 41; *see also* Intervenor Br. 27. But the agency does not deny that for decades it has told the public that, as a "rule," off-campus use "is ineligible for support." FCC Br. 43; *see also* Molak Br. 21 & n.3. Indeed, the agency says that the Declaratory Ruling came about after certain entities sought a "waiver" of the rule against off-campus support. FCC Br. 15. And the few previously approved off-campus uses that the agency can identify— wireless phone service for bus drivers and teachers accompanying students on field trips, a mobile library, and those attending residential schools (FCC Br. 12–13)—appear limited to telecommunications services provided by telecommunications carriers, which means they at least arguably could be covered by § 254(h)(1)(B) alone. The same is not true of the Wi-Fi and Internet equipment that the Declaratory Ruling purports to subsidize. Anyway, even if agency has occasionally disregarded the plain statutory text,

it is doubtful that "the Executive could accumulate power through adverse possession." *NLRB v. Noel Canning*, 573 U.S. 513, 613 (2014) (Scalia, J., concurring in judgment).

*Third*, the FCC alludes (*see* FCC Br. 8 n.2) to its recent order reincarnating "net neutrality" by reclassifying broadband Internet as a "telecommunications service," as though that might bring the Declaratory Ruling within the scope of § 254(h)(1)(B). *See In the Matter of Safeguarding and Securing the Open Internet*, FCC 24-52, 2024 WL 2109860 (Apr. 25, 2024) (Open Internet Order). But the Open Internet Order has not yet taken effect (*id.* ¶ 710); it is already subject to litigation (*Ohio Telecom Ass'n v. FCC*, No. 24-3449 (6th Cir. docketed May 28, 2024)); and there are good reasons to doubt its legality (*U.S. Telecom Ass'n v. FCC*, 855 F.3d 381, 418–35 (D.C. Cir. 2017) (Kavanaugh, J., dissenting from denial of rehearing en banc)). In all events, while the Open Internet Order reclassifies *broadband Internet* as a telecommunications service, the Declaratory Ruling subsidizes *Wi-Fi networking and equipment*—none of which even arguably counts as a telecommunications service provided by a telecommunications carrier under § 254(h)(1)(B). *See supra*, Part III.B. So this too goes nowhere.

Moreover, the Open Internet Order itself cites § 254(h)(2)(A) as the source of authority for subsidizing broadband Internet and infrastructure "regardless" of whether the service is classified as a telecommunications or information service. Open Internet Order ¶ 92 & n.339; *see also id.* ¶ 94 & n.342. In other words, at the same time the FCC is telling this Court that § 254(h)(1)(B) independently authorizes E-Rate and the Declaratory Ruling, the agency is telling the public that the statutory linchpin is

§ 254(h)(2)(A). The FCC cannot have it both ways. *Cf. Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 213 (1988) ("Deference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate."). In reality, § 254(h)(2)(A) is not irrelevant (as the agency contends in this case); it is critical (as the agency has said for years). And under its plain terms, support is limited to "classrooms." *Supra*, Part III.A.

*Finally*, the intervenors and *amici* spend many pages of briefing arguing that the the expansion of E-Rate to cover Internet service on school buses is good policy. *See* Intervenor Br. 14-21; Joint Amicus Br. 7-18. That is, at minimum, debatable. The Internet has certainly "transformed" the way schools educate students (Intervenor Br. 1)—whether that transformation has been a net positive for students is another matter. And whether students would use Wi-Fi on the bus to do their homework, or instead to deepen their addiction to social media, remains to be seen.[4] All that matters for present purposes is that neither the Court nor the FCC is empowered to make that judgment. The statute authorizes the agency only to enhance Internet access for "classrooms."

Of course, Congress is free to go further. So if it is true that "policymakers on a bipartisan basis" believe the lack of Internet access on school buses is a "national

---

[4] While intervenors and *amici* suggest that there is no reason to worry about abuse of Internet access on unsupervised buses (Intervenor Br. 19–20; Joint Amicus Br. 16), their reassurances are largely empty. The FCC has already declared that social media is not "*per se* 'harmful to minors'" and therefore need not be filtered under CIPA. *In the Matter of Schools & Libraries Universal Service Support Mechanism*, FCC 11-125, CC Docket No. 02-6, ¶ 17, 2011 WL 3547577 (Aug. 11, 2011).

concern" (Joint Amicus Br. 12), then Congress can pass new legislation. Until it does so, however, the FCC has no authority to update the statute, notwithstanding its own concerns about "contemporary educational trends" (FCC Br. 4), and notwithstanding others' pleas to abandon ostensibly old-fashioned assumptions about "chalkboards," "textbooks," "hard-copy homework," "four-walled room[s]," and other supposed relics of "previous decades" (Intervenor Br. 1; Joint Amicus Br. 22).

## <u>CONCLUSION</u>

This Court should grant the petition for review, vacate the Declaratory Ruling as contrary to law, and award such other relief it deems appropriate.


Date: June 24, 2024

Respectfully submitted,

*s/ Jacob Moshe Roth*
Jacob (Yaakov) M. Roth
yroth@jonesday.com
David K. Suska
dsuska@jonesday.com
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Telephone: (202) 879-3939

***Counsel for Petitioners***

## CERTIFICATE OF SERVICE

I hereby certify that on June 24, 2024, the foregoing brief was electronically filed with the United States Court of Appeals for the Fifth Circuit using the CM/ECF system. I further certify that all parties required to be served have been served.

Dated: June 24, 2024     Respectfully submitted,

             *s/ Jacob Moshe Roth*

             *Counsel for Petitioners*

## CERTIFICATE OF COMPLIANCE

1.      This document complies with the word limit of Fed. R. App. P. 5(c)(1). Excluding the parts of the document exempted by Fed. R. App. P. 32(f) and Fifth Cir. R. 5, this brief contains 6,034 words.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Garamond font.

s/ *Jacob Moshe Roth*
*Counsel for Petitioners*
