No. 23-60641

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

Maurine Molak; Matthew Molak,

*Petitioners*,

v.

FEDERAL COMMUNICATIONS COMMISSION
and UNITED STATES OF AMERICA,

*Respondents*.

Petition for Review of an Order of the
Federal Communications Commission

## BRIEF IN SUPPORT OF RESPONDENTS OF INTERVENORS SCHOOLS, HEALTH & LIBRARIES BROADBAND COALITION

Andrew Jay Schwartzman
1341 G Street, NW
5th Floor
Washington, DC 20005
(202) 241-2408
AndySchwartzman@gmail.com

Jason Neal
Mohammad M. Ali
HWG LLP
1919 M Street, NW, 8th Floor
Washington, D.C. 20036
(202) 730-1300
jneal@hwglaw.com
mali@hwglaw.com

*Counsel for Schools, Health &*
*Libraries Broadband Coalition*

July 8, 2024

# CERTIFICATE OF INTERESTED PARTIES

## No. 23-60641, *Maurine Molak et al. v. Federal Communications Commission and United States of America*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

(1) Petitioners are: Maurine Molak and Matthew Molak.

(2) Counsel for Petitioners are: Jacob (Yaakov) M. Roth and David K. Suska, of Jones Day.

(3) The Federal Communications Commission is a federal agency, and the United States of America is a respondent by statute.

(4) Counsel for the Federal Communications Commission are: P. Michele Ellison, Jacob Matthew Lewis, Sarah E. Citrin, Rachel Proctor May, and Merrick Garland. Counsel for the United States of America are: Merrick Garland, Robert J. Wiggers, Robert B. Nicholson, and P. Michele Ellison.

(5) Intervenor Schools, Health & Libraries Broadband Coalition, supporting Respondents, is an incorporated 501(c)(3) public interest organization with over 300 members who share the goal of promoting open, affordable, high-quality broadband for anchor institutions and their communities. Its members include representatives of health care providers and networks,

schools, libraries, state broadband offices, private sector companies, state and national research and education networks, and consumer organizations. A complete list is available at http://shlb.org/about/coalition-members. Schools, Health & Libraries Broadband Coalition is a non-profit corporation that has no owners or subsidiaries; accordingly, it has no parent corporation and no publicly held corporation owns 10% or more of its stock.

(6) Counsel for Intervenor Schools, Health & Libraries Broadband Coalition are: Jason Neal and Mohammad M. Ali of HWG LLP, and Andrew Jay Schwartzman.

(7) Professor Adam Candeub has filed an *amicus curiae* brief in this case in support of Petitioners. Counsel for Professor Adam Candeub is James Burnham of King Street Legal, P.L.L.C.

(10) Competitive Enterprise Institute filed an *amicus curiae* brief in this case in support of Petitioners. Counsel for Competitive Enterprise Institute is David Sean McFadden.

(11) Senators Ted Cruz, Marsha Blackburn, Mike Braun, Ted Budd, James Lankford, Cynthia Lummis, and Pete Ricketts have filed an *amicus curiae* brief in this case in support of Petitioners. Counsel for those *amici* are: Christopher Peele, David Austin Robert Nimocks, and Michael Christopher Toth of Peele Nimocks Toth.

(12) Texas Public Policy Foundation has filed an *amicus curiae* brief in this case in support of Petitioners. Counsel for Texas Public Policy Foundation are: Thomas McCarthy and Tiffany Bates of Consovoy McCarthy, P.L.L.C.

(13) American Association of School Administrators, American Federation of School Administrators, American Federation of Teachers, American Library Association, Association of School Business Officials International, Association of Educational Service Agencies, Consortium for School Networking, National Association of Elementary School Principals, National Catholic Educational Association, National Education Association, and National School Boards Association have filed an *amicus curiae* brief in this case in support of Respondents. Counsel for those *amici* are: Jennifer Tatel, L. Charles Keller, and Travis E. Litman of Wilkinson Barker Knauer, LLP.

(14) Pursuant to Fifth Circuit Rule 28.2.1, the following describes the "large group of persons or firms" that are "financially interested in the outcome" of this litigation: Petitioners challenge the Federal Communications Commission's Declaratory Ruling regarding the use of Wi-Fi, or other similar technologies that act as an access point, on school buses. *See Modernizing the E-Rate Program for Schools and Libraries*, Declaratory Ruling, FCC 23-84, WC Docket No. 13-184 (rel. Oct. 25, 2023) ("Decl. Ruling") (A1). The Universal Service Fund pays for the schools and

libraries universal service support mechanism, also called the "E-Rate" program. *See* Federal Communications Commission, *Universal Service Support Mechanisms*, https://www.fcc.gov/consumers/guides/universal-service-support-mechanisms (last visited June 10, 2024). Telecommunications companies obligated to pay a percentage of their interstate end-user revenues to the Universal Service Fund based on the Contribution Factor are financially interested in the outcome of this litigation. Direct beneficiaries of the E-Rate program, providers of services covered by E-Rate, and many other participants in the overall telecommunications industry are financially interested or potentially interested in the outcome of this litigation.

Dated: July 8, 2024

/s/ Jason Neal

Jason Neal

*Counsel of Record for Schools, Health & Libraries Broadband Coalition*

# TABLE OF CONTENTS

INTRODUCTION ................................................................1

JURISDICTIONAL STATEMENT ...........................................4

STATEMENT OF ISSUES PRESENTED.................................4

STATEMENT OF THE CASE.................................................4

SUMMARY OF ARGUMENT ..............................................12

ARGUMENT ...................................................................14

I. SCHOOL-BUS INTERNET ACCESS SERVES AN IMPORTANT
EDUCATIONAL PURPOSE. .......................................14

    A. E-Rate Eligibility for School-Bus Internet Access Offers Vital
Connectivity for Students...................................14

    B. Petitioners' and *Amici*'s Concerns Regarding Student Misuse of
School-Offered Wi-Fi Are Unfounded. .............19

II. SECTION 254 AUTHORIZES THE COMMISSION TO PROVIDE
E-RATE SUPPORT FOR SCHOOL-BUS INTERNET ACCESS...............21

    A. The FCC Is Correct that Section 254 Provides Ample Authority
for the Declaratory Ruling.................................22

    B. Petitioners' Arguments Regarding Section 254(h)(2)(A)
Are Contrary to the Statute and to Longstanding FCC
E-Rate Decisions. ...........................................25

    C. Petitioners' Arguments Regarding the Emergency Connectivity
Fund Also Fail. ..............................................27

CONCLUSION .................................................................30

# TABLE OF AUTHORITIES

## CASES

*Alabama Association of Realtors v. HHS*,
   141 S. Ct. 2485 (2021) ................................................... 29

*City of Arlington v. FCC*,
   569 U.S. 290 (2013) ....................................................... 23

*Worldcall Interconnect, Inc. v. FCC*,
   907 F.3d 810 (5th Cir. 2018) ........................................ 12

## STATUTES

47 U.S.C. § 254(a)(2) ............................................................. 4

47 U.S.C. § 254(c)(1)(A) ........................................................ 3

47 U.S.C. § 254(c)(3) .............................................. 3, 4, 13, 22

47 U.S.C. § 254(h)(1)(B) ....................... 3, 4, 5, 13, 22, 23, 24

47 U.S.C. § 254(h)(2)(A) ...................................................... 25

47 U.S.C. § 254(h)(5) ........................................................... 19

47 U.S.C. § 254(*l*) ................................................................ 19

47 U.S.C. § 405 ..................................................................... 12

American Rescue Plan Act of 2021,
   Pub. L. No. 117-2, 135 Stat. 4 (2021) ......................... 28

## REGULATIONS

47 C.F.R. § 54.500 .......................................................... 5, 26

47 C.F.R. § 54.501 ............................................................... 25

47 C.F.R. § 54.520(c)(1) ...................................................... 19

## ADMINISTRATIVE MATERIALS

*E-Rate Deployed Ubiquitously 2011 Pilot Program*, Order, 26 FCC
   Rcd. 9526 (2011) ............................................................. 7

Letter from Jon Bernstein, AASA, The School Superintendents
    Organization, to Marlene Dortch, Secretary, FCC, WC Docket
    Nos. 13-184, 06-122 (Sept. 12, 2019) .............................................17

Letter from Tara Sweeney, Assistant Secretary, Indian Affairs, United
    States Department of the Interior, to Marlene Dortch, Secretary,
    FCC, WC Docket No. 13-184 (Aug. 31, 2020)....................................8

Reply Comments and Request for Waiver of the West Virginia
    Department of Education, CC Docket No. 02-6, WC Docket Nos.
    13-184, 10-90 (Sept. 13, 2017).........................................................18

*Schools and Libraries Universal Serv. Support Mechanism*, Second
    Report and Order, 18 FCC Rcd. 9202 (2003)....................5, 6, 26, 27

*Schools and Libraries Universal Service Support Mechanism*, Sixth
    Report and Order, 25 FCC Rcd. 18762 (2010)...............................6, 7

*Wireline Competition Bureau Seeks Comment on Petitions Regarding
    Off-Campus Use of Existing E-Rate Supported Connectivity*, 31
    FCC Rcd. 10510, 10513 (2016).........................................................7

## OTHER AUTHORITIES

Amy Worst, *Create a Safer School Bus: Decreasing Student
    Behavior Incidents* ...........................................................................21

Clare McLaughlin, *The Homework Gap: The 'Cruelest Part of the
    Digital Divide'*, Nat'l Educ. Ass'n (2016) ...................................2, 14

Federal Communications Commission, *Universal Service
    Support Mechanisms*........................................................................ iv

**INTRODUCTION**

Education in 2024 bears very little resemblance to education in previous decades.  When Congress passed the Telecommunications Act of 1996, for example, teachers instructed students during classroom time using chalkboards, physical handouts, and notebooks, and students carried textbooks home to do additional reading.  "Homework" meant reading assignments in a textbook, or a handout of math problems, writing prompts, and the like.  Students brought books, notes, and hard-copy homework home at the end of the day to complete assignments and prepare for the next day's instruction.

Advances in technology have opened new avenues for education and transformed the pattern of classwork and homework.  Homework no longer means cracking open a textbook and completing a written handout.  Instead, students are instructed to access reading assignments on web-based learning platforms, to watch online video presentations, and to complete and submit interactive homework assignments online.  Some of these technological shifts in education were underway before the COVID-19 pandemic, but the shift to remote learning due to pandemic-related restrictions greatly accelerated the use of Internet-based education.  Even as pandemic-related restrictions have lifted, the shift toward digital education has remained.  Indeed, basic facility with these kinds of technologies is an essential part of students' preparation for adult life and

participation in the workforce.  The FCC rightly explained in the Declaratory Ruling under review that "having broadband connectivity is vital to learning in today's increasing digital world."  Decl. Ruling ¶ 11 (A7).

Unfortunately, broadband Internet access remains out of reach for millions of Americans.  The "digital divide"—between those who do and do not have reliable access to broadband—is especially acute in rural areas and among lower-income communities.  And it has significant negative impacts on children and their educational opportunities.  Indeed, experts have long been sounding the alarm on this "homework gap": unconnected students fare worse academically than their connected peers, including lower test scores and rates of homework completion. *See* Decl. Ruling ¶ 11 & n.37 (A7) (citing Clare McLaughlin, *The Homework Gap: The 'Cruelest Part of the Digital Divide'*, Nat'l Educ. Ass'n (Apr. 20, 2016), https://www.nea.org/nea-today/all-news-articles/homework-gap-cruelest-part-digital-divide (explaining how unconnected students seek out free Internet access in commercial parking lots or libraries to complete assignments, and many others are "simply unable to finish the work")).  Likewise, even students with sufficient home connectivity often face long daily bus rides to and from school, in addition to long rides to and from athletic and other school activities.

In the Telecommunications Act, Congress charged the FCC with preserving and advancing universal service.  Even in 1996, Congress recognized that

communications technologies would inevitably evolve and advance over time, including those "essential to education." 47 U.S.C. § 254(c)(1)(A). Congress thus specifically created a mechanism, administered by the FCC, to ensure that schools and libraries would be able to receive services designated by the FCC "for educational purposes at rates less than the amounts charged for similar services to other parties." *Id.* § 254(h)(1)(B); *see id.* § 254(c)(3) (FCC authority to "designate additional services" for this purpose). The FCC has established and updated its rules for this program (the "E-Rate" program) in the ensuing years.

The Declaratory Ruling at issue here recognized what is practically indisputable: that enabling schools to add Wi-Fi capabilities to school buses is one significant way of bridging the homework gap through the E-Rate program, allowing students on long bus rides home from school, or to and from school activities, to "meaningfully engage in learning" in the modern age. Decl. Ruling ¶ 10 (A7).

Petitioners did not participate in the agency proceeding below. For the first time on appeal, they characterize the Declaratory Ruling as an unprecedented expansion of the E-Rate program, triggered by the expiration of another funding source. To the contrary, the Schools, Health & Libraries Broadband Coalition ("SHLB Coalition") and other E-Rate supporters have explained for years—in this proceeding—that the FCC's statutory authority and agency precedent support the

inclusion of school-bus Wi-Fi access in the E-Rate program. The FCC's action

was well within its authority, and the Court should reject Petitioners' challenge.

## JURISDICTIONAL STATEMENT

SHLB Coalition adopts the jurisdictional statement from Respondents' brief

and reiterates its support for Respondents' motion to dismiss. *See* Resp. Br. 4.

## STATEMENT OF ISSUES PRESENTED

SHLB Coalition adopts the statement of issues from Respondents' brief. *See*

Resp. Br. 5.

## STATEMENT OF THE CASE

***The E-Rate Program.*** Congress authorized the E-Rate program as part of

the Telecommunications Act of 1996. It directed the FCC to adopt rules regarding

the "services that are supported by Federal universal service support mechanisms."

47 U.S.C. § 254(a)(2). Congress also authorized the FCC to "designate additional

services" for universal-service support "for schools, libraries, and health care

providers" for the purposes of the programs described in Section 254(h). *Id.*

§ 254(c)(3).

Section 254(h)(1)(B), in turn, requires carriers to provide those services

designated by the FCC under Section 254(c)(3) to schools and libraries "for

educational purposes" at discounted rates. *Id.* § 254(h)(1)(B). The FCC

determines the amount of the discount based on what is "appropriate and necessary

to ensure affordable access to and use of such services by such entities," and carriers are reimbursed out of the universal service fund.  *Id.*

**The FCC's Adoption of the "Educational Purpose" Test for E-Rate Services.**  The FCC first adopted rules for the E-Rate program in 1997.  Consistent with Section 254, the FCC continued to refine those rules in the following years.

Most relevant here, in 2003, the FCC explained its interpretation of the requirement in Section 254(h) that the services supported under the E-Rate program be provided to schools and libraries "for educational purposes." 47 U.S.C. § 254(h)(1)(B).  The FCC concluded that, for schools, "activities that are integral, immediate, and proximate to the education of students … qualify as educational purposes under this program."  *Schools and Libraries Universal Service Support Mechanism*, Second Report and Order, 18 FCC Rcd. 9202, 9208 ¶ 17 (2003) ("E-Rate Second Report and Order"); *see* 47 C.F.R. § 54.500 (defining "Educational purposes").

The FCC recognized, even in 2003, that those educational activities happen primarily—but not exclusively—in the classroom or on school grounds.  It thus "establish[ed] a presumption that activities that occur in a … classroom or … on school property are integral, immediate, and proximate to the education of students."  E-Rate Second Report and Order ¶ 17.  It also concluded, however, that "in certain limited instances," offsite use of the services "would also be integral,

immediate, and proximate" to the education of students and thus eligible for support, albeit without the presumption for in-class or on-campus locations. *Id.* ¶ 19. As examples of eligible offsite services, the FCC described "a school bus driver's use of wireless telecommunications services while delivering children to and from school, a library staff person's use of wireless telecommunications service on a library's mobile library unit van, and the use by teachers or other school staff of wireless telecommunications service while accompanying students on a field trip or sporting event." *Id.* at n.28.

As far back as 2010, the FCC recognized that "[a]dvances in technology have enabled students to continue to learn well after the school bell rings," and that "online educational systems are rapidly taking learning outside the classroom." *Schools and Libraries Universal Service Support Mechanism*, Sixth Report and Order, 25 FCC Rcd. 18762, ¶ 42 (2010) ("E-Rate Sixth Report and Order") (cleaned up). The Commission noted, however, that a growing broadband access gap might disadvantage "students who can only access these resources at their public schools and libraries." *Id.* (internal quotation marks omitted). The FCC acknowledged that some stakeholders encouraged it to "proceed cautiously in this area" to understand the relevant benefits and challenges. *Id.* ¶ 43. It thus established a pilot program to explore E-Rate support for offsite wireless connectivity. *See id.* That program ultimately dedicated "approximately

$9 million for funding year 2011 to 20 initiatives ranging from off-campus access to e-textbooks for students; to connectivity for netbooks for students living in remote, isolated areas; and to access to flexible, online education programs for home-bound students unable to attend classes because of medical challenges." *Wireline Competition Bureau Seeks Comment on Petitions Regarding Off-Campus Use of Existing E-Rate Supported Connectivity*, 31 FCC Rcd. 10510, 10513 (2016) (citing *E-Rate Deployed Ubiquitously 2011 Pilot Program*, Order, 26 FCC Rcd. 9526, 9526 ¶ 1 (2011)).[1]

**SHLB Coalition's 2021 Petition for Declaratory Ruling.** The COVID-19 pandemic transformed education, like much of society, effectively overnight. In-person attendance came to a halt as schools and libraries across the country shuttered. *See* Petition for Expedited Declaratory Ruling and Waivers of the Schools, Health & Libraries Broadband Coalition, et al., WC Docket No. 13-184, at 1 (filed Jan. 26, 2021) ("SHLB Coalition Petition") (A93). Tens of millions of students and their families were thrust into remote learning with no warning or preparation. The pandemic also exacerbated the inequity of education between

---

[1]  The E-Rate Sixth Report and Order also permitted E-Rate support for eligible services provided in the residential areas of "residential schools that serve unique populations," such as schools on Tribal lands and certain others, concluding that services in those areas met the educational-purpose requirement because the educational needs of students attending those institutions "may not be otherwise met." E-Rate Sixth Report and Order ¶ 31.

connected and unconnected students. Students who before the pandemic had faced difficulty accessing and keeping up with schoolwork without sufficient at-home broadband access now faced being locked out of learning entirely. *See, e.g.*, Letter from Tara Sweeney, Assistant Secretary, Indian Affairs, United States Department of the Interior, to Marlene Dortch, Secretary, FCC, WC Docket No. 13-184, at 1 (filed Aug. 31, 2020) (A121) (noting that "of the 44,000 BIE students enrolled for the 2019-2020 school year … 72 percent live in areas unserved or underserved by broadband"). In response, and in the absence of federal assistance, schools and educators pursued creative solutions to try to keep students connected to the Internet and their education. *See* SHLB Coalition Petition at 1-5 (A93-97) (describing the challenges and solutions in individual communities).

In January 2021, however, with many students still facing a dearth of connectivity in hybrid and fully remote learning environments, SHLB Coalition filed a petition asking that the FCC clarify that using E-Rate support for offsite "use of broadband services and equipment for the purpose of facilitating remote learning during the COVID-19 pandemic," such as on school buses, "constitutes an educational purpose." *Id.* at 7 (A99). SHLB Coalition argued that "the COVID-19 pandemic has exacerbated the digital divide and made longstanding calls for the Commission to allow E-rate support for off-campus broadband a matter of great urgency." *Id.* at 8 (A100). Declaring that "E-rate funds may be used to support

off-campus equipment and services," SHLB Coalition argued, would help to address the challenges created by the pandemic.  *Id.* (A100)

 ***The FCC Proceeding.***  The FCC issued a public notice in February 2021 seeking public comment on SHLB Coalition's petition, as well as other petitions urging the FCC to permit the use of E-Rate funds for remote learning.  *See Wireline Competition Bureau Seeks Comment on Petitions for Emergency Relief to Allow the Use of E-Rate Funds to Support Remote Learning During the COVID-19 Pandemic*, 36 FCC Rcd. 1304 (2021) (A124-33).  In comments filed in response to the public notice, a broad and geographically diverse range of stakeholders urged the Commission to make school bus Internet connectivity permanently eligible for E-Rate support.  *See* Decl. Ruling ¶ 6 & n.18 (A3-4) (noting support from the E-Rate Management Professionals Association, the Aurora Institute, the New Mexico Public School Facilities Authority, the Illinois Office of Broadband, and the West Virginia Department of Education).  A wide range of commenters also supported E-Rate eligibility for school bus Internet connectivity in response to separate public notices that the FCC issued.  *See id.* ¶ 6 & nn.20-21 (A3-4) (citing comments by SHLB Coalition, Microsoft, Urban Education Network of Iowa, Rural School Advocates of Iowa, the Wisconsin Department of Public Instruction, Information Technology Industry Council, SpaceX, and T-Mobile USA, among others, arguing that school-bus Wi-Fi serves an educational purpose and should be

eligible for E-Rate support).  Neither of the Petitioners filed comments or otherwise participated in the proceeding.

The FCC published the Declaratory Ruling in October 2023, clarifying that "the use of Wi-Fi, or other similar access point technologies, on school buses serves an educational purpose." *Id.* ¶ 9 (A6).  It concluded that, given the widespread lack of reliable in-home broadband for students, school bus wireless connectivity was "integral, immediate, and proximate to the education of students," and was authorized by Section 254(h)(1)(B), read in conjunction with section 254(c)(3).  *Id.* & n.32 (A6).

The FCC explained that it had long ago "determined that certain off-campus use of E-Rate-eligible services is considered an educational purpose," citing its pilot program for offsite wireless services and its decision to allow E-Rate support for residential areas of some residential schools in the E-Rate Sixth Report and Order.  *Id.* ¶ 10 (A6); *see also id.* ¶ 5 (A2-3).  As in those past decisions, the FCC concluded, providing connectivity on school buses was "critical to meeting the ongoing educational needs of students and their ability to meaningfully engage in learning." *Id.* ¶ 10 (A7).  The FCC specifically identified the "lack of connectivity in students' homes" as an obstacle for many students, as well as the fact that "students can spend hours on school buses traveling to and from school and other school-related activities, particularly in rural parts of the country." *Id.* (A7).

The Commission noted in the alternative that its ruling was also authorized by 47 U.S.C. § 254(h)(2)(A), which authorizes the FCC to "establish competitively neutral rules … to enhance, to the extent technically feasible and economically reasonable, access to advanced telecommunications and information services for all public and nonprofit elementary school classrooms, health care providers, and libraries." *See* Decl. Ruling ¶ 9 n.32 (A6). This separate source of authority, the FCC explained, supported the provision of Wi-Fi on school buses for similar reasons. *Id.* (A6).

***Petitioners' Challenge.*** Petitioners Maurine Molak and Matthew Molak filed this case to challenge the Commission's declaratory ruling. Petitioners argue that Section 254 limits E-Rate support only to services for physical classrooms and libraries and that the Declaratory Ruling therefore violates the statute. *See* Pet. Br. 15.

The FCC filed a motion to dismiss the petition for lack of jurisdiction. *See* Federal Respondents' Motion to Dismiss and to Suspend Merits Briefing, ECF No. 33. This Court ordered that the motion to dismiss be carried with the case, and it therefore remains before the Court. *See* Order, ECF No. 59-2. SHLB Coalition agrees with the FCC's arguments in support of dismissal. *See* Resp. Br. 4, 24-31.[2]

---

[2]  Petitioners' failures are not mere foot faults, but rather prejudice SHLB Coalition and others who participated in the proceeding. As Respondents note

SHLB Coalition is a public interest organization whose mission is to promote open, affordable, high-quality broadband for anchor institutions and their communities. SHLB Coalition and its members, who include many E-Rate recipients, support the E-Rate program to ensure that educational institutions themselves can access, and can provide their many students with access to, the broadband Internet connectivity that is essential to a 21st Century education. SHLB Coalition filed one of the petitions that led to the FCC's adoption of the Declaratory Ruling and intervened in this case to support the many educational institutions and students that rely upon and benefit from the E-Rate Program, who would be harmed by being denied Internet connectivity.

## SUMMARY OF ARGUMENT

**I.** School-bus Internet access serves an important educational purpose because Internet access is essential to modern learning. Making Internet access available on school buses provides numerous students opportunities to complete schoolwork that they would not otherwise have—both for students with limited

---

at various points, for example, Petitioners' opening brief raises several arguments that were waived below. *See* Resp. Br. 36-41. Judicial discussions of 47 U.S.C. § 405's requirements rightly focus primarily on the *agency*'s opportunity to pass upon issues raised by parties to the proceeding, *see, e.g.*, *Worldcall Interconnect, Inc. v. FCC*, 907 F.3d 810, 820 (5th Cir. 2018), but both agencies and reviewing courts also benefit from the development of a record that reflects the give and take of different parties engaging with one another's arguments.

Internet access at home and for students who ride buses for extended periods to and from school or to and from athletic and other school activities. Real-life experience, reflected in comments from numerous parties on the record, shows the benefits of this increased connectivity. And while Petitioners and some *amici* suggest that providing access to school-bus Wi-Fi will lead to misuse, FCC rules require filtering, and service providers submitted significant evidence on the record that content filtering is both available and effective.

**II.** SHLB Coalition agrees with Respondents regarding the numerous bases for dismissal. But if the Court reaches the merits, it should deny the petition because Section 254 provides the FCC ample authority for the Declaratory Ruling. Sections 254(h)(1)(B) and 254(c)(3) authorize the Commission to designate services as eligible for reimbursement under the E-Rate program when provided to an eligible school for educational purposes. 47 U.S.C. §§ 254(c)(3), (h)(1)(B). Petitioners largely ignore the FCC's reliance on those statutory provisions and instead focus on the FCC's discussion of Section 254(h)(2)(A). Petitioners' arguments misread the statute and misconstrue decades of FCC precedent.

**ARGUMENT**

## I. SCHOOL-BUS INTERNET ACCESS SERVES AN IMPORTANT EDUCATIONAL PURPOSE.

### A. E-Rate Eligibility for School-Bus Internet Access Offers Vital Connectivity for Students.

The Commission concluded in the Declaratory Ruling that "the use of Wi-Fi, or other similar access point technologies, on school buses … is integral, immediate, and proximate to the education of students," and therefore "serves an educational purpose."  Decl. Ruling ¶ 9 (A6).  The record strongly supports that conclusion.

Broadband Internet access is essential to modern education—and not just while students are physically in the classroom.  As far back as 2009, the FCC estimated that 70% of teachers assigned homework requiring access to broadband Internet, while 65% of students used the Internet at home to complete their homework.  *See* Clare McLaughlin, *The Homework Gap: The 'Cruelest Part of the Digital Divide'*, Nat'l Educ. Ass'n (Apr. 20, 2016), https://www.nea.org/nea-today/all-news-articles/homework-gap-cruelest-part-digital-divide (referencing FCC Broadband Task Force report).  Fifteen years later, and following the explosion of web-based education in the wake of the COVID-19 pandemic, that number has surely grown.  Numerous state departments of education and other stakeholders in the proceeding agreed on the importance of student access to the

Internet for successful education.  *See, e.g*, Reply Comments of the Wisconsin

Department of Public Instruction at 1, WC Docket No. 13-184 (filed Oct. 12, 2021)

(A134) ("As was clear to many before the pandemic, and became clear to all

during the pandemic, students need internet access at home to participate in

school."); Comments of The School District of Lee County, FL at 1, WC Docket

No. 21-31 (filed Feb. 12, 2021) (A137) (arguing for E-Rate support for mobile

hotspots "even after the COVID crisis to address virtual instruction AND the

homework gap/digital divide"); Comments of New York State Education

Department at 2, WC Docket No. 21-31 (filed Feb. 16, 2021) (A139) ("Sufficient

access to computing devices and high-speed internet are essential for educational

equity.").

Even as broadband Internet has become a prerequisite for education, it

remains out of reach for many students.  Some estimates hold that upwards of 16

million students nationwide lack at-home broadband Internet access.  *See* Decl.

Ruling ¶ 1 n.1 (A1) (citing an estimate from Common Sense Media and the Boston

Consulting Group).  Others put that number as high as 19 million.  Reply

Comments of the Information Technology Industry Council at 1, WC Docket No.

13-184 (filed Oct. 12, 2021) ("IT Industry Council Reply Comments") (A142).

Low-income, rural, and minority students disproportionately lack access.  *See*

SHLB Coalition Petition at 2-3 (A94-95); Comments of the Schools, Health &

Libraries Broadband Coalition at 2, WC Docket No. 13-184 (filed Sept. 27, 2021) (A147) (noting that "[r]oughly thirty percent of households do not have broadband access at home today, and this percentage can be much higher in lower-income neighborhoods").

Making Internet access available on school buses provides those students at least one significant means of learning and completing schoolwork outside the school building. *See* Comments of SpaceX at 1-2, WC Docket No. 13-184 (filed Sept. 20, 2022) (A150-51) (noting that many low-income students lack home Internet access, and "[c]onnecting school buses will afford students the ability to optimize their commute time for necessary educational internet use"); IT Industry Council Reply Comments at 3 (A144) (noting that pandemic-era "successes of Wi-Fi enabled buses demonstrate just how important that functionality will continue to be for students who may lack broadband at home"). As one school district described in a letter supporting school-bus Wi-Fi, while students may face poverty and other challenging circumstances, they "are rich in potential when we provide the conditions for modern learning such as computing devices and broadband access." Comments of Fresno Unified School District at 1, WC Docket No. 13-184 (filed Nov. 30, 2023) ("Fresno Unified School Bus Wi-Fi Comments") (A153). Increasing access to connectivity for students also provides them

opportunities to gain facility with modern technologies they will need as adult citizens and members of the workforce.

While increased connectivity is particularly valuable to students who lack Internet access at home, it is also beneficial for all students on bus rides commuting to and from school and to and from athletic and other school activities. As several commenters noted in the record, those bus rides can be very long and time-consuming, and the FCC's action will enable more students to use that time to access educational materials and complete classwork. *See, e.g.*, Comments of the New Mexico Public School Facilities Authority at 5, CC Docket No. 02-6, WC Docket No. 21-31 (filed Feb. 16, 2021) ("New Mexico PSFA Remote Learning Comments") (A55) (noting that "[i]n New Mexico and other states, it is not uncommon for students to travel more than two hours per day via bus and even longer for sporting events"); Comments of the Consortium for School Networking, at 4, WC Docket No. 13-184 (filed Sept. 27, 2021) ("Consortium for School Networking Comments") (A171) (noting that "many students are routinely subject to long bus rides where they would benefit from broadband access to complete their homework and access learning resources while they are in transit"); Letter from Jon Bernstein, AASA, The School Superintendents Organization, to Marlene Dortch, Secretary, FCC, WC Docket Nos. 13-184, 06-122 at 1-2 (filed Sept. 12, 2019) (A172-73) (rural school superintendents voicing "support for adding Wi-Fi

on buses," and noting several examples of how "their students endured long bus rides to school and to athletic competitions").

Students with Wi-Fi or similar connectivity on school buses can "make effective use of their time," New Mexico PSFA Remote Learning Comments at 5 (A56), "complete their homework[,] and access learning resources while they are in transit," Consortium for School Networking Comments at 4 (A171). In its own petition seeking authorization to use E-Rate funds for this purpose, for example, the West Virginia Department of Education explained that "West Virginia is an extremely rural state that is lacking in home access for students in their communities" and that a school-bus Wi-Fi program would allow "students who are participating in sporting events and field trips … as well as students who are on school buses before and after school," "to continue their studies and complete homework." Reply Comments and Request for Waiver of the West Virginia Department of Education at 1, 8, CC Docket No. 02-6, WC Docket Nos. 13-184, 10-90 (filed Sept. 13, 2017) (A174, 181).

This expanded connectivity has "myriad demonstrated benefits for students," including "increased productivity [and] focused behavior." *See* Letter from Indra Sehdev Chalk, T-Mobile USA, Inc., to Marlene Dortch, Secretary, FCC, WC Docket No. 13-184 at 1 (filed May 31, 2023) (A185). Indeed, as SHLB has noted, in addition to "a decrease in inappropriate student behavior," school districts

implementing school-bus Wi-Fi have reported "an increase in homework

completion, and an increase in school bus driver satisfaction and retention." Letter

from Kristen Corra, SHLB Coalition to Marlene Dortch, Secretary, FCC, WC

Docket No. 13-184 at 3 (filed Sept. 6, 2022) ("SHLB Simington Ex Parte")

(A189).

### B. Petitioners' and *Amici*'s Concerns Regarding Student Misuse of School-Offered Wi-Fi Are Unfounded.

Petitioners and *amici* argue, in various ways, that providing access to Wi-Fi

on school buses will harm students because it will make it easier for them to access

social media and other non-educational content. *See* Pet. Br. 12; Texas Public

Policy Foundation Br. 16; U.S. Senators Br. 7-8. The record does not support

those arguments.

First, E-Rate rules implementing the Children's Internet Protection Act

(CIPA) require schools to employ content filtering capabilities on their networks.

*See* 47 C.F.R. § 54.520(c)(1); *see also* 47 U.S.C. §§ 254(h)(5), (*l*). The FCC has

already informed applicants of its expectation that schools will "implement the

same filtering capability for a school's network provided through school bus

Wi-Fi" as on their on-campus networks. *Modernizing the E-Rate Program for*

*Schools and Libraries*, Order, DA 23-1171, WC Docket No. 13-184, ¶ 9 (rel. Dec.

15, 2023) (A21). While CIPA applies directly to school-issued devices (as

opposed to personal devices students might use to access school-provided Wi-Fi),

schools providing Wi-Fi on buses are also required to "implement content and user network restrictions consistent with the restrictions that they place on their building-based broadband network." *Id.* (A21). That requirement ensures that "services on school buses are used primarily for educational purposes and are otherwise consistent with E-Rate rules," consistent with Section 254 and E-Rate rules. *Id.* (A21).

Second, the record shows that content filtering at the service provider network level is technically feasible and in fact has been available for years. Kajeet Inc., a major provider of educational internet connectivity, "has been offering this type of filtering for nearly a decade in collaboration with all major wireless carrier networks." Comments of Kajeet Inc. at 4, WC Docket No. 21-31 (filed Feb. 16, 2021) (A194). Content filtering at the service provider level ensures that "no non-educational content ever reaches any student, regardless of the device used, thus supporting Section 254's goals." *Id.* (A194). Indeed, platforms like Kajeet's offer schools the ability not only to "filter[] for inappropriate content or security/privacy risks," but also to "filter anything additional that is (more broadly) non-educational (e.g., consumer games or entertainment)." SHLB Simington Ex Parte at 3 (A189).

Third, as discussed above, the record before the FCC reflects that Wi-Fi for educational purposes on school buses may in fact *improve* student behavior. While

*amici* hypothesize about what students *might* do, like accessing social media platforms and causing disruptions, *see* Tex. Pub. Pol'y Found. Br. 11, record submissions from SHLB Coalition and Kajeet are based on experience. Kajeet has "seen (through collected data) that once Wi-Fi is installed on the bus, students actively use it," and school districts have "noted a decrease in inappropriate student behavior on a Wi-Fi enabled bus." SHLB Simington Ex Parte at 3 (A189); *see, e.g.*, Amy Worst, *Create a Safer School Bus: Decreasing Student Behavior Incidents*, Kajeet, https://www.kajeet.com/en/blog/how-to-decrease-student-behavior-incidents (last visited June 7, 2024) (discussing how Raytown School District observed a 45% reduction in bus-related disciplinary referrals after equipping buses with Wi-Fi). Similarly, the Fresno Unified School District, which has "a student enrollment of 70,000 with 89% eligible for free and reduced lunch," reported that in its seven years of providing Wi-Fi on school buses, the District "observed that student ridership increased and student behavior improved," while absenteeism decreased. Fresno Unified School Bus Wi-Fi Comments at 1 (A153).

## II. SECTION 254 AUTHORIZES THE COMMISSION TO PROVIDE E-RATE SUPPORT FOR SCHOOL-BUS INTERNET ACCESS.

Petitioners argue that the Declaratory Ruling is a novel extension of the FCC's authority that violates the limits in Section 254. The text of the statute and history of the E-Rate program indicate otherwise.

## A.     The FCC Is Correct that Section 254 Provides Ample Authority for the Declaratory Ruling.

Petitioners' arguments focus heavily on Section 254(h)(2)(A), even though the FCC was clear that it was relying on Section 254(h)(1)(B) as "authoriz[ing]" E-Rate support for school-bus Wi-Fi.  Decl. Ruling ¶ 9 (A6); *see* Resp. Br. 32 n.9 (Section 254(h)(1)(B) was the "primary basis on which the Commission relied"); *cf.* Pet. Br. 19-21.  Section 254(h)(1)(B) provides the FCC the authority to issue the Declaratory Ruling, and Petitioners' arguments thus miss the mark.

As the Commission explained in the Declaratory Ruling, Section 254(h)(1)(B) requires carriers to provide covered services to elementary schools, secondary schools, and libraries for educational purposes, when they receive a bona fide request for services within the scope of universal service, as defined by the Commission under Section 254(c)(3).  47 U.S.C. § 254(h)(1)(B). Section 254(c)(3), for its part, authorizes the Commission to "designate additional services for such support mechanisms for schools, libraries, and health care providers for the purposes of subsection (h)."  *Id.* § 254(c)(3).  Read together, the two provisions reflect Congress's delegation to the Commission of the authority to designate services (including Internet services) as eligible for reimbursement under the E-Rate program, so long as the services (1) are provided to an eligible school and (2) are for educational purposes.

Petitioners struggle unsuccessfully against the clear import of those provisions.  Petitioners first argue (at 26) that Section 254(h)(1)(B) "does not authorize the FCC to do *anything*."  Yet Section 254(h)(1)(B) plainly requires agency action, both to determine which services (such as Wi-Fi or Internet access) are "within the definition of universal service under subsection (c)(3)" and to determine the "amount" that is "appropriate and necessary to ensure affordable access to and use of such services by" schools.  47 U.S.C. § 254(h)(1)(B).  Respondents also rightly note that Petitioners waived this argument in any event.  *See* Resp. Br. 37.

Petitioners also argue (at 26) that "[t]he FCC is … incorrect in thinking the phrase 'for educational purposes' states the test for whether something is within the statute's domain" because "Section 254(h)(1)(B) uses that phrase to *limit* the range of support available to schools and libraries, not to *expand* it."  Pet. Br. 26.  Petitioners' argument makes little sense.  The statute's reference to the use of services for "educational purposes" provides a requirement against which the FCC considers requests for support—characterizing it as an "expansion" or "limitation" on authority is irrelevant.  *Cf., e.g.*, *City of Arlington v. FCC*, 569 U.S. 290, 301 (2013) ("[J]udges should not waste their time in the mental acrobatics needed to decide whether an agency's interpretation of a statutory provision is 'jurisdictional' or 'nonjurisdictional.'  Once those labels are sheared away, it becomes clear that

the question in every case is, simply, whether the statutory text forecloses the agency's assertion of authority."). Petitioners agree that "subsection (c)(3) allows the FCC to add things like 'Wi-Fi' to the eligible-services list." Pet. Br. 27. In providing reimbursements pursuant to Section 254(h)(1)(B)—and in setting rules regarding eligibility for the E-Rate program under that provision—the FCC is complying with the statute in approving requests only if the services requested satisfy the "educational purposes" requirement.

Nor does the FCC's interpretation reduce the terms "elementary schools [and] secondary schools" to "mere surplusage," as Petitioners argue. Pet. Br. 27 (cleaned up). The statute establishes the entities eligible for supported services ("elementary schools, secondary schools, and libraries"), the services that must be provided ("any of [a provider's] services that are within the definition of universal service under" Section 254(c)(3)), and the purposes for which such services must be provided ("educational purposes"). 47 U.S.C. § 254(h)(1)(B). In clarifying that school-bus Wi-Fi satisfies the educational-purpose requirement, the FCC did nothing to eliminate the other requirements in the statute and in its rules. *See* Resp. Br. 36 ("[T]he Commission's rules limit 'eligible recipients' to schools (and

libraries), 47 C.F.R. § 54.501, and the Ruling never suggested that any entity but a school (or a library) is eligible to receive E-Rate support.").[3]

### B. Petitioners' Arguments Regarding Section 254(h)(2)(A) Are Contrary to the Statute and to Longstanding FCC E-Rate Decisions.

Petitioners focus the bulk of their argument on Section 254(h)(2)(A), which separately directs the Commission to establish rules "to enhance, to the extent technically feasible and economically reasonable, access to advanced telecommunications and information services for all public and nonprofit elementary and secondary school classrooms, health care providers, and libraries." 47 U.S.C. § 254(h)(2)(A). Petitioners suggest that Section 254(h)(2)(A)— whatever its own scope—limits *all* of the FCC's powers over E-Rate to "classrooms" and "libraries." Pet. Br. 27. That is incorrect. Nothing in Section 254(h)(2)(A) purports to restrict other authority Congress granted the FCC in the statute.[4]

---

[3] As noted above, the FCC has traditionally presumed that "activities that occur in a school or on a school campus serve an educational purpose" and therefore are eligible for E-Rate funding. Decl. Ruling ¶ 4 (A2). The FCC correctly concluded that school-bus Wi-Fi is "integral, immediate, and proximate to the education of students" and thus serves an educational purpose. *Id.* ¶ 9 (A6). It bears noting, however, that school buses—owned by schools or operated at their direction and subject to their authority—are also closely connected to the school campus and its educational purpose.

[4] SHLB Coalition agrees with Respondents' arguments on the correct interpretation of Section 254(h)(2)(A) and will not repeat those arguments at

Petitioners' arguments regarding the meaning and overall import of Section 254(h)(2)(A) also go farther than Petitioners seem to realize—and would be extremely disruptive to aspects of the E-Rate rules that Petitioners do not appear to challenge. On one hand, Petitioners argue that "the line drawn by Section 254"—presumably, Section 254(h)(2)(A)—"is *on-campus* versus *off-campus* support." Pet. Br. 21. On the other, Petitioners repeatedly argue that the only locations for which E-Rate support may be given are "classrooms" and "libraries." *E.g.*, Pet. Br. 20. Yet there are locations on school property—*e.g.*, teachers' lounges and workrooms, gymnasiums, cafeterias, and auditoriums—that are not classrooms in Petitioners' narrow sense, but where activities integral, immediate, and proximate to the education of students occur, and which qualify for E-Rate support. *See* 47 C.F.R. § 54.500 (noting that "[a] service is eligible for support as a component of an institution's 'internal connections' if such service is necessary to transport or distribute broadband within one or more instructional buildings of a single school campus"); *see also* E-Rate Second Report and Order ¶ 17 (adopting the educational-purpose test). Petitioners' unduly tunneled focus on the word

length here. *See* Resp. Br. 48-50. SHLB Coalition agrees with Respondents, though, that Section 254(h)(2)(A) is not so restrictive in its reference to classrooms as Petitioners suggest. In particular, the statutory directive to establish rules to enhance access to services "for" classrooms is not equivalent to (and is broader than) enhancing access to services "in" classrooms, as Petitioners would have it. *See id.* at 49.

"classroom" is thus out of step not only with longstanding FCC precedent, but also with Petitioners' own position on the "line drawn by Section 254." Pet. Br. 21.

Petitioners also misstate the FCC's longstanding position on potential eligibility of off-campus services for E-Rate support. *See, e.g.*, Pet. Br. 21. Petitioners suggest that the FCC categorically excluded any off-site use of services, when in fact, the FCC has taken a more nuanced approach. *See* Resp. Br. 43-44 (addressing FCC documents that Petitioners cite). Indeed, the FCC specifically identified off-campus uses that would satisfy the educational-purpose requirement as long ago as 2003. *See* E-Rate Second Report and Order ¶ 19. It has also, as described above, authorized E-Rate support for "eligible services serving the residential areas of schools that serve unique populations," based on the same rationale it applied here: that those students' "educational needs may not otherwise be met" if E-Rate support were not available for those educational purposes. Decl. Ruling ¶ 5 (A3). Petitioners simply ignore these prior FCC decisions, including authorization of E-Rate support for educational activities indisputably outside a traditional "classroom."

### C. Petitioners' Arguments Regarding the Emergency Connectivity Fund Also Fail.

Petitioners finally claim that the FCC's discussion of the relationship of E-Rate support for school-bus Wi-Fi to the funding available for a limited time via the Emergency Connectivity Fund is "fatal to the Declaratory Ruling." Pet. Br. 23.

Petitioners are incorrect for several reasons, including those discussed in the FCC's brief (at 44-48), but SHLB Coalition will focus on two key flaws in Petitioners' argument.

First, Petitioners read far too much into the Emergency Connectivity Fund's provision of funding for off-campus services and equipment. Petitioners infer that Congress made that funding available because Section 254 forbids the use of E-Rate support for any such purposes, even though Congress said no such thing in the American Rescue Plan Act of 2021, which created the Emergency Connectivity Fund. A more realistic inference, given the text of Section 254, is that Congress simply recognized that the FCC had not made E-Rate support available for most remote-learning services. The COVID-19 emergency heightened the need for immediate relief, which the Emergency Connectivity Fund helped provide at funding levels significantly higher than those in the E-Rate program, and on different terms.[5] *See* Resp. Br. 44-45. But that does not explicitly or implicitly speak to the scope of the FCC's authority under Section 254. Nor does the fact

---

[5]  In addition, and unlike E-Rate, the Emergency Connectivity Fund provided funding through a direct federal appropriation. *See* American Rescue Plan Act of 2021, Pub. L. No. 117-2, § 7402(c)(2), 135 Stat. 4, 109 (2021) (appropriating $7,171,000,000 for the Emergency Connectivity Fund); *id.* § 7402(c)(4) (clarifying that support under the Emergency Connectivity Fund would not be provided using Universal Service Fund contributions).

that, once the pandemic receded, Congress allowed a program created to respond to that particular crisis to expire.

Second, Petitioners suggest that the Court should disregard the FCC's interpretation of the statute because, as Petitioners would have it, "only when faced with the impending expiry of" the Emergency Connectivity Fund "did the agency suddenly discover in Section 254 the power to provide off-campus support." Pet. Br. 2; *see* Pet. Br. 22-23. As explained above, Petitioners' narrative may be useful for purpose of its argument, but it ignores the actual history of the FCC's application of the educational-purpose requirement. *See also* Resp. Br. 47-48 (explaining the government's perspective regarding the timing of the Declaratory Ruling relative to the Emergency Connectivity Fund). Petitioners' narrative also ignores the fact that SHLB Coalition and others—even before Congress passed the American Rescue Plan Act in March 2021—were urging the FCC to follow its longstanding precedent and issue an order clarifying that school-bus Wi-Fi and similar services served an educational purpose, even off-campus, and qualified for E-Rate support. *See, e.g.*, SHLB Coalition Petition at 6-8, 21-24 (A98-100, 113-16). Petitioners' analogy to cases like *Alabama Association of Realtors v. HHS*, 141 S. Ct. 2485 (2021), is thus flawed. Pet. Br. 24.

*   *   *

Sections 254(c)(3) and (h)(1)(B) reflect Congress's delegation to the Commission of the authority to designate services as eligible for E-Rate support, so long as the services are provided to an eligible school and are for educational purposes. The FCC has done so for decades, recognizing, as Congress intended, that technology and societal needs change, and that universal service must meet those changing needs. The provision of Wi-Fi on school buses will help schools provide millions of students with services that are integral, immediate, and proximate to their education. That is precisely the task Congress charged—and authorized—the Commission to undertake.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the petition for review or deny the petition if the Court reaches the merits.

Respectfully submitted,

/s/ Jason Neal

| | |
|---|---|
| Andrew Jay Schwartzman | Jason Neal |
| 1341 G Street, NW | Mohammad M. Ali |
| 5th Floor | HWG LLP |
| Washington, DC 20005 | 1919 M Street, NW, 8th Floor |
| (202) 241-2408 | Washington, D.C. 20036 |
| AndySchwartzman@gmail.com | (202) 730-1300 |
| | jneal@hwglaw.com |
| | |
| July 8, 2024 | *Counsel for Schools, Health &* |
| | *Libraries Broadband Coalition* |

## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of July 2024, the foregoing document was filed via CM/ECF.  Service was accomplished on all parties or their counsel of record via CM/ECF.

/s/ Jason Neal
Jason Neal

**CERTIFICATE OF COMPLIANCE**

I certify that the foregoing document complies with the requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because it has been prepared in 14-point Times New Roman font.

I further certify that the foregoing document complies with the requirements of Fifth Circuit Rule 32 and Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,591 words according to the word-count feature of Microsoft Word.

/s/ Jason Neal
Jason Neal