# IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

MAURINE MOLAK AND MATTHEW MOLAK,

*Petitioners*,

v.

FEDERAL COMMUNICATIONS COMMISSION
and UNITED STATES OF AMERICA,

*Respondents*.

On Petition for Review of an Order of
the Federal Communications Commission

## FINAL BRIEF FOR RESPONDENTS

P. Michele Ellison
*General Counsel*

Sarah E. Citrin
*Deputy Associate General Counsel*

Rachel Proctor May
*Counsel*

Jonathan S. Kanter
*Assistant Attorney General*

Robert B. Nicholson
Robert J. Wiggers
*Attorneys*

U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
950 Pennsylvania Ave. NW
Washington, DC 20530

FEDERAL COMMUNICATIONS
COMMISSION
45 L Street NE
Washington, DC 20554
(202) 418-1740
fcclitigation@fcc.gov

## CERTIFICATE OF INTERESTED PARTIES

*Molak v. Federal Communications Commission*, No. 23-60641

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1. Petitioners

    a. Matthew Molak

    b. Maurine Molak

2. Counsel for Petitioners

    a. Yaakov M. Roth

    b. David K. Suska

3. Respondents

    a. Federal Communications Commission

    b. The United States of America

4. Counsel for Respondents

    a. P. Michele Ellison, Federal Communications Commission

    b. Jacob M. Lewis, Federal Communications Commission

    c. Sarah E. Citrin, Federal Communications Commission

d. Rachel Proctor May, Federal Communications Commission

e. Robert B. Nicholson, United States of America

f. Robert J. Wiggers, United States of America

g. Jonathan S. Kanter, United States of America

5. Intervenor

a. Schools, Health & Libraries Broadband Coalition

6. Counsel for Intervenor

a. Andrew J. Schwartzman

b. Jason Neal

/s/ *Rachel Proctor May*

Attorney of Record for Federal
Communications Commission

## STATEMENT ON ORAL ARGUMENT

Respondents believe that the Court could find oral argument helpful in examining the claims raised by petitioners.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PARTIES ......................................... i

TABLE OF AUTHORITIES ................................................. vi

INTRODUCTION ........................................................ 1

JURISDICTIONAL STATEMENT ........................................... 4

STATEMENT OF THE ISSUES ............................................ 5

BACKGROUND ......................................................... 6

    A.    Universal Service For Schools And Libraries ......................... 6

    B.    The E-Rate Program ........................................ 10

    C.    The Emergency Connectivity Fund ...................... 13

    D.    The Declaratory Ruling ...................................... 15

    E.    The Current Appeal .......................................... 20

SUMMARY OF THE ARGUMENT ....................................... 21

STANDARD OF REVIEW ............................................... 23

ARGUMENT ........................................................... 24

I.    BECAUSE NEITHER PETITIONER WAS A "PARTY" TO THE PROCEEDINGS, PETITIONERS ARE NOT ENTITLED TO SEEK REVIEW OF THE RULING .......................................... 24

    A.    Section 405(a) Requires Party Status ................... 25

    B.    The Hobbs Act Also Requires Party Status ......... 26

II.    PETITIONERS HAVE NOT MET THEIR BURDEN TO ESTABLISH STANDING ............................................................ 29

III.    SECTION 254(H)(1)(B) AUTHORIZES THE RULING ........................... 32

    A.    Section 254(h)(1)(B) Authorizes Discounts For Services Provided To "Schools" For "Educational Purposes" .............. 32

    B.    Petitioners Waived The Argument That Section 254(h)(1)(B) Is Not A Grant Of Authority, Which In Any Event Is Incorrect .......................................... 36

# TABLE OF CONTENTS
## (continued)

C. The Commission Has Allowed E-Rate Support For Off-Campus Uses Since 2003 .................................................. 41

D. The Emergency Connectivity Fund Program Does Not Limit The E-Rate Program ...................................... 44

IV. SECTION 254(H)(2)(A) INDEPENDENTLY AUTHORIZES THE RULING .............................................................................. 48

CONCLUSION ................................................................. 51

CERTIFICATE OF COMPLIANCE ...................................... 52

CERTIFICATE OF FILING AND SERVICE ......................... 53

# TABLE OF AUTHORITIES*

**Cases**

*Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758 (2021) ................................................................ 46

*Alenco Commc'ns, Inc. v. FCC*, 201 F.3d 608 (5th Cir. 2000) .................. 6

*Am. Airlines, Inc. v. Herman*, 176 F.3d 283 (5th Cir. 1999) ............ 21, 28

*Am. Hosp. Ass'n v. Becerra*, 596 U.S. 724 (2022) .................................. 24

*Biden v. Nebraska*, 143 S. Ct. 2355 (2023) ............................................ 47

*Booth v. Churner*, 532 U.S. 731 (2001) .................................................. 26

*Chevron USA, Inc. v. NRDC*, 467 U.S. 837 (1984) ................................. 24

*Children's Health Def. v. FCC*, 25 F.4th 1045 (D.C. Cir. 2022) ............. 37

*CleanCOALition v. TXU Power*, 536 F.3d 469 (5th Cir. 2008) ............... 49

*E.T. v. Paxton*, 41 F.4th 709 (5th Cir. 2022) ......................................... 31

*Gomez v. Hill*, 87 F. App'x 374 (5th Cir. 2004)...................................... 26

*Hikvision USA, Inc. v. FCC*, 97 F.4th 938 (D.C. Cir. 2024) ................... 40

*Hotze v. Burwell*, 784 F.3d 984 (5th Cir. 2015) ..................................... 31

*Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421 (5th Cir. 2021) ......... 24, 46

*Huntington Ingalls, Inc. v. U.S. Dep't of Labor*, 70 F.4th 245 (5th Cir. 2023) ......................................................................... 24

*In re Tex. Wyo. Drilling, Inc.*, 647 F.3d 547 (5th Cir. 2011) .................. 23

*Kirby Corp. v. Pena*, 109 F.3d 258 (5th Cir. 1997) ................................ 28

---

* *Authorities upon which we chiefly rely are marked with asterisks.*

(vi)

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Leedom v. Kyne*, 358 U.S. 184 (1958)...................................................28

*Merchants Fast Motor Lines v. ICC*, 5 F.3d 911 (5th Cir. 1993) ...........27

*Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109 (2022) ......................47

*Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997) ......................................49

*Ross v. Blake*, 578 U.S. 632 (2016)........................................................26

*Shrimpers & Fishermen of the RGV v. Texas Comm'n on Env't Quality*, 968 F.3d 419 (5th Cir. 2020) .................................................29

*Spokeo, Inc. v. Robins*, 578 U.S. 338 (2016) ..........................................29

*Stewart v. Entergy Corp.*, 35 F.4th 930 (5th Cir. 2022) ..........................35

*Texas Off. of Pub. Util. Couns. v. FCC*, 183 F.3d 393 (5th Cir. 1999) .................................................................................6, 8, 34, 40

*Texas v. Nuclear Regul. Comm'n,* 78 F.4th 827 (5th Cir. 2023) ............27

*Texas v. Nuclear Regul. Comm'n*, 95 F.4th 935 (5th Cir. 2024) ............27

*United States v. Aguirre-Villa*, 460 F.3d 681 (5th Cir. 2006) ................47

*United States v. Craft*, 535 U.S. 274 (2002) ..........................................48

*United States v. Wallington*, 889 F.2d 573 (5th Cir. 1989)....................35

*Worldcall Interconnect, Inc. v. FCC*, 907 F.3d 810 (5th Cir. 2018) ........37

*Young Conservatives of Texas Found. v. Smatresk*, 73 F.4th 304 (5th Cir. 2023) .................................................................................31

## Statutes

5 U.S.C. § 706(2)(C) .............................................................................24

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

20 U.S.C. § 7801.................................................................34

28 U.S.C. § 2342(1) ..................................................*passim*

28 U.S.C. § 2344 .......................................................*passim*

47 U.S.C. § 151.................................................................6

\* 47 U.S.C. § 254.................................................................6

47 U.S.C. § 254(b)(5).......................................................6

47 U.S.C. § 254(b)(6).............................................1, 7, 39, 50

47 U.S.C. § 254(c)(1) ..............................................*passim*

47 U.S.C. § 254(c)(1)(A) ..........................................7, 42, 50

47 U.S.C. § 254(c)(3) .............................................7, 32, 33

47 U.S.C. § 254(d) ...................................................9, 38

47 U.S.C. § 254(h)(1)(A)................................................35

47 U.S.C. § 254(h)(1)(B)..........................................*passim*

47 U.S.C. § 254(h)(1)(B)(i)-(ii) ...................................8, 38

47 U.S.C. § 254(h)(2)(A)..........................................*passim*

47 U.S.C. § 254(h)(5)(A)(i) ........................................35, 40

47 U.S.C. § 254(h)(5)(A)(ii) ...........................................40

47 U.S.C. § 254(h)(5)(A)(iii)...........................................35

47 U.S.C. § 254(h)(5)(E)(ii)(III) .......................................35

47 U.S.C. § 254(h)(5)(F)(i) ............................................36

**Page(s)**

47 U.S.C. § 254(h)(7)(A)............................................................34

47 U.S.C. § 303(r)....................................................................38

47 U.S.C. § 402(a) ................................................................4, 20

47 U.S.C. § 405(a) ..........................................................*passim*

American Rescue Plan Act of 2021, H.R. 1319, Pub. L. No. 117-2,
    135 Stat 4 ................................................................14, 44, 45

Consolidated Appropriations Act 2001, Pub. L. No. 106-554, 114
    Stat. 2763 ............................................................................40

Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 ......6

**Regulations**

47 C.F.R. §§ 54.302-54.321..........................................................9

47 C.F.R. §§ 54.400-54.423..........................................................9

47 C.F.R. § 54.500............................................................12, 18

47 C.F.R. § 54.501....................................................................36

47 C.F.R. § 54.502(a) ..............................................................10

47 C.F.R. § 54.502(e)..............................................................10

47 C.F.R. § 54.505....................................................................11

47 C.F.R. §§ 54.600-54.633..........................................................9

47 C.F.R. § 54.706(a) ................................................................9

47 C.F.R. § 54.706(b) ................................................................9

47 C.F.R. § 54.709....................................................................31

47 C.F.R. § 54.709(a)(2) ................................................................9

47 C.F.R. § 54.709(a)(3) ..............................................................30

47 C.F.R. § 54.712................................................................................31

47 C.F.R. § 54.712(a) ...................................................................10

47 C.F.R. §§ 54.801-54.1515....................................................9

## Administrative Materials

Declaratory Ruling, Order, Report and Order, and Order on
  Reconsideration, *Safeguarding and Securing the Open Internet,*
  FCC 25-42, 2024 WL 2109860 (Apr. 25, 2024) .....................................9

First Report and Order, *Fed.-State Joint Bd. On Universal Serv.,*
  12 FCC Rcd. 8776 (1997) ................................................*passim*

Order App. B, *Modernizing the E-Rate Program for Schools and
  Libraries*, 37 FCC Rcd. 14615 (WCB 2022) ...................................43, 44

Proposed Second Quarter 2024 Universal Service Contribution
  Factor, DA 24-257 (Mar. 14, 2024)........................................10

Public Notice, *Wireline Competition Bureau Seeks Comment on
  Proposed Eligible Services List for the E-Rate Program*, 37 FCC
  Rcd. 9570 (WCB 2022) .........................................................16

Public Notice, *Wireline Competition Bureau Seeks Comment on
  Proposed Eligible Services List for the E-Rate Program*, DA 23-
  819, 2023 WL 5969324 (WCB Sept. 12, 2023) ...........................16

Report and Order, *Establishing Emergency Connectivity Fund to
  Close the Homework Gap*, 36 FCC Rcd. 8696 (2021).......................15

Second Report and Order, *Sch. & Librs. Universal Serv. Support
  Mechanism*, 18 FCC Rcd. 9202 (2003) ................................12, 42

Sixth Report and Order, *Sch. and Librs. Universal Service Report Mechanism*, 25 FCC Rcd. 18762 (2010) ..................................... *passim*

**Other Materials**

Federal Universal Service Support Mechanisms Fund Size Projections for Third Quarter 2024 (May 2, 2024) ............................ 20

Universal Service Administrative Co., 2023 Annual Report ............ 30, 44

## INTRODUCTION

In the Telecommunications Act of 1996, Congress established the goal that "schools and classrooms . . . should have access to advanced telecommunications services." 47 U.S.C. § 254(b)(6). In service of this goal, Congress directed the Federal Communications Commission to subsidize discounts for services that "schools" purchase for "educational purposes." *Id.* § 254(h)(1)(B). Congress also directed the Commission to update "periodically" the services eligible for support under this "E-Rate" program, "taking into account advances in telecommunications and information technologies and services." *Id.* § 254(c)(1).

In the Declaratory Ruling under review, *Modernizing the E-Rate Program for Schools and Libraries*, FCC 23-84 (Oct. 25, 2023) (the "Ruling") (A1-A16), the Commission responded to requests to add Wi-Fi on school buses to the list of services eligible for support under the E-Rate program. School and educational advocates explained that millions of students still lack a home Internet connection, even though a majority of students require a broadband connection to complete their homework assignments. Many students, particularly in rural areas, also travel long distances to and from school. The Commission concluded, based on the record, that equipping school buses to allow

students to complete broadband-dependent assignments serves an "educational purpose[]," 47 U.S.C. § 254(h)(1)(B), and is eligible for funding.

Without having participated in the proceedings before the agency, petitioners now argue that the Ruling is outside the Commission's statutory authority. If the Court reaches the merits of petitioners' claims, the Commission should prevail. But the Court should not reach them. As respondents explained in a motion to dismiss, which the Court carried with the case, Dkt. 59-2, and which we incorporate here, petitioners' failure to participate in the agency proceedings requires dismissal pursuant to Section 405(a) of the Communications Act, 47 U.S.C. § 405(a), and to the Administrative Orders Review Act, 28 U.S.C. §§ 2342(1) and 2344 ("Hobbs Act").

Petitioners also have not met their burden to demonstrate an injury-in-fact sufficient for Article III standing. They assert that E-Rate support for school bus Wi-Fi – applications for which total approximately $19 million for funding year 2024 – will increase the fee they pay to support the approximately $8 billion universal service program. But they have provided no evidence of any imminent increase.

If the Court does reach the merits, it should reject petitioners'
challenges.  Petitioners argue that "Section 254 limits E-Rate to
'classrooms.'" (Br. 19 (quoting 47 U.S.C. § 254(h)(2)(A)).  This mistaken
assertion is inconsistent with the text of Section 254(h) and decades of
agency practice.  The Ruling primarily relies on Section 254(h)(1)(B) –
which authorizes support for "schools," not "classrooms" – just as the
Commission has relied on that provision to authorize E-Rate discounts
since 1997, in an order that was upheld in relevant part by this Court.
And for decades, the Commission has allowed E-Rate support for
services outside of brick-and-mortar classrooms:  discounts for services
in non-instructional spaces on school campuses (such as offices), and
discounts for certain off-campus services for which a need and
justification existed.  It was in line with this precedent, and with the
Commission's duty to ensure that services eligible for support "evolv[e]"
in light of marketplace "advances," *id.* § 254(c)(1), for the Commission to
designate school bus Wi-Fi as eligible for support when a convincing
case for that designation existed.

Petitioners largely ignore Section 254(h)(1)(B), other than to raise
meritless challenges to the Commission's authority to provide E-Rate
support under that provision, which has been solidly established for

decades. Instead, they focus on the Commission's conclusion that the Ruling was "independently" authorized by Section 254(h)(2)(A), which directs the Commission to adopt rules to "enhance . . . access" to advanced communications services for "classrooms." But the Commission reasonably concluded that, in light of contemporary educational trends, "classroom" is not confined to brick-and-mortar locations and may reasonably be "interpreted more broadly" to include school buses. Ruling n.32 (A6).

## JURISDICTIONAL STATEMENT

The Ruling under review was released on October 25, 2023. Petitioners timely filed a petition for review on December 20, 2023, invoking this Court's jurisdiction under 47 U.S.C. § 402(a) and 28 U.S.C. § 2342(1). As we explain in Part I of the argument below, the Court lacks subject-matter jurisdiction under those provisions because neither petitioner is a "party aggrieved," 28 U.S.C § 2344, and the *ultra vires* exception this Circuit has recognized does not apply. As we explain in Part II, the Court also lacks jurisdiction because petitioners have not met their burden to establish Article III standing.

## STATEMENT OF THE ISSUES

1.  Whether the petition must be dismissed for failure to satisfy the statutory exhaustion requirement of 47 U.S.C. § 405(a).

2.  Whether the petition must be dismissed for lack of subject-matter jurisdiction under the Hobbs Act, 28 U.S.C §§ 2342(1) and 2344.

3. Whether petitioners have failed to meet their burden to demonstrate an injury-in-fact sufficient to establish Article III standing.

4.  Whether 47 U.S.C. § 254(h)(1)(B), which authorizes the Commission to define the services that carriers must provide to "schools" on a discounted basis "for educational purposes," includes authority to designate as eligible for discounts the equipment and services that enable Wi-Fi on school buses.

5.  Whether 47 U.S.C. § 254(h)(2)(A), which authorizes the Commission to promulgate rules "to enhance . . . access to advanced telecommunications and information services for all public and nonprofit elementary and secondary school classrooms," includes authority to designate as eligible for discounts the equipment and services that enable Wi-Fi on school buses.

# BACKGROUND

## A.     Universal Service For Schools And Libraries

In the Telecommunications Act of 1996, Pub. L. No. 104-104, 110
Stat. 56 (1996), Congress enacted a new program aimed at achieving
"universal service."  47 U.S.C. § 254.  "[U]niversal service" embodies the
"fundamental goal of federal telecommunications regulation since the
passage of the Communications Act of 1934" that "all the people of the
United States" should have access to "'communication service with
adequate facilities at reasonable charges.'"  *Alenco Commc'ns, Inc. v.
FCC*, 201 F.3d 608, 614 (5th Cir. 2000) (quoting 47 U.S.C. § 151).
Before 1996, the Commission had pursued this goal through a mixture
of "explicit and implicit subsidies," but the 1996 Act directed the FCC to
replace these with "'specific, predictable and sufficient Federal and
State mechanisms to preserve and advance universal service.'"  *Texas
Off. of Pub. Util. Couns. v. FCC*, 183 F.3d 393, 406 (5th Cir. 1999)
("*TOPUC I*") (quoting 47 U.S.C. § 254(b)(5)).  The Act also directs the
Commission to "base policies for the preservation and advancement of
universal service" on principles defined in the statute, including that
"[e]lementary and secondary schools and classrooms . . . should have

access to advanced telecommunications services" as described in Section 254(h). 47 U.S.C. § 254(b)(6).

Rather than defining the services eligible for support in terms of specific technologies that could quickly become obsolete, the 1996 Act defines "universal service" as "an evolving level of telecommunications services" that the Commission "shall establish periodically . . . , taking into account advances in telecommunications and information technologies and services." *Id.* § 254(c)(1). In fulfilling that mandate, the Commission must consider factors including the extent to which services "are essential to education." *Id.* § 254(c)(1)(A). "In addition to" the services defined under Section 254(c)(1), "the Commission may designate additional services for such support mechanisms for schools, libraries, and health care providers for the purposes of [Section 254(h)]." *Id.* § 254(c)(3).

Universal service support under Section 254(h) is primarily provided by means of discounts on services that schools purchase from telecommunications carriers. *Id.* § 254(h)(1)(B). Section 254(h)(1)(B) requires telecommunications carriers, on request, to "provide [covered] services to elementary schools, secondary schools, and libraries for educational purposes at rates less than the amounts charged for similar

services to other parties." *Id.* The Commission sets the discount for interstate services at an amount "appropriate and necessary to ensure affordable access to and use of such services by such entities." *Id.* It then reimburses providers for the discount from universal service funds.[1] *See id.* § 254(h)(1)(B)(i)-(ii).

The "services" eligible for discounts under Section 254(h)(1)(B) are "any of [a carrier's] services that are within the definition of universal service under" Section 254(c)(3). *Id.* § 254(h)(1)(B). Because the "services" covered by Section 254(c)(3) are not limited to "telecommunications services," the Commission has interpreted this provision to include "information services." *See* First Report and Order ¶ 437, *Fed.-State Joint Bd. On Universal Serv.*, 12 FCC Rcd. 8776, 9009 (1997) (*First Report and Order*).[2] This Court has upheld that interpretation. *See TOPUC I*, 183 F.3d at 440-43.

---

[1] The carrier can either treat the amount of the discount as an offset against any requirement to contribute to the universal service program, or receive a direct reimbursement. 47 U.S.C. § 254(h)(1)(B)(i)-(ii).

[2] In the past, Internet access has been classified as an "information service." On April 25, 2024, the Commission reclassified broadband Internet access service as a telecommunications service. *See* Declaratory Ruling, Order, Report and Order, and Order on Reconsideration ¶ 2, *Safeguarding and Securing the Open Internet,* FCC
(cont'd)

Separately, Section 254 directs the Commission to establish rules "to enhance, to the extent technically feasible and economically reasonable, access to advanced telecommunications and information services for all public and nonprofit elementary and secondary school classrooms." *Id.* § 254(h)(2)(A). The statute does not define "classroom."

Pursuant to 47 U.S.C. § 254(d), the Commission funds the E-Rate program, along with three other universal service programs,[3] by collecting fees from providers of interstate telecommunications. 47 C.F.R. § 54.706(a), (b). A provider's contribution is calculated on a quarterly basis, using the provider's revenues from the sale of interstate telecommunications services and a "contribution factor" that is based on projected demand for all four of the Commission's universal service programs. *See id.* § 54.709(a)(2) (factor is "based on the ratio of total projected quarterly expenses of the universal service support

25-42, 2024 WL 2109860 (Apr. 25, 2024). Even when Internet access was classified as an information service, support was authorized under Section 254(h)(1)(B) and 254(c)(3) for the reasons explained herein.

[3] *See* 47 C.F.R. §§ 54.302-54.321, 54.801-54.1515 (support for extending service to areas where the cost of providing service is high); *id.* §§ 54.400-54.423 (support for certain low-income consumers); *id.* §§ 54.600-54.633 (support for rural health care providers).

mechanisms to the total projected collected end-user interstate and international telecommunications revenues"). The contribution factor is rounded up to the next highest tenth of a percent; for example, a calculated contribution factor of 0.32703 rounds to 32.8 percent. *See* Proposed Second Quarter 2024 Universal Service Contribution Factor at 3, DA 24-257 (Mar. 14, 2024).[4]

The Commission's rules permit, but do not require, carriers to recover their federal universal service contribution costs "through interstate telecommunications-related charges to end users." *Id.* § 54.712(a). The amount each customer pays is capped at "the interstate telecommunications portion of [each] customer's bill" times the "contribution factor" for that quarter. *Id.*

## B. The E-Rate Program

Each year, the agency's Wireline Competition Bureau (the "Bureau") adopts, pursuant to notice and comment, a list of equipment and services that are eligible for E-Rate-supported discounts, called the "eligible services list." *See* Ruling n.2 (A1); 47 C.F.R. § 54.502(a), (e). Schools may receive discounts of between 20 and 90 percent of the pre-

---

[4] https://www.fcc.gov/document/proposed-usf-factor-2q-2024-will-be-328-percent.

discount price for a given service, based on factors such as indicators of poverty among the student body. *See id.* § 54.505. As the Commission has explained, "[r]equiring schools . . . to pay a share of the cost should encourage them to avoid unnecessary and wasteful expenditures because they will be unlikely to commit their own funds for purchases that they cannot use effectively." *First Report and Order* ¶¶ 492-93, 12 FCC Rcd. at 9035-36.

In keeping with Congress' directive that universal service should "evolv[e]" to "account [for] advances in telecommunications and information technologies and services," 47 U.S.C. § 254(c)(1), the Commission has periodically updated the E-Rate eligibility rules to respond to changes in educational technologies and services. Because funds are limited, the Commission does not add every potentially eligible service to the list; rather, it "evaluate[s] potential impact of adding additional services" and balances the benefits against the effect the addition may have on other needs. *See, e.g.*, Sixth Report and Order ¶ 99, *Sch. and Librs. Universal Service Report Mechanism*, 25 FCC Rcd. 18762, 18805 (2010) (*Sixth Report and Order*).

All eligible services must serve "educational purposes." 47 U.S.C. § 254(h)(1)(B). The Commission has made clear since 2003 that these

include "activities that are integral, immediate, and proximate to the education of students." 47 C.F.R. § 54.500. Activities that occur "on . . . school property are presumed" to satisfy that test. *Id.* Funded services may therefore be "used by support staff not involved in instructional activities." Second Report and Order ¶ 17, *Sch. & Librs. Universal Serv. Support Mechanism*, 18 FCC Rcd. 9202, 9208 (2003) (*Second Report and Order*).

Also since 2003, the Commission has recognized that some off-campus uses will satisfy the "educational purposes" test. *Id.* n.28, 18 FCC Rcd. at 9209. Examples include "a school bus driver's use of wireless telecommunications services while delivering children to and from school," or "the use by teachers or other school staff of wireless telecommunications service while accompanying students on a field trip or sporting event." *Id.*

The Commission added additional off-campus uses in 2010, when it added eligibility for services in the residential areas of "residential schools that serve unique populations." *Sixth Report and Order* ¶ 31, 25 FCC Rcd. at 18778. These include schools serving students on Tribal lands or students with medical needs or disabilities; schools with a high percentage of low-income students; and juvenile justice facilities. *Id.*

The Commission explained that such services "will facilitate ongoing access to educational and learning materials beyond the normal school day and increase the ability of those students to complete homework assignments . . . after school hours." *Id.*

The Commission also initiated a $10 million pilot program in 2010 to "investigate the merits and challenges of wireless off-premises connectivity services" for mobile learning devices "to help [it] determine whether they should ultimately be eligible for E-rate support." *Id.* ¶ 44, 25 FCC Rcd. at 18785. The Commission recognized that "improvements and cost reductions in portable learning devices" created new opportunities for offsite learning, but chose to "proceed cautiously" with a limited pilot program in light of potential implementation challenges and the fact that such devices would compete for funding with "equally or more important" services. *Id.* ¶¶ 42-43, 25 FCC Rcd. at 18784-85.

## C.    The Emergency Connectivity Fund

When the COVID-19 pandemic closed most school buildings in 2020, many schools responded by holding classes online. Many students, however, had difficulty accessing their virtual classrooms because they lacked home broadband connections. *See* Ruling ¶ 11 (A7).

In March 2021, Congress created a $7.17 billion Emergency Connectivity Fund to provide "E-Rate support for emergency educational connections and devices."  American Rescue Plan Act of 2021, H.R. 1319, Pub. L. No. 117-2, 135 Stat 4, Tit. VII § 7402 ("Rescue Plan Act").  The Rescue Plan Act directed the Commission to promulgate, within 60 days, regulations for providing support from the Emergency Connectivity Fund.  *Id.* § 7402(a).

The Rescue Plan Act provided that Emergency Connectivity Fund support could go to "an eligible school or library, for the purchase during a COVID-19 emergency period of eligible [equipment and/or services], for use by . . . students and staff of the school at locations that include locations other than the school."  *Id.* § 7402(a)(1).  An "eligible school" is one that is "eligible for support under [47 U.S.C. § 254(h)(1)(B) or (2)]."  *Id.* § 7402(d)(7).  In contrast with the E-Rate rules, which provide for formula-based discounts of between 20 and 90 percent of the price of eligible purchase, *see supra* at 10, the Rescue Plan Act directed the Commission to "reimburse 100 percent of the costs associated with the eligible equipment [and/or] . . . services."  *Id.* § 7402(b).

The Commission promulgated regulations governing Emergency Connectivity Fund disbursements in May 2021.  Report and Order, *Establishing Emergency Connectivity Fund to Close the Homework Gap*, 36 FCC Rcd. 8696, 2021 WL 1921632 (May 11, 2021).  In doing so, it explained that some schools had "already undertaken initiatives to equip school buses and bookmobiles with Wi-Fi hotspots during the COVID-19 emergency period and have found such initiatives to be particularly effective."  *Id.* at *21 ¶ 61.  It therefore concluded that Emergency Connectivity Fund support was eligible to be used for such purchases.  *Id.*  Between May 2021 and October 2023, the Commission committed "approximately $58.2 million in funding for the purchase of Wi-Fi hotspots and broadband services for school buses."  Ruling ¶ 8 (A5).

### D.    The Declaratory Ruling

Meanwhile, in February 2021, the Bureau sought comment on several petitions for waiver of the Commission's rules to allow E-Rate funding to support, among other things, school bus Wi-Fi.  *See id.* ¶ 6 (A3).  The Bureau's public notices of the proposed funding year 2023 and 2024 eligible services lists accordingly stated that the Commission was considering E-Rate funding for Wi-Fi on school buses.  *See* Public

Notice ¶ 1 n.2, *Wireline Competition Bureau Seeks Comment on Proposed Eligible Services List for the E-Rate Program*, 37 FCC Rcd. 9570 (WCB 2022); Public Notice at *1 n.2, *Wireline Competition Bureau Seeks Comment on Proposed Eligible Services List for the E-Rate Program*, DA 23-819, 2023 WL 5969324 (WCB Sept. 12, 2023).

Numerous school and public interest organizations submitted comments in support of these proposals. Ruling ¶ 6 n.20 (A4); *see, e.g.*, Initial Comments of the New Mexico Public School Facilities Authority at 5-6, WC Dkt. No. 21-31 (Feb. 16, 2021) (noting that in New Mexico "it is not uncommon for students to travel more than two hours per day via bus and even longer for sporting events," and that Santa Fe public schools had already deployed six "rolling study halls" to "allow students to complete homework during their long commute home") (A55); Comments of Aurora Institute at 5, WC Dkt. No. 21-31 (Feb. 16, 2021) (noting that half the students in Mississippi and 20 percent of students in New Hampshire lack home Internet access) (A65); Comments of the E-Rate Management Professionals Association at 14, WC Dkt. No. 21-31 (Feb. 12, 2021) (because "buses are school property . . . Internet services provided on school property (i.e. buses) should be eligible for E-Rate discount") (A80); Reply Comments of West Virginia Department of

Education at 2-3, WC Dkt. No. 21-31 (Feb. 26, 2021) (explaining that West Virginia's experience deploying about 190 school buses equipped with Wi-Fi demonstrated that bus Wi-Fi is a "sensible way to meet the homework gap") (A86).

In May 2022, the Commission's chairwoman announced she had circulated a draft declaratory ruling clarifying that the equipment and services necessary for school bus Wi-Fi are eligible for support under the E-Rate program rules. Ruling n.20 (A4). The agency released the draft ruling to the public on September 28, 2023.[5]

On October 25, 2023, the Commission adopted the Ruling. The Commission concluded that "the use of Wi-Fi, or other similar access point technologies, on school buses serves an educational purpose and, therefore, the service and equipment that enable it are eligible for E-Rate funding." Ruling ¶ 9 (A2).

As the Commission explained, the record before it showed that the "vast majority of students today require a reliable broadband connection to complete homework assignments," but that at least 16

---

[5] *See* https://www.fcc.gov/document/clarifying-school-bus-wi-fi-eligibility-e-rate-funding

million students lack a broadband connection at home. *Id.* ¶¶ 9-10 &
n.30 (A6). Thus, the Commission found, "students without adequate
broadband access at home have been shut out of being able to fully
engage in their education, often having to resort to completing
assignments from parking lots or other public spaces with free Wi-Fi or
risk falling behind their peers." *Id.* ¶ 11 (A7). At the same time, the
Commission stated, many students "spend hours on school buses
traveling to and from school and other school-related activities,
particularly in rural parts of the country." *Id.* ¶ 10 (A7).

The Commission concluded that authorizing E-Rate funding for
school bus Wi-Fi "fits squarely within [the] authority" provided by 47
U.S.C. § 254(h)(1)(B) to "to support the provision of communications
services, including broadband, to schools and libraries for educational
purposes." *Id.* ¶ 9 (A6). The Commission found that school bus Wi-Fi is
"integral, immediate, and proximate to the education of students," 47
C.F.R. § 54.500, in light of the many students without "a reliable
broadband connection at [their] homes" who "could use the school bus
Wi-Fi to complete homework and other assignments while traveling to
and from school." Ruling ¶¶ 6, 9-10 (A3-A6). And "[a]dapting the
eligible services list to reflect how schools now can use advanced

- 18 -

information services to connect their students allows the program to keep up with an 'evolving level' of technological services, 'taking into account advances in telecommunications and information technologies and services.'" *Id.* ¶ 12 & n.40 (A8) (quoting 47 U.S.C. § 254(c)(1)).

The Commission also concluded, in a footnote, that the Ruling "independently is permitted by [S]ection 254(h)(2)(A)," *id.* n.32 (A6), which directs the Commission to "enhance . . . access to advanced telecommunications and information services for all public and nonprofit elementary and secondary school classrooms, health care providers, and libraries." 47 U.S.C. § 254(h)(2)(A). The Commission explained that the statute does not define "classrooms," and that "recent history has shown that in today's world, teaching and learning often occur outside of brick and mortar school buildings and thus 'classroom' may be interpreted more broadly." Ruling n.32 (A6). Thus, "the use of Wi-Fi on school buses to aid the many students who lack robust internet access at home . . . enhances eligible schools' and libraries' access to advanced . . . services." *Id.*

On March 27, 2024, the application window closed for funding year 2024 E-Rate support. *See* Federal Universal Service Support Mechanisms Fund Size Projections for Third Quarter 2024 at 56 (May

2, 2024), *available at*

https://www.fcc.gov/ecfs/document/10502037228270/2. Demand for E-Rate support in funding year 2024 totals $3.014 billion. *Id.* Based on applications received, demand for E-Rate funds for school bus Wi-Fi in funding year 2024 totals approximately $19 million. *Id.*

### E. The Current Appeal

Without having participated in the Commission's proceedings underlying the Ruling, petitioners sought review in this Court on December 19, 2023. Petitioners asserted jurisdiction under 47 U.S.C. § 402(a) and 28 U.S.C. § 2342(1), commonly known as the Hobbs Act. Petitioners did not assert that either of them was a "party aggrieved," as required for subject-matter jurisdiction under the Hobbs Act. *See* 28 U.S.C. § 2344. Nor did they claim to have participated before the agency in any way.

On February 6, 2024, respondents moved to dismiss the petition for review on the grounds that, by neglecting to move for reconsideration of the Ruling or otherwise participate in the agency's proceedings, petitioners had failed to fulfill an express condition precedent, under 47 U.S.C. § 405(a), to judicial review. *See* Federal Respondents' Motion to Dismiss and to Suspend Merits Briefing, Dkt.

33 (Feb. 6, 2024).  Respondents also moved to dismiss on the grounds

that neither petitioner was a "party aggrieved" under the Hobbs Act,

and that the petition did not fall into a narrow *ultra vires* exception this

Court has recognized to that Act.  *See id.*  On February 22, 2024, the

Court issued an order carrying the respondents' motion with the case.

Order, Dkt. 59-2 (Feb. 22, 2024).

## SUMMARY OF THE ARGUMENT

1.  The Court should dismiss the petition because neither

petitioner was "a party to the proceedings resulting in" the challenged

Ruling and neither filed a petition for agency reconsideration, which is

a "condition precedent" to judicial review of petitions brought by non-

parties.  47 U.S.C. § 405(a).

2.  Petitioners' failure to participate in agency proceedings

separately requires dismissal under the Hobbs Act because neither

petitioner is a "party aggrieved" entitled to judicial review of the Ruling.

28 U.S.C. § 2344.  The narrow *ultra vires* exception this Court has

recognized to the Hobbs Act's "party aggrieved" requirement does not

apply because this case does not involve a "plain violation of an

unambiguous and mandatory provision of the statute."  *Am. Airlines,*

*Inc. v. Herman*, 176 F.3d 283, 293 (5th Cir. 1999).

2. Petitioners also have not met their burden to establish Article III standing to challenge the Ruling because they have not demonstrated an actual or imminent injury-in-fact. They have offered no evidence demonstrating that E-Rate support for school bus Wi-Fi will imminently increase their monthly universal service fee.

For each of these reasons, the petition should be dismissed.

3. If the Court reaches the merits, it should deny the petition. The Commission designated school bus Wi-Fi as eligible for E-Rate support under 47 U.S.C. § 254(h)(1)(B), which authorizes the Commission to define the services carriers must provide on a discounted basis to "schools" "for educational purposes." The Commission has relied on this provision as authority for the E-Rate program of discounts for services that schools purchase from telecommunications carriers – including Internet access services – since its first order implementing Section 254(h), which was upheld in relevant part by this Court. Designating school bus Wi-Fi as eligible for support is part of the Commission's obligation to "establish periodically" the "evolving" services eligible for support. *Id.* § 254(c)(1). When it exercises that authority to update eligibility, it is appropriately responding to changed circumstances. Moreover, the Commission has allowed E-Rate support

for designated off-campus services since 2003. And the fact that Congress in the American Rescue Plan Act separately established a time-limited emergency connectivity fund dedicated solely to off-campus devices and services does not vitiate the Commission's separate authority to support some of the same services under Section 254(h).

4. The Ruling is separately authorized by 47 U.S.C. § 254(h)(2)(A), which authorizes the Commission to establish rules to "enhance . . . access" for "classrooms" to advanced telecommunications and information services. As the Commission explained, particularly in this day and age, the term "classroom" connotes more than a brick-and-mortar room. And Congress did not refer to services "in" or "at" classrooms, but rather access *for* classrooms, which further supports the Commission's interpretation that E-Rate support is not limited to services delivered to brick-and-mortar classrooms.

## STANDARD OF REVIEW

This case involves two issues: the Court's jurisdiction and interpretation of the Communications Act. The Court necessarily assesses its jurisdiction de novo. *See In re Tex. Wyo. Drilling, Inc.*, 647 F.3d 547, 550 (5th Cir. 2011). In interpreting a statute when reviewing an agency action, this Court should harness the "traditional tools of

statutory interpretation," *Am. Hosp. Ass'n v. Becerra*, 596 U.S. 724, 739 (2022),[6] to determine whether the challenged action is "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C); *see Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 433 (5th Cir. 2021) (reviewing FCC order pursuant to Administrative Procedure Act).

## ARGUMENT

I. **BECAUSE NEITHER PETITIONER WAS A "PARTY" TO THE PROCEEDINGS, PETITIONERS ARE NOT ENTITLED TO SEEK REVIEW OF THE RULING**

Petitioners did not submit comments to the agency regarding school bus Wi-Fi, file a petition for agency reconsideration, or otherwise participate in the agency proceedings. As explained in respondents' motion to dismiss, which the Court carried with the case and which we incorporate here, the petition for review should therefore be dismissed

---

[6] The Court also applies the principles of *Chevron USA, Inc. v. NRDC*, 467 U.S. 837 (1984) to ambiguous statutes "until and unless it is overruled by our highest Court." *Huntington Ingalls, Inc. v. U.S. Dep't of Labor*, 70 F.4th 245, 252 n.2 (5th Cir. 2023) (citing *Loper Bright Enters., Inc. v. Raimondo*, 45 F.4th 359 (D.C. Cir. 2022), *cert. granted*, 2023 WL 3158352 (2023) (granting certiorari on whether *Chevron* should be overturned)). In any event, "[t]his case is not conditional on *Chevron*'s longevity," *Huntington Ingalls*, 70 F.4th at 252 n.2, because the Commission's interpretation also accords with the best reading of Section 254's plain language.

under two statutes.  *See* Mot. 1-3, Reply 1-3; *see* Order, Dkt. 59-2 (Feb. 22, 2024).

## A.    Section 405(a) Requires Party Status

Section 405(a) of the Communications Act provides that filing a petition for reconsideration is a "condition precedent" to judicial review of a Commission order "where the party seeking such review" either "(1) was not a party to the proceedings resulting in" the challenged order, "or (2) relies on questions of fact or law upon which the Commission . . . has been afforded no opportunity to pass."  47 U.S.C. § 405(a).  Here, neither petitioner was a "party to the proceedings," *id.*, or filed a petition for reconsideration.  Petitioners do not assert otherwise.

Instead, petitioners argued in response to respondents' motion to dismiss that the Court can overlook their failure to participate before the agency where the *second* prong of Section 405(a) is satisfied; *i.e.*, when they press an argument on which the Commission has had an "opportunity to pass."[7]  *Id.*  But as respondents have already explained,

---

[7] As explained below, the Commission did not have an opportunity to pass on some of the arguments petitioners make in their brief.  *See infra* at 37, 39.

*see* Reply 3-9, the disjunctive prongs of Section 405(a) constitute separate requirements, and this Court must enforce those requirements because Section 405(a) is a "mandatory exhaustion regime[]" that "foreclose[s] judicial discretion." *Ross v. Blake*, 578 U.S. 632, 639 (2016); *see Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001) ("we will not read futility or other exceptions into statutory exhaustion requirements"); *Gomez v. Hill*, 87 F. App'x 374, 375 (5th Cir. 2004) (quoting *Booth*).  Section 405(a) thus bars this Court's review, and the Court should dismiss the petition.

### B.    The Hobbs Act Also Requires Party Status

Dismissal is separately required because the Court lacks subject-matter jurisdiction under the Hobbs Act.  28 U.S.C. § 2344 (only a "party aggrieved" may file a petition for review of a final FCC order); *see id*. § 2342(1).  In their response to respondents' motion to dismiss, and in their opening brief, petitioners did not claim to be "part[ies] aggrieved" under Section 2344 of the Hobbs Act.  Nor could they reasonably do so, because "party" in Section 2344 refers to a person who participated in the agency proceeding, which these petitioners did not do.  *See* Mot. 12-13.  Petitioners have instead invoked this Court's decision in *Texas v. Nuclear Regulatory Commission,* 78 F.4th 827, 839

(5th Cir. 2023). *Texas* applied the "exceedingly narrow" exception that this Court has recognized to Section 2344, which can allow review of arguments alleging an *ultra vires* agency action. *Id.* n.3 (quoting *Merchants Fast Motor Lines v. ICC*, 5 F.3d 911, 922 (5th Cir. 1993)). In other words, this Court has subject-matter jurisdiction over the petition for review only if it holds, as in *Texas*, that the *ultra vires* exception applies and that petitioners' arguments fall within that exception.

After respondents filed the motion to dismiss, this Court denied the government's petition seeking en banc rehearing as to this Court's *ultra vires* exception. *See Texas v. NRC*, 95 F.4th 935 (5th Cir. 2024) (order denying en banc rehearing and separate statements concurring in and dissenting from denial). As of the filing of this brief, the time for petitioning for a writ of certiorari in *Texas* has not yet run. While recognizing that *Texas* is currently binding on this Court, we continue to preserve for further review the argument that this exception is in error and should be eliminated by this Court.

Even assuming that an *ultra vires* exception to the Hobbs Act "party aggrieved" requirement were proper in some circumstances, that exception would not properly apply here. *See* Mot. 13 n.3, 15-16; Reply 11-13. The *ultra vires* exception this Court has recognized applies only

in "rare instances," *Texas*, 78 F.4th at 839, involving a "plain violation of an unambiguous and mandatory provision of the statute," *Am. Airlines*, 176 F.3d at 293; *see also id.* (citing *Leedom v. Kyne*, 358 U.S. 184 (1958)).

This is not such a case. As we explain below, 47 U.S.C. § 254(h)(1)(B) authorizes the agency to subsidize discounts for services purchased by "schools" that are "for educational purposes." That is what the Ruling allows. Petitioners' argument to the contrary – that support under section 254(h) is limited to services provided in brick-and-mortar "classrooms," *see* Br. 19 – is contrary to the text of Section 254(h) and longstanding agency practice. And even if the agency's interpretation were in error, the Ruling is not "so contrary to the terms of the relevant statute that it necessitates judicial review independent of" statutory review provisions. *Kirby Corp. v. Pena*, 109 F.3d 258, 269 (5th Cir. 1997); *see* Reply 12-13, 16. Because the exceedingly narrow *ultra vires* exception this Court has recognized does not apply to petitioners' statutory argument, the Court should dismiss the petition for lack of jurisdiction.

## II. PETITIONERS HAVE NOT MET THEIR BURDEN TO ESTABLISH STANDING

The "irreducible constitutional minimum" of standing under Article III requires a party to have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the [respondent], and (3) that is likely to be redressed by a favorable decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  A claimed injury must be, among other things, "actual or imminent, not conjectural or hypothetical." *Id.* at 339.  It is petitioners' burden to demonstrate each element of standing with "citations to specific facts in the record." *Shrimpers & Fishermen of the RGV v. Texas Comm'n on Env't Quality*, 968 F.3d 419, 423 (5th Cir. 2020).

Petitioners assert that if universal service costs increase to cover school bus Wi-Fi, their telephone bills will increase because they will have to "pay their share of those extra costs." Br. 18.  This theory does not account for two things.  First, applications for E-Rate support for bus Wi-Fi in funding year 2024 total approximately $19 million – far less than 1 percent of the total demand for universal service programs,

which totaled approximately $8 billion in 2023.[8]  That means petitioners' theoretical "share" would appear to be no more than a fraction of a penny, which may not translate into any increase on their bill.  See Br. Exhs. A, B (bills showing monthly fees for the entire universal service program of $0.55 and $0.66 per telephone line).

Second, the E-Rate subsidies associated with bus Wi-Fi are not simply divided *pro rata* between the millions of customers and businesses that purchase interstate and international telecommunications services.  Rather, the universal service fee a provider can pass through to a customer turns on factors including "projections of demand for the federal universal service support mechanisms for high-cost areas, low-income consumers, schools and libraries, and rural health care providers," 47 C.F.R. § 54.709(a)(3), and "the interstate telecommunications portion of that customer's bill,"

---

[8] *See supra* at 20; *see* Universal Service Administrative Co., 2023 Annual Report at 3, *available at* https://www.usac.org/wp-content/uploads/about/documents/annual-reports/2023/2023_USAC_Annual_Report.pdf.   There is no reason to expect a dramatic future increase in subsidies for bus Wi-Fi, when support under the Emergency Connectivity Fund – which reimbursed 100 percent of the cost rather than the 20 to 90 percent available under E-Rate – totaled only $58.2 million between May 2021 and October 2023.  See Ruling ¶ 8 (A5).

*id.* § 54.712; *see generally id.* § 54.709. Petitioners have not established – and it is far from clear – when a slight increase in the expenditures for E-Rate, which is only one of the numbers that feeds into those calculations, will actually increase petitioners' bills by even a penny. While it is possible that the subsidies for bus Wi-Fi may at some point cause petitioners' universal service fees to round up to the next cent, the imminence requirement is "stretched beyond the breaking point where, as here, the plaintiff alleges only an injury at some indefinite future time." *E.T. v. Paxton*, 41 F.4th 709, 716 (5th Cir. 2022); *see also Young Conservatives of Texas Found. v. Smatresk*, 73 F.4th 304, 309 (5th Cir. 2023) (financial injury requires an "*identifiable* trifle" (emphasis added)).

Thus, even assuming that the widely shared experience of paying a line item for universal service could be an injury for Article III purposes, *but see Hotze v. Burwell*, 784 F.3d 984, 995 (5th Cir. 2015) (increased health insurance premiums alleged to be caused by the Patient Protection and Affordable Care Act held insufficient for standing as a "generalized grievance"), petitioners have not met their burden to provide specific facts demonstrating an imminent injury.

## III. SECTION 254(H)(1)(B) AUTHORIZES THE RULING

Petitioners' failure to establish standing and lack of participation in the underlying agency proceedings foreclose this Court from reaching the merits of their claims. In any event, those claims are unavailing. The Commission's decision to treat school bus Wi-Fi as eligible for support under the E-Rate program was within its authority under the Communications Act.

### A. Section 254(h)(1)(B) Authorizes Discounts For Services Provided To "Schools" For "Educational Purposes"

The Ruling explains that Section 254(h)(1)(B) "authorizes the Commission to support the provision of communications services, including broadband, to schools and libraries for educational purposes, and [the Ruling] fits squarely within that authority." Ruling ¶ 9 & n.32 (A6) (citing 47 U.S.C. § 254(h)(1)(B), (c)(3)).[9] This interpretation accords with the plain text of Section 254.

---

[9] The Commission thus did not rely on Section 254(h)(1)(B) as a "fallback" argument, as petitioners assert (Br. 25). Instead, it was the primary basis on which the Commission relied. Ruling ¶ 9 (A6). The Commission "identifie[d] Section 254(h)(2)(A) as the source of its authority for" the Ruling, Br. 19, only in explaining that the Ruling is "independently" authorized by that provision. Ruling n.32 (A6).

Section 254(h)(1)(B) directs carriers, upon "request for any of [their] services that are within the definition of universal service under subsection (c)(3), [to] provide such services to elementary schools, secondary schools, and libraries for educational purposes at rates less than the amounts charged for similar services to other parties." 47 U.S.C. § 254(h)(1)(B). Section 254(c)(3) authorizes the Commission to "designate . . . services for such support mechanisms for schools. . . for the purposes of [Section 254(h)]." *Id.* § 254(c)(3). These provisions plainly authorize the Commission, upon a finding that school bus Wi-Fi serves "educational purposes," to allow schools to request and receive E-Rate-funded discounts from carriers for that service. *See* Ruling ¶ 9 & n.32 (A6) (citing 47 U.S.C. § 254(h)(1)(B), (c)(3)).

Petitioners' primary argument against the Ruling is that E-Rate support for schools is limited to services provided in "classrooms." *See, e.g.*, Br. 19 (citing 47 U.S.C. § 254(h)(2)(A)). But the word "classrooms" is nowhere to be found in Section 254(h)(1)(B). *See* Ruling n.32 (A6). Rather, Section 254(h)(1)(B) authorizes the Commission to subsidize discounts for services provided to "schools," and unambiguously uses this term to mean the educational providers that request and receive

- 33 -

discounted communications services, and not the physical buildings in which such services are deployed.

Section 254(h)(1)(B) requires carriers to provide discounted "services to elementary schools [and] secondary schools" at rates "less than the amounts charged for similar services *to other parties*" and in an amount "appropriate and necessary to ensure affordable access to and use of such services *by such entities*." 47 U.S.C. § 254(h)(1)(B). Thus, "schools" in Section 254(h)(1)(B) are "entities" that receive services at a lower rate than that paid by "other parties." *Cf. TOPUC I*, 183 F.3d at 440 (Section 254(h) "direct[s] the FCC to provide support to elementary and secondary schools," thus imposing a "new statutory mandate to subsidize support for certain beneficiaries"). This is consistent with the statutory definitions of "elementary school" and "secondary school," which specify that such schools "provide[] elementary education" or "provide[] secondary education," respectively. *See* 47 U.S.C. § 254(h)(7)(A) (incorporating the definition of schools from 20 U.S.C. § 7801). Whereas an educational entity can "provide . . . education," *id.*, a building cannot. The Commission's understanding of "schools" is further confirmed by the title of Section 254(h)(1)(B), which is "Educational Providers and Libraries." *See United States v.*

*Wallington*, 889 F.2d 573, 577 (5th Cir. 1989) (interpreting statutory text in light of section heading).

Other provisions of Section 254(h) likewise confirm this understanding. Section 254(h)(1)(A), for example, confirms that the object of "provide services to" in Section 254(h)(1)(B) is the *recipient*, not a location. Section 254(h)(1)(A) requires carriers to "provide telecommunications services . . . to any public or nonprofit health care provider." *Id.* § 254(h)(1)(A). It would not be natural to use the word "provider" to mean a building or location. It is, however, natural to refer to providing services to customers or other recipients. *See, e.g.*, *Stewart v. Entergy Corp.*, 35 F.4th 930, 933 (5th Cir. 2022) (energy company "provide[s] services to 3 million customers in 4 states"). Similarly, several other provisions of Section 254(h) use the term "school" in contexts where "school building" would make no sense. *See, e.g.*, 47 U.S.C. § 254(h)(5)(A)(i) (making discounts contingent upon certain actions by a "school, school board, local educational agency, or other authority with responsibility for administration of the school"); *id.* § 254(h)(5)(A)(iii) (a "school . . . shall provide reasonable public notice and hold at least one public hearing" in certain circumstances); *id.* § 254(h)(5)(E)(ii)(III) ("[a]ny school . . . may seek a waiver" of certain

requirements); *id.* § 254(h)(5)(F)(i) ("[a]ny school that knowingly fails" to take certain actions "shall not be eligible for services at discount rates").

Contrary to petitioners' assertions (Br. 27), the Ruling's focus on whether support for school bus Wi-Fi satisfies the "for educational purposes" language of Section 254(h)(1)(B) does not mean that the Commission is ignoring the independent requirement that only "elementary schools" or "secondary schools" (or libraries) are eligible to request and receive discounted services. 47 U.S.C. § 254(h)(1)(B). On the contrary, the Commission's rules limit "eligible recipients" to schools (and libraries), 47 C.F.R. § 54.501, and the Ruling never suggested that any entity *but* a school (or a library) is eligible to receive E-Rate support, *see, e.g.*, Ruling ¶ 13 (A8) (the "school or library seeking support").

## B. Petitioners Waived The Argument That Section 254(h)(1)(B) Is Not A Grant Of Authority, Which In Any Event Is Incorrect

Petitioners argue (Br. 26) that Section 254(h)(1)(B) cannot authorize the Ruling because that provision "does not authorize the FCC to do *anything*." Petitioners are mistaken.

As an initial matter, this argument is not before the Court because the Commission did not have an "opportunity to pass" on it prior to judicial review, as required by 47 U.S.C. § 405(a). *See Children's Health Def. v. FCC*, 25 F.4th 1045, 1050 (D.C. Cir. 2022) (argument "waived" where no party questioned the Commission's statutory authority under a particular provision). To satisfy Section 405(a), an argument must be "'flagged' for the agency's consideration." *Worldcall Interconnect, Inc. v. FCC*, 907 F.3d 810, 820 (5th Cir. 2018). Here, no party argued that Section 254(h)(1)(B) is not a grant of authority to establish E-Rate discounts. Moreover, "a reasonable Commission" would not have "seen the question raised" for purposes of Section 405(a), *id.*, because the Commission has relied on Section 254(h)(1)(B) for such authority since 1997. *See First Report and Order* ¶ 425, 12 FCC Rcd. at 9002 (establishing discount program for services purchased from carriers "pursuant to section 254(c)(3) and section 254(h)(1)(B) rather than section 254(h)(2)(A)").

In any event, petitioners are incorrect that Section 254(h)(1)(B) is not a "grant of authority to the agency." Br. 26. Section 254(h)(1)(B) authorizes the Commission to define which services are eligible for discounts by requiring carriers to provide discounts only for "services

that are within the definition of universal service under subsection (c)(3)," the provision that authorizes the Commission to define the services that are eligible for E-Rate support. 47 U.S.C. § 254(h)(1)(B). The second and third sentences of Section 254(h)(1)(B) further direct the Commission to "determine" a discount amount that is "appropriate and necessary to ensure affordable access to and use of such services by such entities," and to either "reimburse[]" the carrier "utilizing the support mechanisms to preserve and advance universal service" or to "treat[]" the discount "as an offset to [a carrier's] obligation to contribute to the mechanisms to preserve and advance universal service." *Id.* § 254(h)(1)(B)(i)-(ii); *see id.* § 254(d) (requiring providers to contribute to the "mechanisms established by the Commission to preserve and advance universal service").[10]

To the extent that the thrust of petitioners' "grant of authority" argument is that it is Section 254(h)(2)(A) that defines the scope of the discount program, this is belied by Section 254(b), which directs the

---

[10] In addition to the specific grants of authority in Section 254, the Commission also has general authority to "[m]ake such rules and regulations . . . as may be necessary to carry out the provisions of [the Communications Act]." 47 U.S.C. § 303(r); *see id.* § 154(i).

Commission to "base policies" for universal service on the principle that "schools and classrooms" should have access to services "as described in subsection (h)" generally. *Id.* § 254(b)(6). That this provision does not say "as described in Section 254(h)(2)(A)" means that Section 254(h)(2)(A) alone does not define the scope of either the Commission's E-Rate authority or the services eligible for support under the program.

Petitioners have likewise waived the argument (Br. 26) that Section 254(h)(1)(B) does not authorize support for "Internet access and Wi-Fi connections." *See* 47 U.S.C. § 405(a). And even if that issue were before the Court, it is well established that the Commission can designate Internet access provided by telecommunications carriers for E-Rate support pursuant to Section 254(h)(1)(B) and (c)(3). *See First Report and Order* ¶¶ 436-37, 12 FCC Rcd. at 9009 (those provisions authorize support for services "needed to use the Internet at discounted rates"). As the Commission explained, Section 254(c)(3) authorizes the Commission to designate "services" eligible for support – not "telecommunications services," as used elsewhere in Section 254. *Id.*; *see* Ruling n.32 (A6). The Commission may therefore designate both telecommunications services and information services as eligible for

discounts under Section 254(h)(1)(B) when they are provided by telecommunications carriers.  *See id.*

This Court upheld that interpretation.  *See TOPUC I*, 183 F.3d at 440-43 (affirming the Commission's conclusion that "[Section] 254(h)(1)(B) and (c)(3) authorize[] it to require discounted internet access and internal connections to schools and libraries").  And Congress has ratified the Commission's interpretation in subsequent amendments to Section 254 that impose requirements on schools that receive "services at discount rates under [Section 254(h)(1)(B)]" for "the provision of Internet access, Internet service, or internal connections." 47 U.S.C. § 254(h)(5)(A)(i), (ii).[11]  *See Hikvision USA, Inc. v. FCC*, 97 F.4th 938, 946 (D.C. Cir. 2024) (where "Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law," particularly where the text makes clear that Congress was "plainly aware" of the interpretation).

---

[11] Section 254(h)(5) was added in the Children's Internet Protection Act, which was part of the Consolidated Appropriations Act, 2001.  Pub. L. No. 106-554, 114 Stat. 2763, §§ 1721 *et seq.*

Petitioners' criticism (Br. 27) of the Commission's reliance on

Section 254(c)(3) is therefore misplaced.  The Commission relied on

Section 254(c)(3) for authority to designate Wi-Fi – which at that time

was classified as an information service, *see supra* at 8 n.2 – as eligible

for E-Rate discounts under Section 254(h)(1)(B).  *See* Ruling n.32 (A6)

(explaining that Section 254(h)(1)(B) "authoriz[es] reimbursement for

'services that are within the definition of universal service under

subsection (c)(3),' which itself authorizes the Commission to designate

non-telecommunications services for support under E-Rate").  The

Commission nowhere suggested that "that provision might permit what

subsections (h)(1)(A) [sic] and (h)(1)(B) do not," as petitioners

erroneously assert (Br. 27).

## C.    The Commission Has Allowed E-Rate Support For Off-Campus Uses Since 2003

For more than twenty years, the Commission has allowed E-Rate

support for specific off-campus services.  *See* Ruling ¶ 5 & n.11 (A2-A3).

Adding new services as the need arises fulfills the Commission's

statutory duty to "establish periodically" an "evolving" definition of

universal service that takes into account "advances in

telecommunications and information technologies and services" and

considers the extent to which a service is "essential to education." 47 U.S.C. § 254(c)(1)(A); *see also Second Report and Order* ¶¶ 28-29, 18 FCC Rcd. at 9211-12 (adding voice mail, which had previously been ineligible, as a supported service); *Sixth Report and Order* ¶¶ 8-9, 25 FCC Rcd. at 18765-67 (adding dark fiber, which had previously been ineligible, as a supported service).

The Commission did that here. The Ruling is a response to requests for E-Rate funding for school bus Wi-Fi that "intensified" during the COVID-19 pandemic. Ruling ¶ 6 (A3). As the record showed, the pandemic hastened a "shift[]" in public education that has made "providing equipment and reliable connectivity to all teachers and students . . . fundamental to sustaining on- and off-campus learning." *Id.* n.36 (A7) (quoting Los Angeles Unified School District Comments at 1, WC Docket No. 21-31 (Feb. 12, 2021)). Not surprisingly, then, the Commission's February 2021 request for comment on petitions seeking E-Rate funding for services including school bus Wi-Fi during the pandemic drew enthusiastic support for school bus Wi-Fi "on a permanent basis" because "many students who do not have broadband connectivity at home could use the school bus Wi-Fi to complete homework and other assignments while traveling to and from school."

Ruling ¶ 6 (A3).  Adding bus Wi-Fi to the list of eligible services when

the record demonstrated it had been used successfully and could

address unmet educational needs was entirely in line with Section 254

and the Commission's longstanding approach to off-campus services.

Petitioners assert that the Commission previously "disclaimed

that Section 254 authorized off-campus support."  Br. 15, *see also id.* at

21 & n.3.  This is incorrect.  As we have explained, the Commission has

long authorized E-Rate support for certain designated off-campus uses.

*See supra* at 12-13.  The citations on which petitioners rely simply

describe the Commission's general rule that "off-campus use . . . is

ineligible for support."  *See, e.g.*, Order App. B, *Modernizing the E-Rate*

*Program for Schools and Libraries*, 37 FCC Rcd. 14615, 14625 (WCB

2022); *see also Sixth Report and Order* ¶ 99, 25 FCC Rcd. at 18805 ("E-

Rate may not be able to fund" every potentially eligible service, so in

making eligibility determinations the Commission "evaluate[s]

potential impact of adding additional services to the eligible services

list").  The cited sources did not disclaim the Commission's statutory

authority to adopt additional off-campus services as part of the agency's

duty to "establish periodically" an "evolving" universal service definition

in light of changed circumstances.  47 U.S.C. § 254(c)(1).  Indeed, the

Bureau order in which the language on which petitioners rely appears also noted that "a draft Declaratory Ruling finding that the provision of Wi-Fi on school buses . . . is eligible for E-Rate support" had already been circulated.  Order ¶ 7, *Modernizing the E-Rate Program for Schools and Libraries*, 37 FCC Rcd. at 14617.

### D.    The Emergency Connectivity Fund Program Does Not Limit The E-Rate Program

Before the Commission acted on requests for E-Rate funding for school bus Wi-Fi that it received in 2020 and 2021, *see* Ruling n.17 (A3), Congress created a $7.17 billion Emergency Connectivity Fund dedicated solely to the needs of remote schooling during the COVID-19 pandemic.  *See* Rescue Plan Act § 7402.  Petitioners assert that if "Section 254 indeed authorizes off-campus support . . . there would have been no need for Congress to create [the Emergency Connectivity Fund] as part of the American Rescue Plan Act."  Br. 23.  But the "need" the Emergency Connectivity Fund addressed was the massive need for *funding* – more than triple the size of 2021 E-Rate support[12] – to

---

[12] E-Rate support in 2021 totaled approximately $2.16 billion. Universal Service Administrative Co., 2023 Annual Report at 3, *available at* https://www.usac.org/wp-content/uploads/about/documents/annual-reports/2023/2023_USAC_Annual_Report.pdf

address the urgent demand for remote learning tools during the COVID-19 pandemic. *See* Rescue Plan Act, § 7402(c)(1)(2)(A).

The Emergency Connectivity Fund also differs from the E-Rate program in a number of ways. In contrast to the Commission's broad discretion to define the services eligible for support under Section 254, the Rescue Plan Act limits the use of support to "the purchase during a COVID-19 emergency period" of specific categories of equipment and services, *id.* § 7402(d)(6), which were to be used by "students and staff of the school at locations that include locations other than the school," *id.* § 7402(a)(1). The Emergency Connectivity Fund also reimburses 100 percent of a school's eligible purchase, rather than the partial discounts of between 20 and 90 percent available under E-Rate. *Id.* § 7402(b). And Congress streamlined administration by requiring the Commission to promulgate implementing rules quickly, and it required the Commission to support covered equipment and devices under only those rules. *Id.* § 7402(a), (c)(4).

It simply does not follow that the creation of a dedicated funding source solely for remote learning tools during the pandemic means Section 254(h) cannot *also* authorize the Commission to support off-campus uses under its regular E-Rate rules. This Court recently

rejected a similar argument in *Huawei Technologies USA, Inc. v. FCC*, 2 F.4th 421 (5th Cir. 2021), in which it upheld a Commission rule that relied on Section 254 (among other provisions) to bar universal service funds from being spent on the products of certain companies that posed a national security risk.  After the Commission adopted the rule, Congress passed a statute that also prohibited FCC subsidies for equipment presenting a national security risk, but under which the Commission's role was "similar" but "more constrained" than under its rule.  *Id* at 445.  This Court rejected the argument that the later-enacted statute meant "Congress could not have intended to grant the FCC the authority asserted in the rule." *Id.* at 444.  So too here.

The Ruling is also unlike the agency actions in the cases cited by petitioners (Br. 24), where courts concluded, as a matter of statutory interpretation, that the programs before them were outside the agencies' respective authority.  *See, e.g., Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 763-65 (2021) (rejecting in a major questions case the argument that the statute authorized the agency to "take whatever measures it deem[ed] necessary to control the spread of

COVID-19").[13]  Here, as we have shown, the Commission's conclusion that bus Wi-Fi is eligible for universal support falls comfortably within the agency's long-extant authority to designate eligible services for schools under section 254(h).  Moreover, contrary to petitioners' suggestion (Br. 23), none of the cases on which petitioners rely held that the bare fact of overlap with a program authorized by an emergency statute is necessarily "fatal" to the exercise of an agency's preexisting authority.

Although petitioners and amici make much of the timing of the Ruling, *see, e.g.*, Br. 22-23, it is hardly surprising that, after receiving requests for E-Rate funding for school bus Wi-Fi, the Commission "refrain[ed] from making Wi-Fi on school buses eligible for [E-Rate] funding in funding year 2022 given the support available for

---

[13] The other cases petitioners cite (Br. 23) also relied on the major questions doctrine to interpret the statutes at issue.  *See Biden v. Nebraska*, 143 S. Ct. 2355, 2372 (2023); *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 117-18 (2022).  Petitioners have not argued that the addition of school bus Wi-Fi to the eligible services list implicates the major questions doctrine (it does not), and they should not be heard to do so on reply.  *See United States v. Aguirre-Villa*, 460 F.3d 681, 683 n.2 (5th Cir. 2006) ("this Court will not ordinarily consider arguments raised for the first time in a reply brief").

. . . services on buses through the Emergency Connectivity Fund program and the need to leverage the Commission's experience with the Emergency Connectivity Fund program." Ruling n.39 (A8). It made good sense to delay action under Section 254 during the time that the Emergency Connectivity Fund "provided relief to the[] students" who could benefit from bus Wi-Fi, particularly where it would allow the agency to later incorporate lessons learned into its decision-making under the E-Rate program. Ruling ¶ 11 (A7).[14] It made equally good sense to then take action when the program that justified delay came to an end.

## IV. SECTION 254(H)(2)(A) INDEPENDENTLY AUTHORIZES THE RULING

The Commission's conclusion that the Ruling is "independently" authorized by Section 254(h)(2)(A), Ruling n.32 (A6), is also consistent with the statute. Section 254(h)(2)(A) directs the Commission to

---

[14] Petitioners' reliance (Br. 25) on unenacted legislation that would have expressly granted the Commission the authority to provide support for Wi-Fi on school buses is equally unavailing. "[F]ailed legislative proposals are a particularly dangerous ground on which to rest an interpretation of a prior statute," because "several equally tenable inferences may be drawn from such inaction, including the inference that the existing legislation already incorporated the offered change." *United States v. Craft*, 535 U.S. 274, 287 (2002).

establish rules with the goal of "enhanc[ing], to the extent technically

feasible and economically reasonable, access to advanced

telecommunications and information services for all public and

nonprofit elementary and secondary school classrooms."

While petitioners focus on the word "classroom," statutory

interpretation must consider not only "the language itself," but also "the

specific context in which that language is used." *CleanCOALition v.*

*TXU Power*, 536 F.3d 469, 474 (5th Cir. 2008) (quoting *Robinson v.*

*Shell Oil Co.*, 519 U.S. 337, 341 (1997))).  Section 254(h)(2)(A) does not

refer to services "in" or "at" classrooms; it directs the Commission to

adopt rules to "enhance . . . access" to advanced services "for"

classrooms.  47 U.S.C. § 254(h)(2)(A).  This readily encompasses access

to services that ensure all students can complete out-of-class

assignments that prepare them for the next day's lessons.  *See* Ruling

n.36 (A7); *see also* Ruling n.32 (A6) (analogizing to telehealth program

that "expanded health care providers' ability to serve more patients").

Acting under its authority to establish periodically an "evolving"

definition of universal service, *id.* ¶ 12 (A8) (quoting 47 U.S.C.

§ 254(c)(1)), the Commission also reasonably concluded that "recent

history has shown that in today's world, teaching and learning often

occur outside of brick and mortar school buildings and thus 'classroom' may be interpreted more broadly." Ruling n.32 (A6). Doing so is also consistent with statutory direction to take into account the services that are "essential to education" in defining services eligible for support. 47 U.S.C. § 254(c)(1)(A); s*ee* Ruling ¶ 10 ("the vast majority of students today require a reliable broadband connection to complete homework assignments"); *id.* n.36 (A7).

Even if Section 254(h)(2)(A) does not independently authorize the Ruling, that provision does not limit the Commission's authority to define the discounted services that "schools" can request and receive under Section 254(h)(1)(B). In defining its universal service goals, Congress unambiguously aimed to provide access to both "schools *and* classrooms." *Id.* § 254(b)(6) (emphasis added). Whatever limitations are contained in the word "classroom" in Section 254(h)(2)(A), they do not apply to Section 254(h)(1)(B), which lacks that word.

## CONCLUSION

The petition for review should be dismissed or, if the Court

reaches the merits, denied.

Dated: September 18, 2024

Respectfully submitted,

/s/ *Rachel Proctor May*

P. Michele Ellison
  *General Counsel*

Sarah E. Citrin
  *Deputy Associate General Counsel*

Jonathan S. Kanter
  *Assistant Attorney General*

Robert B. Nicholson
Robert J. Wiggers
  *Attorneys*

U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
950 Pennsylvania Ave. NW
Washington, DC 20530

*Counsel for Respondent*
  *United States of America*

Rachel Proctor May
  *Counsel*

FEDERAL COMMUNICATIONS
  COMMISSION
45 L Street NE
Washington, DC 20554
(202) 418-1740
fcclitigation@fcc.gov

*Counsel for Respondent Federal*
  *Communications Commission*

# CERTIFICATE OF COMPLIANCE

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1.  This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

    ☒   this document contains <u>9,799</u> words, *or*

    ☐   this document uses a monospaced typeface and contains ____ lines of text.

2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    ☒   this document has been prepared in a proportionally spaced typeface using <u>Microsoft Word for Office 365</u> in <u>14-point Century Schoolbook</u>, *or*

    ☐   this document has been prepared in a monospaced spaced typeface using _____ with _____.

    */s/  Rachel Proctor May*
    Rachel Proctor May
    *Counsel for Respondents*

**CERTIFICATE OF FILING AND SERVICE**

I, Rachel Proctor May, hereby certify that on September 18, 2024, I filed the foregoing FINAL Brief for Respondents with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit using the electronic CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

*/s/ Rachel Proctor May*

Rachel Proctor May
Counsel

Federal Communications
Commission
Washington, D.C. 20554
(202) 418-1740

**STATUTORY ADDENDUM**

**Table of Contents**

20 U.S.C. § 7801........................................................ADD. 1

28 U.S.C. § 2342........................................................ADD. 1

28 U.S.C. § 2344........................................................ADD. 2

47 U.S.C. § 254..........................................................ADD. 3

47 U.S.C. § 405..........................................................ADD. 20

47 C.F.R. § 54.500.....................................................ADD. 22

47 C.F.R. § 54.501.....................................................ADD. 22

47 C.F.R. § 54.502.....................................................ADD. 24

47 C.F.R. § 54.505.....................................................ADD. 24

47 C.F.R. § 54.706.....................................................ADD. 28

47 C.F.R. § 54.709.....................................................ADD. 29

47 C.F.R. § 54.712.....................................................ADD. 32

## 20 U.S.C. § 7801

## Definitions

**\* \* \***

### (19) Elementary school

The term "elementary school" means a nonprofit institutional day or residential school, including a public elementary charter school, that provides elementary education, as determined under State law.

**\* \* \***

### (45) Secondary school

The term "secondary school" means a nonprofit institutional day or residential school, including a public secondary charter school, that provides secondary education, as determined under State law, except that the term does not include any education beyond grade 12.

## 28 U.S.C. § 2342

## Jurisdiction of court of appeals

The court of appeals (other than the United States Court of Appeals for the Federal Circuit) has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of--

(1) all final orders of the Federal Communications Commission made reviewable by section 402(a) of title 47;

(2) all final orders of the Secretary of Agriculture made under chapters 9 and 20A of title 7, except orders issued under sections 210(e), 217a, and 499g(a) of title 7;

(3) all rules, regulations, or final orders of--

> (A) the Secretary of Transportation issued pursuant to section 50501, 50502, 56101-56104, or 57109 of title 46 or pursuant to part B or C of subtitle IV, subchapter III of chapter 311, chapter 313, or chapter 315 of title 49; and

(B) the Federal Maritime Commission issued pursuant to section 305, 41304, 41308, or 41309 or chapter 421 or 441 of title 46;

(4) all final orders of the Atomic Energy Commission made reviewable by section 2239 of title 42;

(5) all rules, regulations, or final orders of the Surface Transportation Board made reviewable by section 2321 of this title;

(6) all final orders under section 812 of the Fair Housing Act; and

(7) all final agency actions described in section 20114(c) of title 49.

Jurisdiction is invoked by filing a petition as provided by section 2344 of this title

## 28 U.S.C. § 2344

### Review of orders; time; notice; contents of petition; service

On the entry of a final order reviewable under this chapter, the agency shall promptly give notice thereof by service or publication in accordance with its rules. Any party aggrieved by the final order may, within 60 days after its entry, file a petition to review the order in the court of appeals wherein venue lies. The action shall be against the United States. The petition shall contain a concise statement of--

(1) the nature of the proceedings as to which review is sought;

(2) the facts on which venue is based;

(3) the grounds on which relief is sought; and

(4) the relief prayed.

The petitioner shall attach to the petition, as exhibits, copies of the order, report, or decision of the agency. The clerk shall serve a true copy of the petition on the agency and on the Attorney General by registered mail, with request for a return receipt

# 47 U.S.C. § 254
## Universal service

(a) Procedures to review universal service requirements

(1) Federal-State Joint Board on universal service

Within one month after February 8, 1996, the Commission shall institute and refer to a Federal-State Joint Board under section 410(c) of this title a proceeding to recommend changes to any of its regulations in order to implement sections 214(e) of this title and this section, including the definition of the services that are supported by Federal universal service support mechanisms and a specific timetable for completion of such recommendations. In addition to the members of the Joint Board required under section 410(c) of this title, one member of such Joint Board shall be a State-appointed utility consumer advocate nominated by a national organization of State utility consumer advocates. The Joint Board shall, after notice and opportunity for public comment, make its recommendations to the Commission 9 months after February 8, 1996.

(2) Commission action

The Commission shall initiate a single proceeding to implement the recommendations from the Joint Board required by paragraph (1) and shall complete such proceeding within 15 months after February 8, 1996. The rules established by such proceeding shall include a definition of the services that are supported by Federal universal service support mechanisms and a specific timetable for implementation. Thereafter, the Commission shall complete any proceeding to implement subsequent recommendations from any Joint Board on universal service within one year after receiving such recommendations.

(b) Universal service principles

The Joint Board and the Commission shall base policies for the preservation and advancement of universal service on the following principles:

(1) Quality and rates

Quality services should be available at just, reasonable, and affordable rates.

(2) Access to advanced services

Access to advanced telecommunications and information services should be provided in all regions of the Nation.

(3) Access in rural and high cost areas

Consumers in all regions of the Nation, including low-income consumers and those in rural, insular, and high cost areas, should have access to telecommunications and information services, including interexchange services and advanced telecommunications and information services, that are reasonably comparable to those services provided in urban areas and that are available at rates that are reasonably comparable to rates charged for similar services in urban areas.

(4) Equitable and nondiscriminatory contributions

All providers of telecommunications services should make an equitable and nondiscriminatory contribution to the preservation and advancement of universal service.

(5) Specific and predictable support mechanisms

There should be specific, predictable and sufficient Federal and State mechanisms to preserve and advance universal service.

(6) Access to advanced telecommunications services for schools, health care, and libraries

Elementary and secondary schools and classrooms, health care providers, and libraries should have access to advanced telecommunications services as described in subsection (h).

(7) Additional principles

Such other principles as the Joint Board and the Commission determine are necessary and appropriate for the protection of the public interest, convenience, and necessity and are consistent with this chapter.

(c) Definition

(1) In general

Universal service is an evolving level of telecommunications services that the Commission shall establish periodically under this section, taking into account advances in telecommunications and information technologies and services. The Joint Board in recommending, and the Commission in establishing, the definition of the services that are supported by Federal universal service support mechanisms shall consider the extent to which such telecommunications services--

> (A) are essential to education, public health, or public safety;

> (B) have, through the operation of market choices by customers, been subscribed to by a substantial majority of residential customers;

> (C) are being deployed in public telecommunications networks by telecommunications carriers; and

> (D) are consistent with the public interest, convenience, and necessity.

(2) Alterations and modifications

The Joint Board may, from time to time, recommend to the Commission modifications in the definition of the services that are supported by Federal universal service support mechanisms.

(3) Special services

In addition to the services included in the definition of universal service under paragraph (1), the Commission may designate additional services for such support mechanisms for schools, libraries, and health care providers for the purposes of subsection (h).

(d) Telecommunications carrier contribution

Every telecommunications carrier that provides interstate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, to the specific, predictable, and sufficient

mechanisms established by the Commission to preserve and advance universal service. The Commission may exempt a carrier or class of carriers from this requirement if the carrier's telecommunications activities are limited to such an extent that the level of such carrier's contribution to the preservation and advancement of universal service would be de minimis. Any other provider of interstate telecommunications may be required to contribute to the preservation and advancement of universal service if the public interest so requires

\* \* \*

(h) Telecommunications services for certain providers

(1) In general

(A) Health care providers for rural areas

A telecommunications carrier shall, upon receiving a bona fide request, provide telecommunications services which are necessary for the provision of health care services in a State, including instruction relating to such services, to any public or nonprofit health care provider that serves persons who reside in rural areas in that State at rates that are reasonably comparable to rates charged for similar services in urban areas in that State. A telecommunications carrier providing service under this paragraph shall be entitled to have an amount equal to the difference, if any, between the rates for services provided to health care providers for rural areas in a State and the rates for similar services provided to other customers in comparable rural areas in that State treated as a service obligation as a part of its obligation to participate in the mechanisms to preserve and advance universal service.

(B) Educational providers and libraries

All telecommunications carriers serving a geographic area shall, upon a bona fide request for any of its services that are within the definition of universal service under subsection (c)(3), provide such services to elementary schools, secondary schools, and libraries for educational purposes at rates less than the amounts charged for

similar services to other parties. The discount shall be an amount that the Commission, with respect to interstate services, and the States, with respect to intrastate services, determine is appropriate and necessary to ensure affordable access to and use of such services by such entities. A telecommunications carrier providing service under this paragraph shall--

(i) have an amount equal to the amount of the discount treated as an offset to its obligation to contribute to the mechanisms to preserve and advance universal service, or

(ii) notwithstanding the provisions of subsection (e) of this section, receive reimbursement utilizing the support mechanisms to preserve and advance universal service.

(2) Advanced services

The Commission shall establish competitively neutral rules--

(A) to enhance, to the extent technically feasible and economically reasonable, access to advanced telecommunications and information services for all public and nonprofit elementary and secondary school classrooms, health care providers, and libraries; and

(B) to define the circumstances under which a telecommunications carrier may be required to connect its network to such public institutional telecommunications users.

(3) Terms and conditions

Telecommunications services and network capacity provided to a public institutional telecommunications user under this subsection may not be sold, resold, or otherwise transferred by such user in consideration for money or any other thing of value.

(4) Eligibility of users

No entity listed in this subsection shall be entitled to preferential rates or treatment as required by this subsection, if such entity operates as a for-profit business, is a school described in paragraph (7)(A) with an

endowment of more than $50,000,000, or is a library or library consortium not eligible for assistance from a State library administrative agency under the Library Services and Technology Act.

(5) Requirements for certain schools with computers having Internet access

    (A) Internet safety

        (i) In general

        Except as provided in clause (ii), an elementary or secondary school having computers with Internet access may not receive services at discount rates under paragraph (1)(B) unless the school, school board, local educational agency, or other authority with responsibility for administration of the school--

            (I) submits to the Commission the certifications described in subparagraphs (B) and (C);

            (II) submits to the Commission a certification that an Internet safety policy has been adopted and implemented for the school under subsection (l); and

            (III) ensures the use of such computers in accordance with the certifications.

        (ii) Applicability

        The prohibition in clause (i) shall not apply with respect to a school that receives services at discount rates under paragraph (1)(B) only for purposes other than the provision of Internet access, Internet service, or internal connections.

        (iii) Public notice; hearing

        An elementary or secondary school described in clause (i), or the school board, local educational agency, or other authority with responsibility for administration of the school, shall provide reasonable public notice and hold at least one public

hearing or meeting to address the proposed Internet safety policy. In the case of an elementary or secondary school other than an elementary school or a secondary school as defined in section 7801 of Title 20, the notice and hearing required by this clause may be limited to those members of the public with a relationship to the school.

(B) Certification with respect to minors

A certification under this subparagraph is a certification that the school, school board, local educational agency, or other authority with responsibility for administration of the school--

(i) is enforcing a policy of Internet safety for minors that includes monitoring the online activities of minors and the operation of a technology protection measure with respect to any of its computers with Internet access that protects against access through such computers to visual depictions that are--

(I) obscene;

(II) child pornography; or

(III) harmful to minors;

(ii) is enforcing the operation of such technology protection measure during any use of such computers by minors; and

(iii) as part of its Internet safety policy is educating minors about appropriate online behavior, including interacting with other individuals on social networking websites and in chat rooms and cyberbullying awareness and response.

(C) Certification with respect to adults

A certification under this paragraph is a certification that the school, school board, local educational agency, or other authority with responsibility for administration of the school--

(i) is enforcing a policy of Internet safety that includes the operation of a technology protection measure with respect to

any of its computers with Internet access that protects against access through such computers to visual depictions that are--

    (I) obscene; or

    (II) child pornography; and

(ii) is enforcing the operation of such technology protection measure during any use of such computers.

(D) Disabling during adult use

An administrator, supervisor, or other person authorized by the certifying authority under subparagraph (A)(i) may disable the technology protection measure concerned, during use by an adult, to enable access for bona fide research or other lawful purpose.

(E) Timing of implementation

    (i) In general

    Subject to clause (ii) in the case of any school covered by this paragraph as of the effective date of this paragraph under section 1721(h) of the Children's Internet Protection Act, the certification under subparagraphs (B) and (C) shall be made--

        (I) with respect to the first program funding year under this subsection following such effective date, not later than 120 days after the beginning of such program funding year; and

        (II) with respect to any subsequent program funding year, as part of the application process for such program funding year.

    (ii) Process

        (I) Schools with Internet safety policy and technology protection measures in place

        A school covered by clause (i) that has in place an Internet safety policy and technology protection

measures meeting the requirements necessary for certification under subparagraphs (B) and (C) shall certify its compliance with subparagraphs (B) and (C) during each annual program application cycle under this subsection, except that with respect to the first program funding year after the effective date of this paragraph under section 1721(h) of the Children's Internet Protection Act, the certifications shall be made not later than 120 days after the beginning of such first program funding year.

(II) Schools without Internet safety policy and technology protection measures in place

A school covered by clause (i) that does not have in place an Internet safety policy and technology protection measures meeting the requirements necessary for certification under subparagraphs (B) and (C)--

(aa) for the first program year after the effective date of this subsection in which it is applying for funds under this subsection, shall certify that it is undertaking such actions, including any necessary procurement procedures, to put in place an Internet safety policy and technology protection measures meeting the requirements necessary for certification under subparagraphs (B) and (C); and

(bb) for the second program year after the effective date of this subsection in which it is applying for funds under this subsection, shall certify that it is in compliance with subparagraphs (B) and (C).

Any school that is unable to certify compliance with such requirements in such second program year shall be ineligible for services at discount rates or funding in lieu of services at such rates under this subsection for such second year and all

subsequent program years under this subsection, until such time as such school comes into compliance with this paragraph.

(III) Waivers

Any school subject to subclause (II) that cannot come into compliance with subparagraphs (B) and (C) in such second year program may seek a waiver of subclause (II)(bb) if State or local procurement rules or regulations or competitive bidding requirements prevent the making of the certification otherwise required by such subclause. A school, school board, local educational agency, or other authority with responsibility for administration of the school shall notify the Commission of the applicability of such subclause to the school. Such notice shall certify that the school in question will be brought into compliance before the start of the third program year after the effective date of this subsection in which the school is applying for funds under this subsection.

(F) Noncompliance

(i) Failure to submit certification

Any school that knowingly fails to comply with the application guidelines regarding the annual submission of certification required by this paragraph shall not be eligible for services at discount rates or funding in lieu of services at such rates under this subsection.

(ii) Failure to comply with certification

Any school that knowingly fails to ensure the use of its computers in accordance with a certification under subparagraphs (B) and (C) shall reimburse any funds and discounts received under this subsection for the period covered by such certification.

(iii) Remedy of noncompliance

(I) Failure to submit

A school that has failed to submit a certification under clause (i) may remedy the failure by submitting the certification to which the failure relates. Upon submittal of such certification, the school shall be eligible for services at discount rates under this subsection.

(II) Failure to comply

A school that has failed to comply with a certification as described in clause (ii) may remedy the failure by ensuring the use of its computers in accordance with such certification. Upon submittal to the Commission of a certification or other appropriate evidence of such remedy, the school shall be eligible for services at discount rates under this subsection.

(6) Requirements for certain libraries with computers having Internet access

(A) Internet safety

(i) In general

Except as provided in clause (ii), a library having one or more computers with Internet access may not receive services at discount rates under paragraph (1)(B) unless the library--

(I) submits to the Commission the certifications described in subparagraphs (B) and (C); and

(II) submits to the Commission a certification that an Internet safety policy has been adopted and implemented for the library under subsection (l); and

(III) ensures the use of such computers in accordance with the certifications.

(ii) Applicability

The prohibition in clause (i) shall not apply with respect to a library that receives services at discount rates under paragraph (1)(B) only for purposes other than the provision of Internet access, Internet service, or internal connections.

(iii) Public notice; hearing

A library described in clause (i) shall provide reasonable public notice and hold at least one public hearing or meeting to address the proposed Internet safety policy.

(B) Certification with respect to minors

A certification under this subparagraph is a certification that the library--

(i) is enforcing a policy of Internet safety that includes the operation of a technology protection measure with respect to any of its computers with Internet access that protects against access through such computers to visual depictions that are--

(I) obscene;

(II) child pornography; or

(III) harmful to minors; and

(ii) is enforcing the operation of such technology protection measure during any use of such computers by minors.

(C) Certification with respect to adults

A certification under this paragraph is a certification that the library--

(i) is enforcing a policy of Internet safety that includes the operation of a technology protection measure with respect to any of its computers with Internet access that protects against access through such computers to visual depictions that are--

(I) obscene; or

(II) child pornography; and

(ii) is enforcing the operation of such technology protection measure during any use of such computers.

(D) Disabling during adult use

An administrator, supervisor, or other person authorized by the certifying authority under subparagraph (A)(i) may disable the technology protection measure concerned, during use by an adult, to enable access for bona fide research or other lawful purpose.

(E) Timing of implementation

(i) In general

Subject to clause (ii) in the case of any library covered by this paragraph as of the effective date of this paragraph under section 1721(h) of the Children's Internet Protection Act, the certification under subparagraphs (B) and (C) shall be made--

(I) with respect to the first program funding year under this subsection following such effective date, not later than 120 days after the beginning of such program funding year; and

(II) with respect to any subsequent program funding year, as part of the application process for such program funding year.

(ii) Process

(I) Libraries with Internet safety policy and technology protection measures in place

A library covered by clause (i) that has in place an Internet safety policy and technology protection measures meeting the requirements necessary for certification under subparagraphs (B) and (C) shall certify its compliance with subparagraphs (B) and (C)

during each annual program application cycle under this subsection, except that with respect to the first program funding year after the effective date of this paragraph under section 1721(h) of the Children's Internet Protection Act, the certifications shall be made not later than 120 days after the beginning of such first program funding year.

(II) Libraries without Internet safety policy and technology protection measures in place

A library covered by clause (i) that does not have in place an Internet safety policy and technology protection measures meeting the requirements necessary for certification under subparagraphs (B) and (C)--

(aa) for the first program year after the effective date of this subsection in which it is applying for funds under this subsection, shall certify that it is undertaking such actions, including any necessary procurement procedures, to put in place an Internet safety policy and technology protection measures meeting the requirements necessary for certification under subparagraphs (B) and (C); and

(bb) for the second program year after the effective date of this subsection in which it is applying for funds under this subsection, shall certify that it is in compliance with subparagraphs (B) and (C).

Any library that is unable to certify compliance with such requirements in such second program year shall be ineligible for services at discount rates or funding in lieu of services at such rates under this subsection for such second year and all subsequent program years under this subsection, until such time as such library comes into compliance with this paragraph.

(III) Waivers

Any library subject to subclause (II) that cannot come into compliance with subparagraphs (B) and (C) in such second year may seek a waiver of subclause (II)(bb) if State or local procurement rules or regulations or competitive bidding requirements prevent the making of the certification otherwise required by such subclause. A library, library board, or other authority with responsibility for administration of the library shall notify the Commission of the applicability of such subclause to the library. Such notice shall certify that the library in question will be brought into compliance before the start of the third program year after the effective date of this subsection in which the library is applying for funds under this subsection.

(F) Noncompliance

(i) Failure to submit certification

Any library that knowingly fails to comply with the application guidelines regarding the annual submission of certification required by this paragraph shall not be eligible for services at discount rates or funding in lieu of services at such rates under this subsection.

(ii) Failure to comply with certification

Any library that knowingly fails to ensure the use of its computers in accordance with a certification under subparagraphs (B) and (C) shall reimburse all funds and discounts received under this subsection for the period covered by such certification.

(iii) Remedy of noncompliance

(I) Failure to submit

A library that has failed to submit a certification under clause (i) may remedy the failure by submitting the certification to which the failure relates. Upon submittal of such certification, the library shall be eligible for services at discount rates under this subsection.

(II) Failure to comply

A library that has failed to comply with a certification as described in clause (ii) may remedy the failure by ensuring the use of its computers in accordance with such certification. Upon submittal to the Commission of a certification or other appropriate evidence of such remedy, the library shall be eligible for services at discount rates under this subsection.

(7) Definitions

For purposes of this subsection:

(A) Elementary and secondary schools

The term "elementary and secondary schools" means elementary schools and secondary schools, as defined in section 7801 of Title 20.

(B) Health care provider

The term "health care provider" means--

(i) post-secondary educational institutions offering health care instruction, teaching hospitals, and medical schools;

(ii) community health centers or health centers providing health care to migrants;

(iii) local health departments or agencies;

(iv) community mental health centers;

(v) not-for-profit hospitals;

(vi) rural health clinics;

(vii) skilled nursing facilities (as defined in section 395i-3(a) of Title 42); and

(viii) consortia of health care providers consisting of one or more entities described in clauses (i) through (vii).

(C) Public institutional telecommunications user

The term "public institutional telecommunications user" means an elementary or secondary s chool, a library, or a health care provider as those terms are defined in this paragraph.

(D) Minor

The term "minor" means any individual who has not attained the age of 17 years.

(E) Obscene

The term "obscene" has the meaning given such term in section 1460 of Title 18.

(F) Child pornography

The term "child pornography" has the meaning given such term in section 2256 of Title 18.

(G) Harmful to minors

The term "harmful to minors" means any picture, image, graphic image file, or other visual depiction that--

(i) taken as a whole and with respect to minors, appeals to a prurient interest in nudity, sex, or excretion;

(ii) depicts, describes, or represents, in a patently offensive way with respect to what is suitable for minors, an actual or simulated sexual act or sexual contact, actual or simulated normal or perverted sexual acts, or a lewd exhibition of the genitals; and

(iii) taken as a whole, lacks serious literary, artistic, political, or scientific value as to minors.

(H) Sexual act; sexual contact

The terms "sexual act" and "sexual contact" have the meanings given such terms in section 2246 of Title 18.

(I) Technology protection measure

The term "technology protection measure" means a specific technology that blocks or filters Internet access to the material covered by a certification under paragraph (5) or (6) to which such certification relates

## 47 U.S.C. § 405

**Petition for reconsideration; procedure; disposition; time of filing; additional evidence; time for disposition of petition for reconsideration of order concluding hearing or investigation; appeal of order**

(a) After an order, decision, report, or action has been made or taken in any proceeding by the Commission, or by any designated authority within the Commission pursuant to a delegation under section 155(c)(1) of this title, any party thereto, or any other person aggrieved or whose interests are adversely affected thereby, may petition for reconsideration only to the authority making or taking the order, decision, report, or action; and it shall be lawful for such authority, whether it be the Commission or other authority designated under section 155(c)(1) of this title, in its discretion, to grant such a reconsideration if sufficient reason therefor be made to appear. A petition for reconsideration must be filed within thirty days from the date upon which public notice is given of the order, decision, report, or action complained of. No such application shall excuse any person from complying with or obeying any order, decision, report, or action of the Commission, or operate in any manner to stay or postpone the enforcement thereof, without the special order of the Commission. The filing of a petition for reconsideration shall not be a condition precedent to judicial review of any such order, decision, report,

or action, except where the party seeking such review (1) was not a party to the proceedings resulting in such order, decision, report, or action, or (2) relies on questions of fact or law upon which the Commission, or designated authority within the Commission, has been afforded no opportunity to pass. The Commission, or designated authority within the Commission, shall enter an order, with a concise statement of the reasons therefor, denying a petition for reconsideration or granting such petition, in whole or in part, and ordering such further proceedings as may be appropriate: Provided, That in any case where such petition relates to an instrument of authorization granted without a hearing, the Commission, or designated authority within the Commission, shall take such action within ninety days of the filing of such petition. Reconsiderations shall be governed by such general rules as the Commission may establish, except that no evidence other than newly discovered evidence, evidence which has become available only since the original taking of evidence, or evidence which the Commission or designated authority within the Commission believes should have been taken in the original proceeding shall be taken on any reconsideration. The time within which a petition for review must be filed in a proceeding to which section 402(a) of this title applies, or within which an appeal must be taken under section 402(b) of this title in any case, shall be computed from the date upon which the Commission gives public notice of the order, decision, report, or action complained of.

(b)(1) Within 90 days after receiving a petition for reconsideration of an order concluding a hearing under section 204(a) of this title or concluding an investigation under section 208(b) of this title, the Commission shall issue an order granting or denying such petition.

(2) Any order issued under paragraph (1) shall be a final order and may be appealed under section 402(a) of this title

# 47 C.F.R. § 54.500
## Terms and definitions

*  *  *

Educational purposes. For purposes of this subpart, activities that are integral, immediate, and proximate to the education of students, or in the case of libraries, integral, immediate and proximate to the provision of library services to library patrons, qualify as "educational purposes." Activities that occur on library or school property are presumed to be integral, immediate, and proximate to the education of students or the provision of library services to library patrons.

Elementary school. An "elementary school" means an elementary school as defined in 20 U.S.C. 7801(18), a non-profit institutional day or residential school, including a public elementary charter school, that provides elementary education, as determined under state law.

*  *  *

Secondary school. A "secondary school" means a secondary school as defined in 20 U.S.C. 7801(38), a non-profit institutional day or residential school, including a public secondary charter school, that provides secondary education, as determined under state law except that the term does not include any education beyond grade 12.

# 47 C.F.R. § 54.501
## Eligible recipients

(a) Schools.

(1) Only schools meeting the statutory definition of "elementary school" or "secondary school" as defined in § 54.500 of this subpart, and not excluded under paragraphs (a)(2) or (3) of this section shall be eligible for discounts on telecommunications and other supported services under this subpart.

(2) Schools operating as for-profit businesses shall not be eligible for discounts under this subpart.

(3) Schools with endowments exceeding $50,000,000 shall not be eligible for discounts under this subpart.

(b) Libraries.

(1) Only libraries eligible for assistance from a State library administrative agency under the Library Services and Technology Act (20 U.S.C. 9122) and not excluded under paragraph (b)(2) or (3) of this section shall be eligible for discounts under this subpart.

(2) Except as provided in paragraph (b)(4) of this section, a library's eligibility for universal service funding shall depend on its funding as an independent entity. Only libraries whose budgets are completely separate from any schools (including, but not limited to, elementary and secondary schools, colleges, and universities) shall be eligible for discounts as libraries under this subpart.

(3) Libraries operating as for-profit businesses shall not be eligible for discounts under this subpart.

(4) A Tribal college or university library that serves as a public library by having dedicated library staff, regular hours, and a collection available for public use in its community shall be eligible for discounts under this subpart.

(c) Consortia.

(1) For consortia, discounts under this subpart shall apply only to the portion of eligible telecommunications and other supported services used by eligible schools and libraries.

(2) Service providers shall keep and retain records of rates charged to and discounts allowed for eligible schools and libraries—on their own or as part of a consortium. Such records shall be available for public inspection.

## 47 C.F.R. § 54.502
### Eligible services

(a) *Supported services.* All supported services are listed in the Eligible Services List as updated annually in accordance with paragraph (d) of this section. The services in this subpart will be supported in addition to all reasonable charges that are incurred by taking such services, such as state and federal taxes. Charges for termination liability, penalty surcharges, and other charges not included in the cost of taking such service shall not be covered by the universal service support mechanisms. The supported services fall within the following general categories:

(1) *Category one.* Telecommunications services, telecommunications, and Internet access, as defined in § 54.5 and described in the Eligible Services List are category one supported services.

(2) *Category two.* Internal connections, basic maintenance and managed internal broadband services as defined in § 54.500 and described in the Eligible Services List are category two supported services

* * *

(e) *Eligible services list process.* The Administrator shall submit by March 30 of each year a draft list of services eligible for support, based on the Commission's rules for the following funding year. The Wireline Competition Bureau will issue a Public Notice seeking comment on the Administrator's proposed eligible services list. The final list of services eligible for support will be released at least 60 days prior to the opening of the application filing window for the following funding year

## 47 C.F.R. § 54.505
### Discounts

(a) *Discount mechanism.* Discounts for eligible schools and libraries shall be set as a percentage discount from the pre-discount price.

(b) *Discount percentages.* Except as provided in paragraph (f), the discounts available to eligible schools and libraries shall range from 20 percent to 90 percent of the pre-discount price for all eligible services

provided by eligible providers, as defined in this subpart. The discounts available to a particular school, library, or consortium of only such entities shall be determined by indicators of poverty and high cost.

(1) For schools and school districts, the level of poverty shall be based on the percentage of the student enrollment that is eligible for a free or reduced price lunch under the national school lunch program or a federally-approved alternative mechanism. School districts shall divide the total number of students eligible for the National School Lunch Program within the school district by the total number of students within the school district to arrive at a percentage of students eligible. This percentage rate shall then be applied to the discount matrix to set a discount rate for the supported services purchased by all schools within the school district. Independent charter schools, private schools, and other eligible educational facilities should calculate a single discount percentage rate based on the total number of students under the control of the central administrative agency.

(2) For libraries and library consortia, the level of poverty shall be based on the percentage of the student enrollment that is eligible for a free or reduced price lunch under the national school lunch program or a federally-approved alternative mechanism in the public school district in which they are located and should use that school district's level of poverty to determine their discount rate when applying as a library system or as an individual library outlet within that system. When a library system has branches or outlets in more than one public school district, that library system and all library outlets within that system should use the address of the central outlet or main administrative office to determine which school district the library system is in, and should use that school district's level of poverty to determine its discount rate when applying as a library system or as one or more library outlets. If the library is not in a school district, then its level of poverty shall be based on an average of the percentage of students eligible for the national school lunch program in each of the school districts that children living in the library's location attend.

(3) The Administrator shall classify schools and libraries as "urban" or "rural" according to the following designations.

(i) The Administrator shall designate a school or library as "urban" if the school or library is located in an urbanized area or urban cluster area with a population equal to or greater than 25,000, as determined by the most recent rural-urban classification by the Bureau of the Census. The Administrator shall designate all other schools and libraries as "rural."

(ii) Any school district or library system that has a majority of schools or libraries in a rural area qualifies for the additional rural discount.

(4) School districts, library systems, or other billed entities shall calculate discounts on supported services described in § 54.502(a) that are shared by two or more of their schools, libraries, or consortia members by calculating an average discount based on the applicable district-wide discounts of all member schools and libraries. School districts, library systems, or other billed entities shall ensure that, for each year in which an eligible school or library is included for purposes of calculating the aggregate discount rate, that eligible school or library shall receive a proportionate share of the shared services for which support is sought. For schools, the discount shall be a simple average of the applicable district-wide percentage for all schools sharing a portion of the shared services. For libraries, the average discount shall be a simple average of the applicable discounts to which the libraries sharing a portion of the shared services are entitled.

(c) Matrices. Except as provided in paragraphs (d), (f), and (g) of this section, the Administrator shall use the following matrices to set discount rates to be applied to eligible category one and category two services purchased by eligible schools, school districts, libraries, or consortia based on the institution's level of poverty and location in an "urban" or "rural" area.

* * *

(d) Voice Services. Discounts for category one voice services shall be reduced by 20 percentage points off applicant discount percentage rates for each funding year starting in funding year 2015, and reduced by an

additional 20 percentage points off applicant discount percentage rates each subsequent funding year.

(e) Interstate and intrastate services. Federal universal service support for schools and libraries shall be provided for both interstate and intrastate services.

(1) Federal universal service support under this subpart for eligible schools and libraries in a state is contingent upon the establishment of intrastate discounts no less than the discounts applicable for interstate services.

(2) A state may, however, secure a temporary waiver of this latter requirement based on unusually compelling conditions.

(f) Additional discounts for State matching funds for special construction. Federal universal service discounts shall be based on the price of a service prior to the application of any state-provided support for schools or libraries. When a governmental entity described below provides funding for special construction charges for networks that meet the long-term connectivity targets for the schools and libraries universal service support program, the Administrator shall match the governmental entity's contribution as provided for below:

(1) All E–rate applicants. When a State government provides funding for special construction charges for a broadband connection to a school or library the Administrator shall match the State's contribution on a one-dollar-to-one-dollar basis up to an additional 10 percent discount, provided however that the total support from federal universal service and the State may not exceed 100 percent.

(2) Tribal schools. When a State government, Tribal government, or federal agency provides funding for special construction charges for a broadband connection to a school operated by the Bureau of Indian Education or by a Tribal government, the Administrator shall match the governmental entity's contribution on a one-dollar-to-one-dollar basis up to an additional 10 percent discount, provided however that the total support from federal universal service and the governmental entity may not exceed 100 percent.

(3) Tribal libraries. When a State government, Tribal government, or federal agency provides funding for special construction charges for a broadband connection to a library operated by Tribal governments, the Administrator shall match the governmental entity's contribution on a one-dollar-to-one-dollar basis up to an additional 10 percent discount, provided however that the total support from federal universal service and the governmental entity may not exceed 100 percent.

(g) Tribal Library Category Two Discount Level. For the costs of category two services, Tribal libraries at the highest discount level shall receive a 90 percent discount

## 47 C.F.R. § 54.706

### Contributions

(a) Entities that provide interstate telecommunications to the public, or to such classes of users as to be effectively available to the public, for a fee will be considered telecommunications carriers providing interstate telecommunications services and must contribute to the universal service support mechanisms. Certain other providers of interstate telecommunications, such as payphone providers that are aggregators, providers of interstate telecommunications for a fee on a non-common carrier basis, and interconnected VoIP providers, also must contribute to the universal service support mechanisms. Interstate telecommunications include, but are not limited to:

(1) Cellular telephone and paging services;

(2) Mobile radio services;

(3) Operator services;

(4) Personal communications services (PCS);

(5) Access to interexchange service;

(6) Special access service;

(7) WATS;

(8) Toll-free service;

(9) 900 service;

(10) Message telephone service (MTS);

(11) Private line service;

(12) Telex;

(13) [Reserved by 82 FR 48777]

(14) Video services;

(15) Satellite service;

(16) Resale of interstate services;

(17) Payphone services; and

(18) Interconnected VoIP services.

(19) Prepaid calling card providers.

(b) Except as provided in paragraph (c) of this section, every entity required to contribute to the federal universal service support mechanisms under paragraph (a) of this section shall contribute on the basis of its projected collected interstate and international end-user telecommunications revenues, net of projected contributions

## 47 C.F.R. § 54.709

## Computations of required contributions to universal service support mechanisms

(a) Prior to April 1, 2003, contributions to the universal service support mechanisms shall be based on contributors' end-user telecommunications revenues and on a contribution factor determined quarterly by the Commission. Contributions to the mechanisms beginning April 1, 2003 shall be based on contributors' projected collected end-user telecommunications revenues, and on a contribution factor determined quarterly by the Commission.

(1) For funding the federal universal service support mechanisms prior to April 1, 2003, the subject revenues will be contributors' interstate and

international revenues derived from domestic end users for telecommunications or telecommunications services, net of prior period actual contributions. Beginning April 1, 2003, the subject revenues will be contributors' projected collected interstate and international revenues derived from domestic end users for telecommunications or telecommunications services, net of projected contributions.

(2) Prior to April 1, 2003, the quarterly universal service contribution factor shall be determined by the Commission based on the ratio of total projected quarterly expenses of the universal service support mechanisms to the total end-user interstate and international telecommunications revenues, net of prior period actual contributions. Beginning April 1, 2003, the quarterly universal service contribution factor shall be determined by the Commission based on the ratio of total projected quarterly expenses of the universal service support mechanisms to the total projected collected end-user interstate and international telecommunications revenues, net of projected contributions. The Commission shall approve the Administrator's quarterly projected costs of the universal service support mechanisms, taking into account demand for support and administrative expenses. The total subject revenues shall be compiled by the Administrator based on information contained in the Telecommunications Reporting Worksheets described in § 54.711(a).

(3) Total projected expenses for the federal universal service support mechanisms for each quarter must be approved by the Commission before they are used to calculate the quarterly contribution factor and individual contributions. For each quarter, the Administrator must submit its projections of demand for the federal universal service support mechanisms for high-cost areas, low-income consumers, schools and libraries, and rural health care providers, respectively, and the basis for those projections, to the Commission and the Office of the Managing Director at least sixty (60) calendar days prior to the start of that quarter. For each quarter, the Administrator must submit its projections of administrative expenses for the high-cost mechanism, the low-income mechanism, the schools and libraries mechanism and the rural health

care mechanism and the basis for those projections to the Commission and the Office of the Managing Director at least sixty (60) calendar days prior to the start of that quarter. Based on data submitted to the Administrator on the Telecommunications Reporting Worksheets, the Administrator must submit the total contribution base to the Office of the Managing Director at least thirty (30) days before the start of each quarter. The projections of demand and administrative expenses and the contribution factor shall be announced by the Commission in a public notice and shall be made available on the Commission's website. The Commission reserves the right to set projections of demand and administrative expenses at amounts that the Commission determines will serve the public interest at any time within the fourteen-day period following release of the Commission's public notice. If the Commission take no action within fourteen (14) days of the date of release of the public notice announcing the projections of demand and administrative expenses, the projections of demand and administrative expenses, and the contribution factor shall be deemed approved by the Commission. Except as provided in § 54.706(c), the Administrator shall apply the quarterly contribution factor, once approved by the Commission, to contributor's interstate and international end-user telecommunications revenues to calculate the amount of individual contributions.

(b) If the contributions received by the Administrator in a quarter exceed the amount of universal service support program contributions and administrative costs for that quarter, the excess payments will be carried forward to the following quarter. The contribution factors for the following quarter will take into consideration the projected costs of the support mechanisms for that quarter and the excess contributions carried over from the previous quarter. The Commission may instruct the Administrator to treat excess contributions in a manner other than as prescribed in this paragraph (b). Such instructions may be made in the form of a Commission Order or a public notice released by the Wireline Competition Bureau. Any such public notice will become effective fourteen days after release of the public notice, absent further Commission action.

(c) If the contributions received by the Administrator in a quarter are inadequate to meet the amount of universal service support program payments and administrative costs for that quarter, the Administrator shall request authority from the Commission to borrow funds commercially, with such debt secured by future contributions. Subsequent contribution factors will take into consideration the projected costs of the support mechanisms and the additional costs associated with borrowing funds.

(d) If a contributor fails to file a Telecommunications Reporting Worksheet by the date on which it is due, the Administrator shall bill that contributor based on whatever relevant data the Administrator has available, including, but not limited to, the number of lines presubscribed to the contributor and data from previous years, taking into consideration any estimated changes in such data

47 C.F.R. § 54.712

**Contributor recovery of universal service costs from end users**

(a) Federal universal service contribution costs may be recovered through interstate telecommunications-related charges to end users. If a contributor chooses to recover its federal universal service contribution costs through a line item on a customer's bill the amount of the federal universal service line-item charge may not exceed the interstate telecommunications portion of that customer's bill times the relevant contribution factor.